# DILLON DECLARATION

# EXHIBIT F

September 28, 2015

**VIA EMAIL: april.collins@vpss.gatech.edu**

Mr. John Stein
Vice President – Student Life
Acting Dean of Students
Georgia Institute of Technology
Suite 210
Charles A. Smithgall Jr. Student Services Building
353 Ferst Drive
Atlanta, GA 30332-0285

Dear Dean Stein:

I am writing on behalf of the Georgia Delta Chapter of Phi Delta Theta in connection with the decision and sanctions issued on September 22, 2015. Please consider this letter an appeal of that decision and sanctions as provided in the Student Code of Conduct Section G. The basis for the appeal is pursuant to Subsections 1(a), 1(b), 1(c) and 1(d).[1]

As you know, the only provision of the Conduct Code for which the Fraternity was found "Responsible" was Section C(23)(b) regarding the alleged incident on August 11, 2015. In contrast, the Fraternity was found "Not Responsible" for the alleged violations on July 2nd and Not Responsible under Section 15 and Section 23(a) of the Conduct Code.[2]

## Summary

We believe that both the process and ultimate decision are extremely wrong and, to be honest, are outrageous and violate our rights as students and as an organization. It is important for you to understand that we are not objecting solely on procedure. <u>The fact is that this charge is completely false. The racial slurs were not made. They are a hoax. They did not</u>

---

[1] As I am sure is apparent, I have had input in preparing this appeal from fellow students, alumni, parents and our National Fraternity. All fully believe in our innocence and are fully supportive of our effort to overturn what they too agree is an unjust and unlawful decision resulting from a violation of our rights.

[2] While obviously I am not a lawyer, we are told that Section 23(b) of the Code is unconstitutional. The section prohibits "conduct that is based on race... [that] otherwise unreasonably interferes with another's ability or opportunity to participate in work, education, research, living or other activities." We are advised that this provision is unlawful on its face because it wrongly seeks to prevent conduct that, for example, "unreasonably interferes with living or other activities." We are told the law is extremely clear that speech codes like this are unconstitutional. We request that the Institute consult Sam Olens, the Georgia Attorney General, for an official opinion. *See also* www.thefire.org/spotlight/reports

Mr. John Stein
September 28, 2015
Page 2

<u>happen</u>. We strongly believe that these charges were contrived to advance a social agenda unrelated to the conduct of the members of our Fraternity.

The complaining student in this matter may be sincere in her belief that there is a rampant problem with racism across the campus, and perhaps she may even be correct. But that does not excuse Georgia Tech sacrificing our Fraternity and students who are completely innocent for political expediency.

As addressed in the hearing and as I will cover in more detail below, the problem with what occurred here is twofold. First, the objective evidence proves that the alleged slurs were never made. We have presented video evidence, pictures and other evidence that prove conclusively that the alleged slurs could not have been made as she claimed. There are many reasons for this conclusion, but foremost, **she says that the slurs came from windows in rooms that were locked, empty and could not have been used as she claims.** One of the two rooms had a window-unit air conditioner in it and the window could not be opened. The other room had a built-in bunk bed that blocked the window in a manner so that it was impossible for three students to hang out the window as she said.

The video evidence also contradicts her direct testimony at the Hearing and in her statement that "**[my car] was parked right outside, it was right in front of the Phi Delta Theta Fraternity House.**" The surveillance video proves conclusively she did not tell the truth since it shows that she was <u>never</u> in front of the House as she said, but she was <u>far away</u> on the other side of the Chi Phi house. She did not tell the truth about this important point. The objective evidence of videos, pictures, etc. not only does not support any part of her story, but it actually contradicts each and every part of her story. And, her story is credibly denied by honest students whose testimony is corroborated by all of the objective evidence.

Second, we believe that the conduct of OSI in pursuing these allegations violated our rights under the Student Code. Mr. Paquette denied us the opportunity of a fair Administrative Resolution since he made clear that he predetermined our guilt from the very beginning. He admitted this in my initial meeting with him, which did not even occur until over two weeks after he started his investigation. He made clear, with no investigation or consideration of our evidence, that he was going to believe the complainant. Although he (and other Institute officials) **met repeatedly with the complainant, he steadfastly refused to interview any of our witnesses, or review our evidence, or conduct an investigation that might support our position.** He even issued the Notice of Charge and summary of his "investigation" before speaking with us. At no point during his handling of this matter did Mr. Paquette provide us the same opportunities or treat us in any comparable fashion to the complainant.

Why did Mr. Paquette give such preferential treatment to the complainant and deny us our right to a fair and impartial investigation?

Mr. John Stein
September 28, 2015
Page 3

Given this obvious and unfair bias, we had no option but to proceed with the Student Conduct Hearing.[3] Even that proceeding violated our rights because OSI did not follow proper procedure and the Student Panel was unfairly pressured to find us guilty at least in some regard. To improperly influence the Student Panel, OSI allowed the Panel to hear evidence about the second alleged incident that supposedly happened on July 2nd. They did so despite the fact that Mr. Paquette in his initial Notice described the July 2nd incident as "unrelated." We believe that the Panel was allowed to hear evidence about the bogus July 2 incident so that they would be given the opportunity to issue a compromise verdict, which is exactly what they did. They found the Fraternity not responsible for the July 2nd incident, but responsible for the August 11th incident.

The pressure placed on the Student Panel was wrong. The Student Panel heard testimony repeatedly "<u>that the same thing has happened to [black students] with different fraternities on campus</u>" and "<u>I'm kind of used to things like this happening on our campus</u>." She then said, "<u>definitely this isn't the first time I've been discriminated by some of the fraternities on campus</u>." The complaining student also argued:

> "I also want to point out that the <u>black community is paying attention to this case</u> really closely and I think it's going to <u>send a message</u> to how our campus handles situations like this. So I just want to stress that as well."

Despite this completely inappropriate argument, at no time did the OSI advisor stop this kind of testimony or make clear that it should not be considered. Instead of taking appropriate action to make sure that we were not tainted by the alleged actions of others, the OSI investigator then participated in the deliberations which we believe is another violation of the Conduct Code procedure.

Given these circumstances, it is no wonder that the Panel issued a contradictory and compromise verdict where we were found "Responsible" on a single charge. Given the pressure placed on the Student Panel, and the clear threat that they would be publicly criticized, it is understandable that they caved into this pressure and issued a verdict that is contradictory on its face and not based on facts. The verdict and its proposed sanctions requiring us to submit to "diversity and social justice training" is obviously an attempt to satisfy the complaining students, and avoid criticism for not being sensitive to a racial issue, while sending the Fraternity a message that we really are innocent.[4]

---

[3] A recording of the hearing is available and will verify our representations of testimony. We are having a written transcript prepared and will submit it as soon as it is available.

[4] Importantly, the decision is devoid of any explanation for its conclusion. The original decision from the Panel said only we were "Responsible" for a violation of Rule 23 (b). It did not even specify which incident was the basis for the decision. We were then told the formal decision would set out the details and reasoning for the decision and the Panel's recommended sanction. Instead, when we received the formal decision five days later, it came from Mr. Shetty, with no reasoning or explanation. It is not even clear if the decision that we are "Responsible" for the alleged incident on the 11th and the recommended sanction is that of OSI or the Student Panel. (Compare Ex. C and D)

Mr. John Stein
September 28, 2015
Page 4

In addition to the overt threats at the hearing, a letter to the editor of the *Technique* was published under the signature of two senior Institute officials which specifically stated that the Fraternity had engaged in the conduct of which it was accused. The title of the letter was **"Racism Not Tolerated on Campus" and the very first sentence of the letter states "we are dismayed to learn of the racial slurs an African-American student recently endured while walking on campus."** The letter then went on to make the incredible and inflammatory statement equating the alleged conduct with "<u>shootings and church burnings</u>." (See Ex. A) Also, the Dean of Engineering publically posted on a Georgia Tech Alumni web site that the conduct was "...a reflection of the unacceptable behavior at the particular Fraternity..." and that "I <u>too</u> was called the N word." (See Ex. B) The combination of all these circumstances makes clear that the Fraternity was wrongly pre-judged, and also that the Student Panel was unduly pressured and could not reach a fair and impartial decision.[5]

Dean Stein, we have done everything asked of us throughout this process. In the face of being prejudged, slandered by the complaining student in multiple media reports, we did as Georgia Tech asked. We withheld comment, we stayed off social media, we cancelled events to avoid attention – we did absolutely everything we were encouraged to do. We did that on the promise of a fair and impartial investigation. We waited and waited and that investigation never came. To this day, not a single Georgia Tech official has come to us to hear our side of the story.

**This is Georgia Tech. We are an institution of fairness, logic and reason. Why have we been subjected to railroad justice?**

For these reasons discussed above, and those that I will cover in more detail below, this appeal should be sustained and the remaining charge against the Fraternity dismissed.

### I.    The Hearing And The Investigatory Process Were Not Conducted Fairly And Violated The Student Conduct And The Student Organization Codes

Our first objection to the decision and sanctions is under Section G(1)(a). The Institute's and OSI's conduct of the investigation of this matter and the hearing were biased and not conducted as required by the Code. The errors committed include the following:

---

[5] The unfair acts of senior Institute officials in prejudging our guilt and denying us an impartial adjudication also is shown by the conduct of the Vice President for Diversity. According to a Facebook post quoting a letter he wrote, he met with the complainant before we even received notice of the investigation. Without so much as even hearing our side of the charge, in his words, he "...assured[d] her of our support throughout this experience" and also "discussed student activism to address this incident." (see Ex. J- copy of Facebook posting). Once more, a senior Tech official abandoned any pretense of impartiality and, unbelievably, apparently played a role in instigating the "silent protest" by black students staged for the benefit of media in front of our House. This explains his presence amidst the protesters. Along with procedural deprivations, this conduct, together with Mr. Paquette's acts, raises the additional issue as to whether our rights under Title VI and Title IX have been violated. See Doe v Washington & Lee, Case No: 6:14-cv-00052 (W.D. VA. 2015). If you are interested, we would be glad to submit additional evidence of Mr. Paquette's motives explaining why he has treated us as he has.

Mr. John Stein
September 28, 2015
Page 5

### 1. Mr. Paquette refused to consider the Fraternity's evidence and conducted a one-sided, biased investigation

Both the Student Code and the Student Organization Code of Conduct provide that the Institute shall "...utilize an investigatory model, not an adversarial model, in resolving allegations of misconduct with a primary goal uncovering the truth." *See* Student Code Section D(4) and Organization Code Section 4.

Instead of following the Code's requirement for a fair and unbiased investigation, Mr. Paquette took on the role of a zealous prosecutor with an agenda, and he did not provide the Fraternity the same rights as provided to the complainant. He judged us guilty from the very beginning and did not give us a fair process.

For example, while Mr. Paquette met with the complainants on several occasions and interviewed the witnesses they suggested, he never did so for us. We repeatedly tried to submit information to him. We offered him the opportunity to come to the House, see the room where the comments supposedly were made, interview anyone he wanted to speak with and conduct any other kind of actions he thought were necessary. However, he refused to do so.

By the time of our first meeting with him, which did not occur until over two weeks after the investigation began, he already had decided we were guilty. He first provided notice on August 20, 2015, to me that he had received a report regarding the alleged August 11 incident. However, at no time prior to issuing a formal Notice of Charge on Monday, August 31 and then meeting with me on the following Thursday, September 3, did he consider any underlying evidence from the Fraternity. Despite repeated offers, Mr. Paquette conducted <u>no interviews, refused to consider all of the statements, video evidence, pictures, etc. that we sent to him. He even expressly stated in multiple emails that he did not want to consider any information from the Chapter.</u> (*See* Ex. E – Email of August 28 "I won't need any additional information," and Ex. F – Email of August 31 "There is not a need for you to continue to provide me e-mails informing me about details of information you have collected...."). While Mr. Paquette told us that he would conduct an investigation, that investigation <u>never</u> involved hearing or considering any of our evidence.

In our eventual meeting on September 3, after which he had already issued the Notice of Charge, he made clear that he had decided the Fraternity's guilt. He stated that **"he was going to believe what the accuser said unless there was reason not to believe her."** He also stated that the mere fact the allegation was made against us **"means something must have happened."** He then said he believed **"what the accuser alleges must have happened,"** and he also stated **"it was up to the Fraternity to explain or show why she would make the story up."** To justify his conclusions, he cited some statistics that he had heard that only 2-8% of all crime reports were "made up." His tone, tenor and express comments made clear that he had decided our fate, and therefore he denied us the "right to be considered not responsible until proven responsible by a preponderance of the evidence," (Student Code Section D(3)(h) and Organization Code 3(h)), as well as denying us our right under the Code to a fair and impartial Administrative Resolution (Student Code Section D(4)(b) and Organization Code 4(b)). Following that meeting, we

Mr. John Stein
September 28, 2015
Page 6

formally objected to Mr. Paquette's continued involvement and requested he recuse himself, that our objections were confirmed in an email from our advisor to him dated Tuesday, September 8th, but he overruled our objection so we had no option but to pursue resolution by the Student Conduct Panel (See Ex. G).

## II. The Student Conduct Hearing Violated The Student Code And The Panel Was Unfairly Pressured To Find Us Responsible

We believe the entire process and conduct of the hearing was flawed and biased which denied us and our members the right to an impartial decision.

First, the Chapter was provided notice of the hearing on Friday, September 11 at the end of the day at 5:01pm (See Ex. H). Yet, the hearing was set for the following Tuesday evening, which is a violation of Section D(5)(b)(3) and Organization Code 4(a), which state that the official notice will be given at least five business days prior to the hearing. We also were told that we had to submit all witnesses and exhibits forty-eight hours in advance, which was impossible since the OSI office had already closed when we were sent the notice.[6]

Second, the notice provided to the Chapter was deficient. It did not identify the witness(es) who would be testifying against the Chapter, as required under Section D(5)(b)(2) and Organization Code 5(b)(2).

Third, as I already mentioned, we were unfairly prejudiced by having these two "unrelated" charges heard in one hearing. (See Ex. I – Email of Mr. Paquette, August 29 "I have been informed of a separate unrelated occasion...."). Also, Section D(1) of the Code requires a complaint be filed within 30 days of the incident, and Mr. Paquette also ignored this rule to include the July 2nd incident together with the August 11 allegation. By including both charges, this made it easy for the Student Panel to accomplish what clearly Mr. Paquette intended all along. The Panel would have the opportunity to find us both innocent and guilty. By including the two incidents together, this effectively allowed three witnesses to prejudice the Panel by testifying about unrelated allegations that had nothing to do with our Fraternity.

Fourth, it is clear that the **Panel considered inappropriate evidence and clearly felt pressured to sustain at least some portion of the complainants' charges**. The threat was made loud and clear to the Panel that the "black community is watching." The complainants' testimony also was filled with allegations that similar conduct routinely happens around campus. The clear implication of these arguments, in the complaining student's exact words, was that the Panel needed to "send a message" to fraternities and others about this type of alleged conduct. Essentially, the Panel was encouraged to use the Phi Delta Theta Chapter as a scapegoat to

---

[6] This effort to rush the hearing was not just a technical violation of the Code. It precluded the Fraternity from being able to determine the availability of witnesses or get written statements. Further, the Notice of Hearing also was defective because it stated that the hearing would be conducted pursuant to the Student Code of Conduct. However, the proper procedure to follow is outlined in the Student Organization Code of Conduct. While the Student Code and the Organization Code are similar, they are different in places. The failure to conduct the hearing pursuant to the proper code is yet another procedural deprivation.

Mr. John Stein
September 28, 2015
Page 7

<u>punish the alleged misconduct of others</u>. Compounding the pressure they sought to apply to Panel members, they effectively threatened them with public criticism if they did not render a decision, at least in part, in favor of the complainants. Even though this kind of argument was made, **there was no effort by Mr. Shetty, the advisor from OSI who was present, to stop this inappropriate argument and implied threats.** His failure to do so only emphasized that he was endorsing the student's argument.

Fifth, the unfair prejudice to our Fraternity and our members also is shown by the fact that Mr. Shetty participated in the Panel's deliberations. His presence clearly carried the message that OSI was watching the proceedings would know everyone's views. Given Mr. Paquette's clear indication that he believed the Fraternity was responsible, the presence of one of his employees in the deliberations violated our right to a fair and impartial deliberation. In reviewing the Student Code and the Organization Code, it does not provide that anyone other than Panel members should attend deliberations. See Student Code Section D(6) and Organization Code 5(b)(3).

Sixth, the overt threats at the hearing were compounded by the Student Panel being provided the Notice of Charges and accompanying narrative as prepared by Mr. Paquette. This narrative was entirely one-sided and completely biased. **His report includes alleged statements from three witnesses who did not testify at the Hearing. The failure to provide the Fraternity an opportunity to question these three witnesses who essentially testified to the Panel through Mr. Paquette's report is a clear violation of Section D(3)(f) and Organization Code 3(f) (right "to call and question relevant witnesses").**

<u>His report also read like a prosecutor's closing statement and omitted any information submitted by the Fraternity</u>. Additionally, his report was incomplete because he made no effort to locate the student in the video who was close by when the alleged slurs were supposedly yelled (and who the video shows did not react in any manner suggesting that he heard anything). Mr. Paquette also did not attempt to check with the Chi Phis or Sigma Nus who should have heard the statements, if they were made. Mr. Paquette also made no effort to locate and interview the Georgia Tech Police Department officer in the video who should have overheard any yelling. Mr. Paquette's action in providing such a one-sided report for the Panel to consider was wrong and violated our rights.

Seventh, the Hearing shows that Mr. Paquette improperly coached and prepped witnesses, which is another example of how he treated us differently than he treated the complainants. The two witnesses who testified about the July 2nd incident expressly admitted that Mr. Paquette had met with them that day to encourage them to testify against the Fraternity and to help them prepare their testimony. The complaining student who testified about the allegation concerning the 11th also admitted Mr. Paquette had met with her to prepare her testimony. These admissions not only show that we were treated differently, but were another

Mr. John Stein
September 28, 2015
Page 8

signal to the Panel that Mr. Paquette believed we were guilty, and that they therefore should find us "Responsible" in some way.[7]

Eighth, the three witnesses who testified in support of the two charges were allowed to do so by telephone or Skype when they should have been required to appear in person. The Student Code at Section D(7) and Organization Code at Section 4 make clear that such an accommodation of this type should only be allowed where it is determined it is necessary to "reasonably accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the complainants." There was no evidence or allegation whatsoever that the complainants met this requirement. **By allowing them to testify in this manner, it was yet another signal to the Panel from OSI that these women supposedly legitimately feared for their safety and that OSI believed there was merit to their charges.**

### III. There Was Not Sufficient Evidence To Support The Decision

The Fraternity also appeals the decision and sanctions under Section G(1)(b) because there is not sufficient evidence to support the decision.

#### 1. There is no credible evidence supporting the August 11 incident

As already mentioned, the overwhelming evidence proves conclusively that the August 11 allegation was a hoax. In support of our position, we rely on our exhibit notebook containing all of the relevant evidence. Included in that notebook is a summary of our evidence which is incorporated below.

### Alleged August 11th Incident

1. All members of the Fraternity credibly deny that any racial slurs were made, including after multiple interviews. None of the members have any inconsistencies in their accounts. **These are honest and truthful students who do not deserve to be sacrificed on the altar of political correctness to satisfy someone else's agenda.**

### No one was in the rooms where the student says the comments came from at time of the alleged Incident

---

[7] While we were found Not Responsible for the July 2nd incident, the hearing had many errors concerning that specific charge which prejudiced us concerning the August 11 incident. Not only were the two witnesses about the July 2nd incident allowed to testify by telephone for no justifiable reason, those two witnesses also were allowed to be together in the same room during their testimony and were coaching each other, while our witnesses were properly excluded while others testified. And, as I already had mentioned, having the two incidents which Mr. Paquette admitted were "unrelated" was a transparent attempt to "pile on" and prejudice the Panel against us. In this regard, social media shows that all three of the complainants knew each other- a fact that gives explains a motive to coordinate their allegations. They hid this relationship from the Panel, and Mr. Paquette should have disclosed it since it goes to their credibility.

Mr. John Stein
September 28, 2015
Page 10

10. In Room #3, there was also an air conditioning unit that is inserted into the bottom of the window. It would not have been possible to remove the air conditioning unit, and open a window yell out, and then replace the air conditioning unit so quickly.
    a. Exhibit 6, Picture of inside of Window #2
    b. Exhibit 13, Declaration of ▓▓▓▓▓ (Room #2)
    c. Exhibit 3, Retweeted picture of the House at 7:42pm showing Room #2 window is closed and Room #3 has A/C unit in window
    d. Exhibit 2, Additional Tweet at 9:32pm, which also shows A/C unit

**In addition to the fact that there were not any occupants in Rooms #2 or #3 at the time of the alleged incident, others in the House did not hear the alleged racial slurs**

11. At the time of the alleged incident, there were two members working in the hallway of the second floor, ▓▓▓▓▓ and ▓▓▓▓▓. These two members confirm that no one entered or exited Rooms #2 or #3 around the time of the alleged incident.
    a. Exhibit 13, Declarations of ▓▓▓▓▓ and ▓▓▓▓▓ (Members Working in Hallway)

12. These two members also confirm that they did not hear anyone yelling racial slurs, and they did not yell any racial slurs at anyone.
    a. Exhibit 13, Declarations of ▓▓▓▓▓ and ▓▓▓▓▓ (Members Working in Hallway)

13. Three other members were in their rooms that are located on the front of the House, in Rooms #5 and #6 as identified on the picture provided in the Notice of Charge.
    a. Exhibit 4, Picture of Rooms Provided in Notice of Charges

14. ▓▓▓▓▓ was in his room at the time of the alleged incident, which is Room #5 as identified on Picture from Notice of Charge. He had his window propped open approximately a foot as he had not yet been able to hook up the air conditioner.
    a. Exhibit 13, Declaration of ▓▓▓▓▓ (Room #5)
    b. Exhibit 3, Retweeted Picture of House and Exhibit 2 with picture of House

15. Mr. ▓▓▓ did not hear anyone make any racial slurs, and with his window open, he would have heard if anyone was yelling from the House to the street. Mr. ▓▓▓ himself did not make any racial slurs.
    a. Exhibit 13, Declaration of ▓▓▓▓▓ (Room #5)

Mr. John Stein
September 28, 2015
Page 9

2. Informant #1 identifies that the alleged racial slurs came from three men hanging out of Rooms #2 or #3 in the picture provided in the Notice of Charge.
    a. Exhibit 4, Picture of Rooms Provided in Notice of Charge

3. **Rooms 2 and 3 were locked and unoccupied at time of alleged incident.** No one other than the occupants who locked the doors would have access to the locked rooms.
    a. Exhibit 13, Declaration of ████████ (Room #2)
    b. Exhibit 13, Declaration of ████████ (Room #3)
    c. Exhibit 13, Declaration of ████████ (Room #3)

4. ████████r, occupant of Room #2, was off-campus at the time of the incident. He was with three other students, ████████, ████████, and ████████.
    a. Exhibit 13, Declaration of ████████ (Room #2)

5. Mr. ████████ has a screenshot of his phone's time stamped GPS which shows that he did not get back to campus until 6:52, which is after the time when Informant #1 sent the tweet saying that she had been targeted by racial slurs.
    a. Exhibit 7, Time Stamped Copy of Phone GPS and Restaurant Receipts

6. ████████, an occupant of Room #3, was off-campus at the time of the incident. He was with ████████, ████████, and ████████.
    a. Exhibit 13, Declaration of ████████ (Room #3)

7. As ████████ was with ████████, who has a screenshot of his phone's time stamped GPS which shows that he did not get back to campus until 6:52, **this shows that both ████████ and ████████ were not on campus until after the time when** Informant #1 sent the tweet saying that she had been targeted by racial slurs.
    a. Exhibit 7, Time Stamped Copy of Phone GPS and Restaurant Receipts

8. ████████, an occupant of Room #3, left the House at 5:30 to go to the movies and locked his door before leaving. Thus, ████████ **also was not in his room at the time of the alleged incident. The room was empty and locked.**
    a. Exhibit 11, Text messages

<u>Notwithstanding this evidence, it was impossible for 3 people to 'hang out' of either Window #2 or #3</u>

9. In Room #2, there is a lofted bed that blocks most of the window. It would have been **impossible to fit three men in window.**
    a. Exhibit 6, Picture of inside of Window #2

Mr. John Stein
September 28, 2015
Page 11

16. ▇▇▇ and ▇▇▇▇▇▇k were both in their room at the time of the alleged incident, which was Room #6 as identified on the picture of the Notice of Charge. Mr. ▇▇ and Mr. ▇▇▇▇ were painting their room so they had the window propped open by a roll of paper towels approximately one foot to vent the fumes.
    a. Exhibit 13, Declaration of ▇▇▇▇▇ (Room #6)
    b. Exhibit 13, Declaration of ▇▇▇▇▇▇▇ (Room #6)
    c. Exhibit 3, Retweeted Picture of House

17. Mr. ▇▇ and Mr. ▇▇▇▇ did not hear anyone make any racial slurs, and with their window open, they would have heard if anyone was yelling from the House to the street. Mr. ▇▇ and Mr. ▇▇▇▇k did not make any racial slurs.
    a. Exhibit 13, Declaration of ▇▇▇▇▇ (Room #6)
    b. Exhibit 13, Declaration of ▇▇▇▇▇▇▇ (Room #6)

**Informant #1 has made contradictory statements throughout this process about where she was when the alleged comments were made**

18. Informant #1 has contradicted herself by saying that she heard the alleged racial slur <u>before she was in her car</u> and then saying they were made <u>while she was in her car</u>.

19. Informant #1 original tweet "when white frat boys yell▇▇ you▇▇ from their house windows to you as you're <u>walking to your car</u> ☺ ☺ ☺" – at 6:45 p.m.
    a. Exhibit 1, Original Tweet (emphasis added)

20. In her statement to Mr. Paquette, she stated that "as she <u>was walking to her parked car</u> on Fowler in front of Phi Delta Theta, these men gestured toward her by yelling…"

21. In her testimony at the hearing, she told a different story, stating, "…once <u>I got into my car</u>… I turned my music down to hear what they were screaming…"

22. To WSB, Informant #1 stated that "<u>As I got into my car</u>, I noticed that they were sticking their heads out of the window and flicking me off." "<u>I opened my window to hear what they were saying</u>, and they were screaming f*** you n***** and f*** you a****** repeatedly. So when that happened, I drove off,"
    a. Exhibit 8, WSB news story (emphasis added)

23. In Informant #1's Original Tweet, she included three smiley faces in tweet, which strongly suggest she was not serious and when others ran with it, she was forced to stay with her story.

Mr. John Stein
September 28, 2015
Page 12

    a. Exhibit 1, Original Tweet

24. As discussed above, the second tweet, at 7:41 p.m. on the same day, shows that windows #2 and #3 either have an AC window unit or are not visible. Instead, the only windows visible are from the other side of the house. Although Informant #1 says in her Second Tweet that the open windows in the picture are the rooms she was referring to, these are on opposite side of house from windows she eventually identified as where the comments came from.
    a. Exhibit 3, Second Tweet at 9:30pm with picture taken at 7:42pm. See also Exhibit 2 which is her Third Tweet sent at 9:31pm.

25. The complaining student's testimony at the hearing also was nonsensical, "there were three males standing outside of the Fraternity House – or standing in the Fraternity House like looking outside the window."

## Surveillance footage demonstrates Informant #1's account is not plausible

26. Surveillance video shows she walked to car and nothing happened. She did not modify her pace at all (fast or slow) walking toward or getting into the car. She walks slowly to her car, puts her backpack in the back seat, gets in the front seat and drives off at a slow rate of speed. It's not plausible that she wouldn't break form if she were screamed at.
    a. Exhibit 10, Enhanced Surveillance Video

27. The handbill from picket states that "On August 11th, 2015 at 6:45 pm a black female student was verbally assaulted using racial slurs by three young males hanging out of the window at the Phi Delta Theta fraternity house. This young woman was alone at the time and **quickly made her way to the car, and drove off**."
    a. Exhibit 5, Handbill (emphasis added)

28. The video shows that Informant #1 drove off slowly and not "quickly" like she claimed.
    a. Exhibit 10, Security Video No. 7 - Enhanced Video

29. Others in video didn't react like anything happened, which they would have if they had heard yelling.
    a. Exhibit 10, Enhanced Surveillance Video

30. Surveillance video also shows police car sitting approximately same distance from car as to PDT house, and clearly officer heard nothing.
    a. Exhibit 10, Security Video No. 6 - Stadium Video (zoomed out)

Mr. John Stein
September 28, 2015
Page 13

31. Informant #1 also made a U-turn at stop sign and drove back by the House after driving off. This is not consistent with someone who was "scared for her safety"
    a. Exhibit 10, Security Video No. 5 – Stop sign at corner of Beta and Peters

32. In fact, Informant #1 drove right by police officer sitting at corner of football stadium and Fowler and did not stop to report the alleged racial slurs. Not consistent with someone who is in fear for her safety.
    a. Exhibit 10, Security Video No. 4, Footage near corner of Fowler and Stadium

33. It is nearly impossible that someone in Rooms #2 and #3 could have seen her to hang out the window and "flip her off." She was coming from opposite side of house and never even crossed in front of the house. Her parking spot is at the edge of both room's peripheral view, let alone the path she took to get to her car which was from the south.
    a. Exhibit 9, Video of parking spot

34. Informant #1's parking spot was so far away (Parked on the south side of Chi Phi) they would have had to scream so loudly that others would have heard her (including those in video and police car).
    a. Exhibit 9, Video of parking spot

35. At the hearing, she specifically claimed that the racial slurs occurred while she was in **front of the Fraternity House**. We specifically asked if her car was parked in front of our House, and she said it was in front of our House. Yet, the video shows that her parking space was far away from the House, and <u>she was never in front of the House</u> when the comments were supposedly made.

Thus, the student's testimony at the Hearing makes clear she was not telling the truth and that her charge is false. This is not an opinion, but an undisputed fact since her own testimony and the video evidence completely contradicts her claim.

    2.    There was no evidence presented showing the Fraternity should be held responsible

Additionally, it is important to note that the panel heard no evidence and did not consider the appropriate standard by which the Fraternity would be responsible for the conduct, even if it occurred. Specifically, Section A(6) of the Code clearly states that a student organizations and its officers may be held collectively and individually responsible only when "violations of this Code by those associated with the Organization <u>have received the consent or encouragement</u> of the Organization…"

Mr. John Stein
September 28, 2015
Page 14

In the Hearing, there was **no evidence whatsoever** that the Fraternity either "encouraged or consented" to the alleged conduct. As you are aware, the Fraternity has cooperated fully with the investigation, and made clear it would not tolerate any such conduct, if it had occurred. The issue of whether the Fraternity "consented to or encouraged" this alleged conduct was not even considered, and the Panel was not instructed on this standard. There was no evidence of any kind to justify conclusion that the Fraternity should be held responsible.[8]

Also, even under the unconstitutional provision at issue, a predicate finding must be made that the alleged conduct either incited "reasonable fear of physical harm" or "otherwise unreasonably interfered with their ability to participate in work, education, research, living or other activities." Once again, there was **no evidence whatsoever** that the comments, even if made, rose to this level of effect on the complainants. With respect to the events on the 11th, the original Tweet by the complainant contained three smiley faces. In addition, the complainant testified that after hearing the alleged statements, she turned around and drove back by the Chapter House.[9] This hardly suggests any objectively reasonable fear of physical harm. There is nothing to in any way suggest that the comments, even if made, meet the requisite standard.

A close examination of the Notice of Charges also shows that the charge never alleged that any of the women contended that they felt "in fear of physical harm" or that the alleged comments "unreasonably interfered" with them in any way. The Notice states only that unnamed (and to this day unknown and frankly non-existent) Phi Delta Theta members <u>or visitors</u> engaged in two separate incidents where racially-motivated derogatory terms were <u>used</u> to black students. Thus, it is clear the charge was <u>only</u> about whether the comments <u>were made</u>, and there were no allegations that the alleged comments rose to the required level of harm as set forth in the Code.

### IV.    The Sanctions Imposed Are Not Appropriate For The Violation

Given that the Fraternity is innocent, this appeal should be sustained under G(1)(c) of the Code because the evidence does not support the decision. And, consequently, any sanctions are wrong.

Alternately, we believe the proposed sanction that the Fraternity be placed on probation for one year is unfair. The proposed sanction, even if we complete the diversity and social justice training, precludes us from <u>any</u> intramural, social or other activities (except for community service) through next summer – effectively three semesters of punishment. Further, the sanction makes clear that any violation of the Student Conduct of Code by any member, no

---

[8] We cannot help but note that we are being held responsible as an organization, but OSI has made no effort to determine who supposedly made the comments. Is this because they know there is no evidence that anyone actually did so? OSI always attempts to determine who is responsible for any incident. They always call students in for interviews to find out what happened. Here, they refused to do so. Also, the suggestion in the Decision that we "conduct an internal investigation" is frankly ridiculous since it ignores that we already have done so. Our investigation was fair and comprehensive and conducted by respected alumni and Phi Delta Theta officials. It justifiably concluded the allegations were untrue.

[9] Notably, in the police report (as she did at the hearing), the complainant expands her claims of racism to other fraternities on campus.

Mr. John Stein
September 28, 2015
Page 15

matter how unrelated to this incident, could result in suspension or expulsion of the Fraternity or student. Such a sanction is extremely wrong, particularly when, in the best possible light, the Chapter was found Responsible based on one person's testimony in the face of overwhelming evidence that her story is not true.

In light of the unfair treatment given the Fraternity in this case, <u>there is a very real threat that the Fraternity would be suspended or banished from campus due to another unsubstantiated, unsupported hoax</u>. Indeed, the social media (and Institute) response has unfairly put a target on the Fraternity and will likely provoke further false claims against the Fraternity to further certain agendas.

We also believe that you should take into account that the Chapter has fully cooperated in this matter, done <u>everything</u> Georgia Tech has asked us to do, repeatedly made clear it wants to participate in the Diversity Taskforce, and that, even though this allegation is untrue, we want to take a leadership position in increasing diversity within the Greek community. In fact, although we have been told that the Diversity Taskforce does not include <u>any</u> Greek members, we already have discussed with the IFC formation of a taskforce called the Greek Inclusion Committee to focus on both racial diversity and broader issues. All of these efforts demonstrate that a punitive sanction such as that proposed by Mr. Paquette is completely unfair and serves no constructive purpose.

### V.   There Is Information Not Available At The Time Of The Hearing That Is Relevant And Should Be Considered

This appeal also should be granted pursuant to Section G(1)(d) because as I have already mentioned, there is evidence that should be considered that was not. Specifically, the video evidence shows that there was an individual crossing the street at the time the alleged slurs were made who went into the Chi Phi House. That individual should have been identified, or at least there should have been an attempt to identify him by Mr. Paquette. Also, the video shows that there was a police car in close proximity. Surely, the Georgia Tech Police Department could identify who that officer was, and he should be interviewed. Finally, as noted at the hearing, we had additional witnesses who were present in other parts of the house on the evening of the 11th and wanted to testify they never saw nor witnessed any sign that there was conduct like that alleged. Given the magnitude of the charge of racism against the Fraternity and those implicated, all relevant witnesses should be heard and allowed to testify. Moreover, the fact that all three complainants knew each other was unknown to the Panel. It is evidence that should be considered in assessing their motive to coordinate their allegations.

### VI.   Request For Relief From The Decision

In light of all the information we have provided, the Fraternity respectfully submits the following decisions should be made:

1.   The decision that the Fraternity was Responsible for violation of 23(b) should be reversed, and the Fraternity should be found Not Responsible.

Mr. John Stein
September 27, 2015
Page 16

    2.    In the alternative, this matter should be remanded for a fair and impartial investigation. The investigation should be conducted by an impartial investigator, not associated with the Office of Student Integrity.

    3.    If the decision is not reversed or the investigative process is not restarted, this matter should be remanded to the Student Conduct Council for renewed proceedings to be conducted only on the issue of the August 11 incident, and the hearing should be conducted in accordance with the Student Code and in a fair and impartial manner.

    4.    If the decision is upheld, the only sanction should be that Fraternity members be required to attend diversity training. Placing the Fraternity on probation and restricting all social, intramural and other activities is unfair and unrelated to the allegations of this incident.

    5.    Finally, regardless of the above, we request that the Student Conduct Code, in particular Rule 23(b), be submitted to the Georgia Attorney General's office for an official opinion as to its constitutionality.

Respectfully submitted,

[signature redacted] 09/27/15

On behalf of
Georgia Delta Chapter of Phi Delta Theta