# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| THE BOARD OF REGENTS OF THE | ) | FILE NO. _____ |
| UNIVERSITY SYSTEM OF GEORGIA, | ) | |
| G.P. "BUD" PETERSON, *President of* | ) | |
| *the Georgia Institute of Technology, sued* | ) | **COMPLAINT** |
| *in his official and personal capacities*, | ) | |
| JOHN M. STEIN, *Dean of Students and* | ) | |
| *Vice President of Student Life at the* | ) | |
| *Georgia Institute of Technology, sued in* | ) | **JURY DEMAND** |
| *his official and personal capacities*, and | ) | |
| PETER PAQUETTE, *Assistant Dean of* | ) | |
| *Students, Director of the Office of Student* | ) | |
| *Integrity & Deputy Title IX Coordinator* | ) | |
| *for Students at the Georgia Institute of* | ) | |
| *Technology, sued in his official and* | ) | |
| *personal capacities*, | ) | |
| | ) | |
| Defendants. | ) | |

John Doe,[1] by and through his undersigned attorney, alleges on information and belief as follows:

## NATURE OF THE CASE

1. On █████████, John Doe was expelled from the Georgia Institute of Technology ("Georgia Tech" or "the University")—where he held a ██████ and had no disciplinary record—based on a single investigator's determination that, █████████ he had engaged in non-consensual sexual contact, non-consensual sexual intercourse, and coercion. He was ████████████████████ ████████████████████████████████████.

2. This case stems from how the University reached its decision—a decision that violated John Doe's due process rights, discriminated against him on the basis of his gender, and failed to comply with the University's own procedures.

3. Georgia Tech vested a single school official, Peter Paquette, the Assistant Dean of Students and the Director of the Office of Student Integrity ("OSI"), with the authority to investigate and adjudicate the claim against John Doe. But Mr. Paquette abused that authority. Instead of objectively investigating the case, he assumed from the outset that Mr. Doe was guilty and looked only for

---

[1] "John Doe" is a pseudonym being used instead of the Plaintiff's real name due to the nature of the allegations in this lawsuit. Mr. Doe seeks to protect his privacy as well as that of his accuser, who is identified as "Jane Roe."

evidence that supported that assumption.  He tried not to interview exculpatory witnesses and discounted the testimony of the ones he did interview.  And he packed his ultimate findings with gossip and rumors so that any subsequent reviewing body would be—and ultimately was—reluctant to overturn his decision.

4.    At the same time, Mr. Paquette, often aided by the University's own policies, denied Mr. Doe the ability to defend himself:

- Mr. Doe was denied the right to question, even indirectly by submitting questions through Mr. Paquette, the complainant or any adverse witness;

- Mr. Doe was denied the right to be present—or to even have counsel present—during Mr. Paquette's interviews of the complainant or any adverse witness;

- Mr. Doe was denied the right to an audio recording, transcript, or any other record that would reveal precisely what was asked of, and said by, the witnesses; and

- Mr. Doe was denied the right to review the evidence that Mr. Paquette had gathered, as well as the names of the witnesses that provided testimony against him, until 30 minutes before his final opportunity to defend himself.

5.    Even where the University did grant Mr. Doe some rights on paper, it frequently ignored them in practice:

- Georgia Tech's Student Code of Conduct ("the Code") requires that complaints be made within 30 days following the discovery of the incident, but Jane Roe was allowed to make her complaint ███████████████████;

3

- The Student Sexual Misconduct Policy ("Sexual Misconduct Policy") requires that an Appellate Committee be convened to consider a respondent's first appeal, but the school's decision to deny Mr. Doe's first appeal of Mr. Paquette's findings and sanction was apparently made solely by John M. Stein, the University's Dean of Students and Vice President of Student Life, or his designee; and

- The President of Georgia Tech, G.P. "Bud" Peterson, violated the Sexual Misconduct Policy by overly circumscribing his review, failing to consider three of the Policy's possible grounds for appeal—"whether the original investigation was conducted fairly," "whether there was sufficient evidence to support the decision," and "whether [the sanction of expulsion was] appropriate."

6.      Mr. Paquette, Mr. Stein, and Mr. Peterson—the three University administrators most involved in the decision to expel Mr. Doe—also tainted the disciplinary proceedings with bias: ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

7.      The University has recognized that it has a problem—but too late for Mr. Doe.  In response to complaints regarding the actions of Mr. Paquette's office, on October 27, 2015, Mr. Peterson "created an advisory group chaired by Nels Peterson . . . chief legal officer of the University System of Georgia's Board of Regents . . . to assess OSI's procedures and compare them to those of other schools

4

nationwide."  That advisory group was created ▮▮▮▮▮▮ after the Board of

Regents finalized Mr. Doe's expulsion.

8.      Unless and until the findings against him are overturned, Mr. Doe will

suffer the stigma of being branded a sexual assailant and the emotional suffering

that accompanies it.  And he will miss the opportunity to enroll in ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Those findings will

also remain a part of John Doe's education record, substantially limiting his ability

to enter a career of his choosing and foreclosing certain career opportunities to him

altogether.

9.      For these reasons and those explained in more detail below, John Doe

asks this Court to enjoin Defendants from expelling him and prevent them from

noting Mr. Paquette's flawed finding and sanction on his transcript.

## JURISDICTION AND VENUE

10.     The Court has federal question and supplemental jurisdiction pursuant

to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because Mr. Doe's claims arise

under the United States Constitution, brought pursuant to 42 U.S.C. § 1983, and

under the laws of the United States, including Title IX of the Education

Amendments of 1972, 20 U.S.C. §§ 1681-1688.  The state law claims are so

closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

11.     The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because Mr. Doe is a citizen of the State of Maryland and Defendants are citizens of the State of Georgia, and the amount in controversy exceeds $75,000.

12.     Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this district.

## THE PARTIES

13.     Plaintiff John Doe is, and at all times relevant to this Complaint has been, a citizen of the State of ███████. From ███████████████████████, Mr. Doe was an undergraduate student at Georgia Tech.

14.     Defendant Board of Regents of the University System of Georgia (the "Board of Regents") oversees the 30 colleges and universities, including Georgia Tech, that comprise the University System of Georgia.  Pursuant to Georgia law, the Board of Regents is the legal entity that must sue, or can be sued, in the place of Georgia Tech.  *See Bd. of Regents of the Univ. Sys. of Ga. v. Doe*, 278 Ga. App. 878, 878 (2006) ("Georgia Tech is not a separate or distinct legal entity from the Board and, therefore, cannot sue or be sued in its own capacity.").  Accordingly,

6

the Board of Regents is the legal entity responsible for any acts or omissions by Georgia Tech.

15.     G.P. "Bud" Peterson is the President of Georgia Tech.  His office is located in Atlanta, Georgia and, upon information and belief, he resides in the Northern District of Georgia.  He is responsible for determining the overall strategic direction and priorities for Georgia Tech, as well as acting as Georgia Tech's liaison to the Board of Regents, the Georgia Governor's Office, and the Georgia General Assembly.

16.     John M. Stein is the Dean of Students and Vice President of Student Life at Georgia Tech.  His office is located in Atlanta, Georgia, and upon information and belief, he resides in the Northern District of Georgia.

17.     Defendant Peter Paquette is the Assistant Dean of Students, Director of the Office of Student Integrity & Deputy Title IX Coordinator for Students at Georgia Tech.  His office is located in Atlanta, Georgia, and upon information and belief, he resides in the Northern District of Georgia.

## STATEMENT OF FACTS

### UNIVERSITY POLICIES AND PROCEDURES

18.     ███████████, John Doe matriculated as a freshman at Georgia Tech.  Upon enrolling, Mr. Doe received a copy of the Code and the Sexual

7

Misconduct Policy (collectively, the "Policies"). The Policies described Georgia Tech's standards for acceptable conduct and the procedures by which the University would investigate and adjudicate alleged violations of its standards.

19. In consideration for his tuition and attendance at Georgia Tech, John Doe received and was given assurances by the University that it would follow and comply with numerous policies and procedures adopted and put forth by the school, including the Policies. The Policies therefore constitute a contractual relationship between the University and John Doe.

20. The University owes its students a duty of care when creating and enforcing standards of conduct.

21. The Code prohibits certain conduct by students at Georgia Tech, including a "Violation of the Georgia Institute of Technology Sexual Harassment & Misconduct Policy."

22. The Code and the Sexual Misconduct Policy work in tandem. As explained in the Sexual Misconduct Policy, "[t]his policy, in addition to the Student Code of Conduct, governs the conduct of all Georgia Tech students."

23. The Sexual Misconduct Policy, as relevant here, forbids two forms of sexual misconduct. The first, "Non-Consensual Sexual Contact," is defined as "including, but not limited to, intentional and/or forcible touching." The second,

8

"Non-Consensual Sexual Intercourse," is defined as "including, but not limited to, anal, oral, or vaginal penetration, however slight."

24.     The Sexual Misconduct Policy also prohibits "Coercion," which is defined as "[t]he intentional use of force or intimidation (i.e. threats) to obtain compliance for an otherwise unwanted act.  Coercion may be determined by the repetition of the activity beyond what is reasonable, the degree of pressure applied, or environmental factors such as isolation or the initiator's knowledge or incapacitation by alcohol and/or other drugs."

25.     According to the Code, "[a]ny person may file a complaint against a Student for violations of the Student Code of Conduct."  The Code states that "[t]his complaint should be submitted as soon as possible after the event takes place or when it is reasonably discovered, no later than thirty (30) business days following the discovery of the incident."

26.     The Sexual Misconduct Policy, *by its own terms*, does not govern the process by which complaints are made.  Rather, the Sexual Misconduct Policy states that it "outlines the processes by which [Georgia Tech] will *investigate* and *resolve* reports or allegations of Prohibited Conduct" (emphasis added).

27.     Thus, the date by which a complaint must be made for violations of the Sexual Misconduct Policy is prescribed by the Code: 30 days.

9

28.     The "Investigation & Resolution Process" contained in the Sexual Misconduct Policy "utilizes an investigatory model, not an adversarial model, in resolving allegations of this policy." The "standard of proof" for determinations of responsibility "shall be Preponderance of the Evidence."

29.     The Sexual Misconduct Policy promises respondents a "prompt, fair, and impartial investigation and resolution" and that "the investigation, resolution, and appeal process [will] be carried out by those who have received annual training on the issues related to . . . how to conduct a sexual misconduct investigation, resolution, and appeal process that protects the safety of Victims, [and] maintains fairness/impartiality for Respondents."

30.     Among other things, the Sexual Misconduct Policy also promises respondents the right "[t]o have the opportunity to provide information regarding his or her involvement in the allegation."

31.     "Regardless of the final outcome, the Respondent and/or the Victim may file a request for an appeal in accordance with procedures outlined in the Student Code of Conduct, Section G within five (5) business days of the resolution decision."

32.     Pursuant to the Sexual Misconduct Policy, appeals are considered for the following reasons: "[t]o determine whether the original investigation was

conducted fairly and in conformity with prescribed procedures"; "[t]o determine whether there was sufficient evidence to support the decision"; "[t]o determine whether the Sanctions and Supplementary Requirement imposed were appropriate for the violation for which the Student was found responsible"; and/or "[t]o determine whether new Information, not available at the time of the investigation, is relevant to the final decision."

33.     If a respondent or victim appeals, the appeal is to be decided by an Appellate Committee, which consists of the "Dean of Students (or his/her designee), and two trained administrators."

34.     In a section titled "Appeal Decision," the Sexual Misconduct Policy states that the Appellate Committee is authorized to take one of the following actions: "dismiss the appeal for failure to state valid reasons," "find no error and uphold the original decision," "uphold the original decision, but modify Sanctions and Supplementary Requirements," "remand the case to a Student Conduct Administrator," or "reverse the original decision."

35.     The Sexual Misconduct Policy states that, "[f]or all cases where the sanction includes suspension or expulsion, Victims and/or Respondents may, after an appeal to the Dean of Students, appeal to the" President of the University "via the Vice President for Student Affairs," who "will review and make a

recommendation to the" President. The President's decision is the "final decision of the Institute."

36. After the appeals process is complete at the University, the Board of Regents "is the final appellate authority for all cases of suspension or expulsion."

37. If a student is found responsible for sexual misconduct and the appeal process is not successful, Georgia Tech makes it impossible for the student to move on. According to the Sexual Misconduct Policy, "[d]isciplinary records containing records of Suspension and Expulsion will be permanently retained." And "non-academic misconduct resulting in expulsion is released to third parties indefinitely."



40.



41.

42.

43.

44.

45.

46.

47.

48.



49.

50.

51.

52.

53.

54.

55. 

56.

57.

**THE INVESTIGATION**

58. On ⬛⬛⬛⬛⬛⬛, Peter Paquette informed John Doe that Jane Roe had made a claim that Mr. Doe engaged in sexual misconduct. Mr. Paquette informed Mr. Doe that the University had issued a no-contact order prohibiting communication between Mr. Doe and Ms. Roe.

59. On ⬛⬛⬛⬛⬛⬛, Mr. Paquette spoke with Mr. Doe regarding Ms. Roe's allegation. Mr. Paquette explained that Ms. Roe had alleged that Mr. Doe engaged in sexual misconduct with her ⬛⬛⬛⬛⬛⬛

15

███████████████████████████████. Mr. Paquette did not, however, specify

what precisely Ms. Roe had accused Mr. Doe of doing that night. Mr. Paquette

gave Mr. Doe the option of either providing a written statement detailing the

██████████████████████, or an oral one that Mr. Paquette would paraphrase in

an investigative report. Mr. Doe chose to provide a written statement.

60. On ███████████, Mr. Doe provided Mr. Paquette, in an e-mail and

an attached written statement, the names of individuals ████████████████████

████████████████████████████████████████ to Mr. Paquette.

Mr. Doe identified ██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████.

61. Mr. Doe also gave Mr. Paquette the names of ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████. Mr. Doe additionally gave Mr. Paquette the names of ████████

██████████████████████████████████████████████████████

███████████████████████████.

62.     Mr. Doe told Mr. Paquette that ███████████████████████

████████████████—were willing to be interviewed with respect to

Ms. Roe's allegation.

63.     In an e-mail responding to Mr. Doe's statement, Ms. Paquette asked:

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Mr. Doe responded by e-

mail that there had not been.

64.     On ██████████, Mr. Paquette interviewed Mr. Doe ████████. Mr.

Doe asked Mr. Paquette whether he had spoken with any of the witnesses that Mr.

Doe mentioned in his ████████, e-mail and written statement.  Mr. Paquette

said that he had not.

65.     As of ██████████, Mr. Paquette had interviewed ████

███████████████████████████████████████████████

██████████████████████████████████.

66.     Only one of the witnesses interviewed by Mr. Paquette ██████████

███████, ███████████████████████████████████. And

that witness did not provide Mr. Paquette with any testimony regarding Mr. Doe

and Ms. Roe's interactions that night.

17

67.     Mr. Paquette told Mr. Doe during the ███████████, interview that

he planned to speak with ███████ but that an interview of ███████████

████████████████████████████████████████████████████

would not be necessary because Mr. Paquette had "already established that ███

███████████████████████

68.     Mr. Doe implored Mr. Paquette to interview Informant 11, explaining

that Informant 11 had critical testimony that he could provide Mr. Paquette. ████

█████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

69.     Mr. Paquette responded that he would only *consider* interviewing

Informant 11.

70.     On ███████████—*before Mr. Paquette had interviewed any of the

witnesses proposed by Mr. Doe, including Informant 11*—Mr. Paquette informed

Mr. Doe that he was being charged with non-consensual sexual contact, non-

consensual sexual intercourse, and coercion.

18

71.     Approximately one week later, on or about March 26, 2015, Mr. Doe received a copy of a Title IX & Student Sexual Misconduct Policy Investigation Report (the "Report"), drafted by Mr. Paquette, which purportedly supported the charges.

72.     When he received the Report, Mr. Doe was shocked—the Report relied heavily on the vague, unsubstantiated rumors regarding Mr. Doe's character, including the following:

- "Victim 1 states that she has heard from other women that others may have had problems with Respondent as well. Victim 1 is working to secure the names of those individuals."

- "Informant 2 noted that she has heard of some women who felt they have been treated poorly by Respondent ████████, but no specific women have identified as being assaulted by Respondent."

- "Informant 2 also noted that Respondent ████████, who she identified only by the Respondent's first name have a reputation for not treating women particularly well and shared an account that she heard from another woman (who she could not specifically recall) ████████ ███████████████████ █████████████████"

- "Informant 3 stated that she believes Respondent to be unpleasant and creepy and that multiple people have mentioned similar views of Respondent."

19

- ████████████████████████████████
████████████████████████

- "Informant 7 is aware of another woman who had a similar concern with [Mr. Doe]."

- "Informant 8 was referred to me by another interviewee who believed Informant 8 may have past knowledge of instances where women felt they had been treated poorly by the respondent. Informant 8 stated that he has not seen anything that raises for suspicion [sic] for him and that he was not aware of ████████ taking advantage of his dates in the past. ████████████████████████████████████."

73.    ████████████████████████████████████
██████████████████████████████.

74.    Mr. Doe had no idea where these rumors came from because the Report did not include the names of the witnesses, referring to them instead as "Informant[s]."

75.    The Report revealed that Mr. Paquette had also failed to interview critical witnesses.  Indeed, out of the ████████ that Mr. Doe had asked Mr. Paquette to interview on ████████, Mr. Paquette interviewed *none of them* prior to bringing charges against Mr. Doe.

76.     Moreover, Mr. Paquette interviewed only *one* of those six witnesses before releasing his Investigation Report.

77.     Mr. Paquette also failed to interview Informant 11 before releasing his Report.

78.     Informant 11 was the only witness identified by Ms. Roe, Mr. Doe, or anyone else in the investigation process ███████████████████████████

███████████████████████████.

79.     Rather than interview this central witness, Mr. Paquette included in the Investigation Report the following short statement drafted by Informant 11:



Mr. Paquette included this statement—which Informant 11 ███████████████

███████████████—with the explanation that, "[d]ue to scheduling conflicts, ███

███████████████████████

80.     After he received the Investigation Report, John Doe implored Mr. Paquette to conduct a full interview of Informant 11 given the importance of his testimony.  Mr. Paquette again refused.

81.     Mr. Paquette also failed to interview two other critical witnesses. According to the Report, ███████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████████ ████████████████████████

82.     Mr. Paquette, however, never sought to speak to ██████████ ████████████████████.  Their testimony would have been significant: according to both of them, **Informant 1 told them that** █████████████████ ████████████████████████████████████ ████████████████████████

83.     Upon sending the Report to Mr. Doe, Mr. Paquette asked Mr. Doe to participate in a "final interview" on ████████████.

84.     Mr. Doe informed Mr. Paquette that he would like to retain counsel for the ████████████, interview.

85.    Mr. Paquette told Mr. Doe that if he did not meet with him by ███

███, then the Report would be issued without Mr. Doe having the opportunity to

defend himself in a final interview.

86.    Two days prior to the ███████, interview, Mr. Doe retained

counsel.

87.    But it was clear at this point that Mr. Paquette had made up his mind

that Mr. Doe was responsible for sexually assaulting Ms. Roe—and he was not

interested in giving Mr. Doe an opportunity to defend himself.

88.    Despite having interviewed more than 10 witnesses who were

identified only as numbered "Informants," Mr. Paquette refused to give Mr. Doe

any witnesses' names until the in-person meeting on ██████.

89.    Thus, Mr. Doe learned the names of the witnesses against him only 30

minutes before his last chance to defend himself against their vague and

unsubstantiated rumors about his character, giving him no time to prepare, much

less conduct his own investigation.

90.    Mr. Paquette likewise withheld critical evidence from Mr. Doe until

that final ██████, interview.  When Mr. Paquette revealed the names of the

"Informants" to Mr. Doe, Mr. Paquette, *for the first time*, shared with Mr. Doe the

evidence that Mr. Paquette had collected throughout his investigation.

23

91.     The evidence that Mr. Paquette revealed was significant.  Among

other things, it included ████████████████████████████████████████

████████████████████████████████████████████████████

██████████.  Yet Mr. Paquette gave Mr. Doe only 30 minutes to review the

evidence and respond to it—the same 30 minutes that Mr. Doe had to consider the

names of the witnesses.  Mr. Doe had no time to adequately examine the evidence.

92.     Mr. Paquette also refused to consider conducting any additional

witness interviews that could undermine his pre-conceived findings.

93.     At the ██████████, meeting, Mr. Paquette rejected Mr. Doe's

request that Mr. Paquette meet with the key witnesses that Mr. Doe had identified

but that he had not interviewed.

94.     In the meeting, Mr. Doe asked Mr. Paquette to interview ███████

██████████████████████████████.

95.     Mr. Doe also asked Mr. Paquette to re-interview Informant 1 in light

of the fact that, ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████.

96.    All ▮▮ of these witnesses were willing and ready to speak with Mr. Paquette.  Indeed, Informant 1—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮expressed a desire to speak with Mr. Paquette to clarify and supplement ▮▮ testimony.

97.    Mr. Paquette nonetheless denied Mr. Doe's request for additional witness interviews, telling Mr. Doe that he had "done all the investigating that [he] need[ed] to do."

98.    When Mr. Doe's counsel pleaded with Mr. Paquette to interview the key witnesses, Mr. Paquette literally laughed at them.

99.    Mr. Paquette also refused to consider ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ that had no place in his Report but that he featured nonetheless.

100.    As a separate bullet point in the first section on the first page of the Report, Mr. Paquette noted that "throughout the course of the investigation," Informant 9 alleged that John Doe had "sen[t] [Informant 9] text messages of a sexual nature."

101.    Informant 9 had never provided those text messages to Mr. Paquette; instead, he simply took her word for it.

102.    Mr. Doe, however, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.

25

103.   But when he begged Mr. Paquette to review them at the ███████,

meeting, Mr. Paquette refused.  Mr. Paquette told Mr. Doe that the text messages

Mr. Doe exchanged with Informant 9 were not relevant to his investigation, *even*

*though he had emphasized them in his Report*.

104.   Mr. Doe was persistent, placing the text messages in front of Mr.

Paquette so that he would have no choice but to look at them.

105.   In an addendum to the Report, Mr. Paquette conceded that he

"reviewed [the text messages between John Doe and Informant 9] and agreed [with

John Doe] that the conversation seemed casual and not sexually related."

106.   Instead of removing the allegation, which had been conclusively

proven false, Mr. Paquette kept it at the top of the first page of the Report.

## THE DECISION AND SANCTION

107.   The ███████, "final interview" took place in the morning and

lasted approximately 30 minutes. Just hours later, Mr. Paquette e-mailed Mr. Doe's

counsel his decision to find Mr. Doe responsible on all charges and expel him.

## THE APPEALS

108.   John Doe appealed the decision on ███████, to the "Sexual

Misconduct Appeals Committee."  However, in violation of the University's

Policies, it does not appear that an Appeals Committee was assembled to hear Mr. Doe's appeal of Jane Roe's complaint.

109.   As noted in Paragraph 33 above, according to the Sexual Misconduct Policy, an appeal is decided by an "Appellate committee [that] shall consist of the Dean of Students (or his/her designee), and two trained administrators." Yet, on ███████████, an appeal decision signed by John M. Stein, the Associate Vice President and Dean of Students at Georgia Tech, was e-mailed to Mr. Doe informing him that his appeal of Jane Roe's complaint had been denied—and that the decision was made by Mr. Stein alone: "After careful review, *I have decided* to uphold the original findings related to [Jane Roe]" (emphasis added).

110.   Two days later, on ███████████, Mr. Paquette informed Mr. Doe that—despite the fact that Mr. Stein's signature block was on the appeal decision— Mr. Stein did not actually decide the appeal because "the Dean ha[d] assumed the Interim Vice President Role" and "would be tasked with reviewing ███████ file and making a recommendation to President Peterson." According to Mr. Paquette, the "Associate Dean of Students" had taken Mr. Stein's place on the "Sexual Misconduct Appeals Committee," which, Mr. Paquette stated, "heard" Mr. Doe's appeal.

27

111.   In any event, based on the ██████████, appeal decision, an individual University employee—whoever he or she was—*decided* Mr. Doe's appeal.  And that is a violation of the Policies.[2]

112.   The University's failure to follow its own policies continued to the next step in the appeal process.  On ██████████, in accordance with the Policies, Mr. Doe appealed Mr. Stein's decision to the President of Georgia Tech, G.P. "Bud" Peterson.

113.   Mr. Peterson denied Mr. Doe's appeal on ██████████.

114.   In evaluating and eventually denying Mr. Doe's appeal, Mr. Peterson failed to follow the Sexual Misconduct Policy.

115.   Mr. Peterson wrote in his decision that "[r]eversal of this type of decision must be made based on some compelling reason.  These typically fall into *one of two categories*: either the discovery of new information not previously available that would materially affect the decision, or the failure to properly follow the governing Institute policies or procedures resulting in an improper decision" (emphasis added).  According to Mr. Peterson, "[a]fter carefully reviewing the

---

[2] Despite multiple requests by Mr. Doe and his counsel during the investigation, Mr. Paquette refused to reveal the names of the individuals on any Appellate Committee.  Because the appeal decision that Mr. Doe received indicates that John M. Stein alone denied his appeal, Mr. Doe has named Mr. Stein a defendant. However, Mr. Doe reserves the right to name additional defendants should discovery reveal that another individual, or a committee, decided the appeal.

information [Mr. Doe] provided," he found "no compelling reason to change the decision."

116.    Mr. Peterson was wrong.  The Sexual Misconduct Policy contains *four* bases for appeal:

- "[W]hether the original investigation was conducted fairly and in conformity with prescribed procedures";

- "[W]hether there was sufficient evidence to support the decision";

- "[W]hether the Sanctions and Supplementary Requirement imposed were appropriate for the violation for which the Student was found responsible"; and

- "[W]hether new Information, not available at the time of the investigation, is relevant to the final decision."

Mr. Peterson, contrary to the Sexual Misconduct Policy, failed to consider whether Mr. Paquette's investigation was fair, whether there was sufficient evidence to support the decision, or whether expulsion was an appropriate sanction.

117.    Mr. Peterson's failure to follow the University's Policies was material to his decision to deny Mr. Doe's appeal.

118.    Had Mr. Peterson reviewed Mr. Paquette's investigation, he would have found that it was fundamentally unfair.  Mr. Paquette denied Mr. Doe virtually any opportunity to examine the testimony and evidence against him. Moreover, he sought only evidence to support Ms. Roe's claim and refused to look

at any evidence or interview any witness that could possibly undermine his pre-conceived decision.

119.   Had Mr. Peterson reviewed the evidence to support Mr. Paquette's decision, he would have found that it was primarily hearsay upon hearsay upon hearsay that had absolutely nothing to do with Ms. Roe's allegations.

120.   Had Mr. Peterson reviewed Mr. Paquette's investigation and adjudication, he could not have possibly determined that expulsion was an appropriate sanction.

121.   Mr. Doe appealed Mr. Peterson's determination to the Board of Regents on ███████.

122.   On ██████████, a committee convened by the Board of Regents' Office of Legal Affairs affirmed the University's decision to expel Mr. Doe.

123.   That appeal constituted Mr. Doe's final opportunity to pursue administrative relief.  Given that he has exhausted all available administrative remedies, he now seeks relief from this Court.

██████████████████████████████████████████

124.   After Mr. Paquette expelled Mr. Doe, and Mr. Stein and Mr. Peterson upheld his decision, ████████████████████████

███████████████████████████████████████

████████████████████████████.

125.   ████████████████████████████████

## GEORGIA TECH'S FOCUS ON GENDER

126.   Georgia Tech—where male students outnumber females by approximately a 3-to-2 ratio—has been under intense scrutiny since October 2013 regarding masculine culture on its campus and, in particular, the allegedly misogynistic behavior of its fraternities.

127.   In the context of the University's reaction to this scrutiny, it is inescapable that Mr. Doe's gender was a motivating factor in the decision to expel him.

128.   In October 2013, a Georgia Tech fraternity's e-mail, with the grotesque title "Luring Your Rapebait," sparked national outrage over misogyny and rape culture on campuses and in fraternities in particular.  The e-mail, which came from the fraternity's social chair, contained, among other things, a seven-step guide to "hooking up," with advice like "[i]f anything ever fails, go get more alcohol" and "send them out of your room when you are finished."

129.   Georgia Tech immediately opened up an investigation of the fraternity and, a few months later, found the chapter responsible for numerous Code of

Conduct violations, including "a pattern of sexual violence" that suggests a "deep-rooted culture within the fraternity that is obscene, indecent, and endangers women." The University suspended the fraternity for three years.

130. According to news reports, Georgia Tech also began taking widespread action. The school rewrote its Student Sexual Misconduct Policy. And an April 18, 2015, investigative report by *The Atlanta Journal-Constitution*, titled *Secretive justice: How Georgia colleges handle rape on campus*, revealed that the school had adopted procedures that limited the rights of accused more than any other large Georgia university.

131. *The Atlanta Journal-Constitution* made clear the impact of the steps taken by the University: "***The students accused at Georgia Tech were almost always found responsible***." John Davis & Shannon McCaffrey, *Secretive Justice: How Georgia Colleges Handle Rape on Campus*, Atlanta Journal-Constitution, Apr. 18, 2015 (emphasis added).

132. In light of the scrutiny that Georgia Tech has faced regarding misogynistic behavior, OSI has established a pattern of investigating and adjudicating claims against male students and organizations: predetermine guilt, refuse to consider evidence that could support the male respondents, and exhibit overwhelming bias in favor of female students.

133.   In its investigation and adjudication of male students and organizations, OSI has endorsed the views of Michael Kimmel, a sociologist specializing in gender studies.  As part of the sanctions it has imposed on male students, OSI has assigned as mandatory reading Mr. Kimmel's book, Guyland.

134.   The book purportedly examines "mostly white, middle-class kids . . . in college . . . [that] live communally with other guys, in dorms, apartments, or fraternities."  Michael Kimmel, Guyland: The Perilous World Where Boys Become Men 8 (2009).

135.   According to Mr. Kimmel, "Greeks and jocks live at the epicenter of Guyland."  Id. at 233.  The author argues that these "intensive all-male peer groups . . . foster rape-supportive behaviors and attitudes."  Id. at 237.  Mr. Kimmel claims, for example, that "athletes or frat guys are more prone to gang rape . . . because being frat guys or athletes confers on them an elite status that is easily translated into entitlement, and because the cement of their brotherhood is intense, and intensely sexualized, bonding."  Id. at 239.

136.   The belief that "frat guys" and "athletes" are more prone to rape has informed OSI's procedures for investigating and adjudicating sexual assault claims.  OSI has prejudged these male groups and afforded them an unfair and biased student disciplinary process.

33

137.   For instance, Mr. Paquette's recent investigation and adjudication of a claim made against a Georgia Tech fraternity is strikingly similar to the unfair process imposed on Mr. Doe.

138.   On September 28, 2015, the fraternity appealed Mr. Paquette's decision to find it responsible for a violation of the Code, arguing that he denied them a fair investigation.  In its written appeal, the fraternity argued:

- "He made clear, with no investigation or consideration of our evidence, that he was going to believe the complainant."

- "**Although he (and other Institute officials) met repeatedly with the complainant, he steadfastly refused to interview any of our witnesses, or review our evidence, or conduct an investigation that might support our position.**"  (Emphasis in original.)

- "We repeatedly tried to submit information to him.  We offered him the opportunity to come to the House . . . interview anyone he wanted to speak with and conduct any other kind of actions he though were necessary.  However, he refused to do so."

- "[A]t no time prior to issuing a formal Notice of Charge on Monday, August 31 and then meeting with me on the following Thursday, September 3, did he consider any underlying evidence from the Fraternity."

- "Despite repeated offers, Mr. Paquette conducted **no interviews, refused to consider all of the statements, video evidence, pictures, etc. that we sent to him.  He even expressly stated in multiple emails that he did not want to consider any information from the Chapter.**"  (Emphasis in original.)

- "He stated that **'he was going to believe what the accuser said unless there was reasons not to believe her.'**" (Emphasis in original.)

- "He also stated that the mere fact the allegation was made against us **'means something must have happened.'**" (Emphasis in original.)

- "He then said he believed **'what the accuser alleges must have happened,'** and he also stated **'it was up to the Fraternity to explain or show why she would make the story up.'**" (Emphasis in original.)

- "To justify his conclusions, he cited some statistics that he had heard that only 2-8% of all crime reports were 'made up.'"

Mr. Paquette's unfair investigation and adjudication of the claim against Mr. Doe was thus not an isolated incident.

139.   Even after his investigation concluded, Mr. Paquette's unfair treatment of the male students continued.

140.   At a hearing to review the charges against the fraternity, female witnesses admitted to being prepped and coached by Mr. Paquette.

141.   Indeed, the complaining female student confessed that Mr. Paquette had met with her to prepare her testimony against the fraternity.

142.   Mr. Paquette provided no such preparation to members of the fraternity.

143.   Mr. Paquette's unfair treatment of the fraternity is part of a pattern.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

144.   ████████████████ described a case in which OSI expelled a member of the Georgia Tech Rugby Football Club—an all-male, student-run organization—on the basis of another biased investigation.

145.   A female student, who admitted to having verbally consented to sex, later alleged that she was too drunk for her consent to be valid.

146.   The male student had text messages indicating that the female student admitted that she was not drunk 20 minutes before she provided verbal consent.

147.   Nonetheless, OSI refused to consider any evidence that could exonerate the male student.

148.   OSI refused, for instance, to interview key witnesses who saw both parties immediately after the alleged incident occurred.

149.   And when the male respondent told OSI that the female complainant had straddled and kissed him while *he* was unconscious—which multiple witnesses corroborated—it didn't investigate the claim at all.

150.   OSI simply refused to consider that a female could have sexually assaulted a male.

151.   Due to the scrutiny that Georgia Tech has been under regarding its male students, and fraternities in particular, Mr. Paquette targeted Mr. Doe for expulsion.

152.   Mr. Doe was ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████.

153.   The investigation and adjudication of Mr. Doe was part of a concerted effort to respond to concerns about the male culture at Georgia Tech.  He would not have been targeted had he been female.

## CAUSES OF ACTION

**COUNT I – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983**
(*Against Defendants Peterson, Stein, and Paquette in their official capacities for injunctive relief; and against Defendants Peterson, Stein, and Paquette in their personal capacities for money damages*)

154.   Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

155.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

37

156.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

157.   A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

158.   A person has a protected liberty interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

159.   A person who has been admitted to a university, and has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study.  The state cannot deprive a person of this interest without due process.

160.   The Board of Regents of the University System of Georgia has promulgated a Policy Manual pursuant to its authority under Article VIII, Section 4, Paragraph 1 of the Georgia Constitution.  Under this policy manual, any student who makes satisfactory academic progress and obeys the rules of the institution "has a legitimate claim of entitlement to continued enrollment."  *See Barnes v. Zaccari*, 669 F.3d 1295, 1303-05 & n.9 (11th Cir. 2012) (citing former Policy 401.01, now contained in Policy 4.1.1).

161. A person has a constitutionally protected liberty interest in his good name, reputation, honor, and integrity.

162. Mr. Doe had a constitutionally protected liberty interest in his good name, reputation, honor, and integrity, and in pursuing his education, as well as in future educational and employment opportunities.

163. At the time of his expulsion from Georgia Tech, Mr. Doe had made satisfactory academic progress and had obeyed all institutional rules.

164. Under Georgia law, including Board of Regents Policy 4.1.1, Mr. Doe had a constitutionally protected property interest in continuing his education at Georgia Tech.

165. Mr. Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in the harshest sanction available at the University, will have lifelong ramifications for Mr. Doe, and are quasi-criminal in nature.

166. Mr. Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual assault.

167. Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a

39

fair adjudication of Ms. Roe's claim. Rather than investigate what occurred ███ ██████████████, Peter Paquette packed a report with gossip and rumor that was highly prejudicial and wholly irrelevant. In so doing, he tainted the findings themselves and any subsequent review.

168.   Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to question his accuser and other adverse witnesses, the credibility of whom was critical to the finding of responsibility.

169.   No individualized determination was made in this case that Roe or any other adverse witnesses would have been traumatized by facing questions, directly or indirectly, from Mr. Doe. And there would have been no apparent burden on Defendants had they provided Mr. Doe this right.

170.   The investigator, Mr. Paquette, conducted *ex parte* interviews of Ms. Roe and other adverse witnesses whose credibility was critical to the finding of responsibility. Mr. Doe was provided neither a video nor an audio recording of the interviews, nor a transcript of them, but rather only written summaries of the interviews. These summaries merely purport to paraphrase the substance of the witnesses' statements.

171.   Mr. Doe had no way of knowing what questions Mr. Paquette asked, the exact responses given to those questions by the adverse witnesses, or those witnesses' demeanors in responding to the questions.

172.   No individualized determination was made in this case that Ms. Roe or any other adverse witnesses would have been traumatized had Defendants provided Mr. Doe with a video, audio recording, or transcript of the interviews. And there would have been no apparent burden on Defendants had they provided Mr. Doe with a video, audio recording, or transcript of the interviews.

173.   Mr. Doe was not given the names of the witnesses against him until 30 minutes prior to his final interview with Mr. Paquette.

174.   No individualized determination was made in this case that Ms. Roe or any other adverse witnesses would have been traumatized had Defendants provided Mr. Doe with their names in advance of his final interview. And there would have been no apparent burden on Defendants had they done so.

175.   Mr. Doe was not shown the evidence that Mr. Paquette had relied on during his investigation until 30 minutes prior to his final interview.

176.   No individualized determination was made in this case that Ms. Roe or any other adverse witnesses would have been traumatized had Defendants provided Mr. Doe with an adequate opportunity to examine this evidence in

41

advance of his final interview. And there would have been no apparent burden on Defendants had they done so.

177. Defendants' procedures denied Mr. Doe the opportunity to effectively defend himself by challenging these witnesses' assertions.

178. Defendants had a custom and practice of disregarding and violating students' constitutional right to question adverse witnesses where credibility is essential to the outcome, or to, at the very least, be provided with an exact record of adverse witness interviews in such a case. This resulted in the absolute failure to afford basic due process protections to students accused of quasi-criminal sexual misconduct.

179. Defendants did not provide Mr. Doe with an impartial and unbiased adjudicator. Mr. Paquette, Mr. Stein, and Mr. Peterson ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████ .

180. No individualized determination was made in this case that providing a fair and impartial adjudicator would have imposed a great burden on Defendants.

181.   Defendants, as well as other agents, representatives, and employees of the University were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Mr. Doe's constitutional rights.

182.   Defendants all agreed to, approved, and ratified this unconstitutional conduct.

183.   As a result of these due process violations, Mr. Doe was expelled and suffers ongoing harm, including to his reputation, and numerous damages as a result.  He is unable to enroll in University courses.  And he is unable to transfer to another comparable undergraduate institution because of the erroneous disciplinary finding labeling him as having committed sexual assault, information that is almost certain to be provided to any educational institution to which he applies in the future.  Even if he could transfer to another undergraduate institution, it would likely not offer the courses that he is required to take in order to complete his engineering degree.

184.   Accordingly, Defendants are all liable to John Doe for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

## COUNT II – BREACH OF CONTRACT
*(Against Defendant Board of Regents)*

185.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

186.   Mr. Doe paid the University money for his education, and in return, the University contracted to give Mr. Doe access to its undergraduate degree program.

187.   The relationship between Mr. Doe and the University is contractual in nature, and each party owes the other certain duties, some of which can be found in the Code and Sexual Misconduct Policy.

188.   The University breached its contract with Mr. Doe by failing to provide him with a "fair" investigation and adjudication of Ms. Roe's claim, as the Student Sexual Misconduct Policy requires.  Peter Paquette sought out rumors and gossip regarding John Doe's character during his investigation and, no matter how irrelevant, he stuffed it into his report so that any subsequent review of his decision would be fatally tainted.  As a direct and proximate result of this breach, Mr. Doe was erroneously found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

44

189.   The University breached its contract with Mr. Doe by accepting Jane Roe's complaint beyond the 30 days permitted by the Code and failing to abide by the procedures in the Sexual Misconduct Policy regarding appeals.  As a direct and proximate result of this breach, Mr. Doe was erroneously found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

190.   Defendants' breach of contract has caused Mr. Doe damages that include, but are not limited to, the amount of all his tuition payments, the lost value of the degree for which he contracted, and the lost value of future earnings, and severe harm to his reputation.

## COUNT III – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant Board of Regents)

191.   Mr. Doe incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

192.   Every contract contains within it an implied covenant of good faith and fair dealing.

193.   The University breached that covenant by focusing its investigation of Ms. Roe's claim on Mr. Doe's character, rather than on what occurred between Ms. Roe and Mr. Doe ███████████.  As a direct and proximate result of

this breach, Mr. Doe was erroneously found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

194.   The University breached that covenant by failing to allow Mr. Doe to submit questions to be posed to Ms. Roe and other adverse witnesses.  As a direct and proximate result of this breach, Mr. Doe was erroneously found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

195.   The University breached that covenant by refusing to provide Mr. Doe with a video or audio recording or exact transcripts of Mr. Paquette's interviews of Ms. Roe and other adverse witnesses.  As a direct and proximate result of this breach, Mr. Doe was erroneously found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

196.   The University breached that covenant by refusing to provide Mr. Doe with the names of the witnesses or the evidence relied upon by Mr. Paquette in his adjudication of Ms. Roe's complaint until 30 minutes before Mr. Doe's final meeting with Mr. Paquette, providing Mr. Doe with no opportunity to defend himself.  As a direct and proximate result of this breach, Mr. Doe was erroneously

found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

197.   The University breached that covenant by refusing to interview witnesses Mr. Doe proposed.  As a direct and proximate result of this breach, Mr. Doe was erroneously found responsible for non-consensual sexual contact, non-consensual sexual intercourse, and coercion, causing him to suffer the harms described above.

198.   The University breached that covenant by pursuing the investigation and adjudication of the charge against Mr. Doe in an unfair and biased manner.

199.   Defendants' breach has caused Mr. Doe damages that include, but are not limited to, the amount of all his tuition payments, the lost value of the degree for which he contracted, and the lost value of future earnings, and severe harm to his reputation.

### COUNT IV – VIOLATION OF TITLE IX (20 U.S.C. § 1681)
*(Against Defendant Board of Regents)*

200.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

201.   Georgia Tech receives federal funding, including in the form of federal student loans given to students.

47

202. Because it receives federal funding, the University is subject to the requirements of Title IX.

203. Title IX prohibits gender discrimination in the education setting.

204. The procedural flaws in Georgia Tech's investigation and adjudication of Ms. Roe's claim against Mr. Doe, as well as the evidentiary weaknesses underlying the University's decision, cast serious doubt on its finding of responsibility. Both the procedural flaws in the investigation and the particular circumstances surrounding the investigation and adjudication of Ms. Roe's claim against Mr. Doe show that gender was a motivating factor in the University's erroneous decision to find Mr. Doe responsible and expel him.

205. The procedural flaws in the University's handling of Ms. Roe's claim against Mr. Doe include:

- The failure to permit Mr. Doe to submit questions to be asked of Ms. Roe and the other adverse witnesses.

- The failure to give Mr. Doe either a video or an audio recording or exact transcript of the investigative interviews of Ms. Roe and other adverse witnesses.

- The failure to give Mr. Doe the names of the witnesses against him or the evidence relied upon in the adjudication of Ms. Roe's complaint until 30 minutes before Mr. Doe's final meeting with Mr. Paquette.

- The failure to interview witnesses that Mr. Doe asked Mr. Paquette to interview.

48

206. Additionally, Mr. Paquette's investigation as to whether Mr. Doe committed sexual assault was cursory. On the other hand, his investigation of Mr. Doe's character was exhaustive and methodical.

207. These procedural flaws prevented Mr. Doe from fully defending himself.

208. The University's actions make clear that its decision to find Mr. Doe responsible and expel him was motivated by gender.

209. The school initiated its investigation in the shadow of a national story that focused on Georgia Tech's male-dominated culture. In light of the scrutiny related to that story, Georgia Tech took aggressive steps to impose discipline on male students and male-only organizations.

210. OSI in particular has targeted male students and male-only organizations—and it has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions. The University has not made comparable efforts with respect to female students.

211. OSI has also endorsed statements by sociologist Michael Kimmel that reveal gender as a motivating factor behind the University's actions. OSI has assigned Mr. Kimmel's book, Guyland, to male students it has disciplined. Mr. Kimmel writes in the book, among other things, that male student athletes and

49

fraternity members have certain characteristics that make them prone to commit sexual assault.

212.   The endorsement of the book, <u>Guyland</u>, indicates that gender was a motivating factor behind Mr. Paquette's unfair and biased investigation of Mr. Doe.

213.   Unlawful gender discrimination also occurs when a university subjects a student to a disciplinary process that has a disparate impact on members of that student's gender.

214.   The procedural protections afforded respondents in sexual misconduct proceedings by the University are unfair and inadequate.

215.   Sexual misconduct violations are more likely than others to result in the most severe sanctions the University may impose.  That is exactly what happened here.  And even worse, Mr. Doe was given the harshest possible sanction without a meaningful opportunity to defend himself.

216.   Claims of sexual misconduct, more often than others, are decided solely or primarily based on the parties' credibility, because sexual contact typically takes place in private.

217.   The vast majority of respondents in the University's sexual misconduct investigations and disciplinary proceedings are male.

218. Respondents charged with Sexual Misconduct at the University are historically and systematically discriminated against.

219. The University's inadequate sexual misconduct procedures therefore have a disparate impact upon male students. The University knows that, yet is deliberately indifferent to it.

220. The University's inadequate and unfair procedures directly and proximately prevented Mr. Doe receiving a fair process.

221. Accordingly, the University is liable to Mr. Doe for violation of Title IX and for all damages arising out of that violation.

**COUNT V – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSITUTION PURSUANT TO 42 U.S.C. § 1983**
(*Against Defendants Peterson, Stein, and Paquette in their official capacities for injunctive relief; and against Defendants Peterson, Stein, and Paquette in their personal capacities for money damages*)

222. Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

223. The Fourteenth Amendment to the United States Constitution prohibits gender discrimination unless it is substantially related to an important governmental interest.

224. For the reasons set out in Count V, there is a permissible inference that the University discriminated against John Doe based on his gender.

225.   Mr. Doe brings these claims pursuant to 42 U.S.C. § 1983 because these actions were taken by Defendants under color of state law.

226.   Because of these violations, Mr. Doe has suffered considerable emotional distress, loss of present and future earnings, humiliation, and damage to his reputation.

227.   All defendants agreed to, approved, and ratified this unconstitutional conduct.

228.   Accordingly, all Defendants are liable to Mr. Doe for violations of the Equal Protection Clause and for all damages arising out of those violations.

## COUNT VI – NEGLIGENCE
### (*Against Defendant Board of Regents*)

229.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

230.   In conducting its investigation and adjudication of Jane Roe's complaint against John Doe, Georgia Tech owed a common law duty to John Doe to exercise reasonable care, with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions, as well as John Doe's various liberty and property rights and interests generally.

231.   Through the acts set forth above, acting through its agents, servants and/or employees, Georgia Tech breached that duty by carelessly, improperly, and negligently performing its assigned duties, and facilitating a process that violated the rights and other protected interests of John Doe.

232.   As a direct and proximate result of Georgia Tech's negligence, carelessness, and gross breach of due care, John Doe has endured extreme emotional and psychological suffering; he lost the ability to fulfill the ▆▆ ▆ ▆▆ required to receive his degree; his academic records will reflect his expulsion; he will be handicapped in transferring to a comparable undergraduate institution; he will be handicapped in being admitted to graduate school or securing his desired employment; and he will suffer a permanent reduction in lifetime earnings.

233.   Accordingly, Georgia Tech is liable to John Doe for negligence and for all damages arising out of that violation.

## COUNT VII – NEGLIGENCE PER SE
### (*Against Defendant Board of Regents*)

234.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

235.   The United States Department of Education's Office for Civil Rights ("OCR") publishes guidance designed to ensure that schools receiving federal funding comply with Title IX.

236.   Administrative regulations can form the basis of a claim of negligence per se.

237.   OCR requires schools to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee sex discrimination complaints."  Implicit in the requirement to publish such procedures is the requirement to actually implement them.

238.   OCR requires schools to engage in "prompt, thorough, and impartial" investigations of allegations of sexual misconduct.

239.   OCR requires that the "rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights."

240.   OCR requires schools to use a preponderance of the evidence standard in making determinations of responsibility for claims of sexual misconduct.

241.   OCR requires campus officials involved in implementing the school's grievance procedures to be properly and regularly trained in, or have experience with, both the handling of sexual misconduct complaints and the school's

investigation and adjudication procedures.  This includes training in evaluating

witness credibility and weighing evidence impartially.

242.   These OCR requirements are meant to protect all parties in sexual

misconduct disciplinary proceedings.  John Doe, as a respondent in a sexual

misconduct disciplinary proceeding, falls within the class of people protected by

OCR guidance and, more generally, Title IX.

243.   The College breached at least the following duties owed to Plaintiff as

proscribed by OCR:

- The duty to abide by the school's published policies and procedures regarding sexual misconduct;

- The duty to afford an impartial process with an equitable resolution;

- The duty to implement its OCR-compliant policies and procedures consistently with federally guaranteed due process rights, and in particular the duty to allow for cross-examination when a student faces suspension or expulsion for disciplinary reasons; and

- The duty to properly train campus officials who implement and participate in the school's sexual misconduct grievance procedures.

244.   The breaches described above violated both OCR guidance and the

University's own policies and procedures.

245.    As a direct and proximate result of Georgia Tech's negligence,

carelessness, and gross breach of due care, John Doe has been seriously and

irreparably damaged in the following ways, among others: John Doe has endured extreme emotional and psychological suffering; he lost the ability to fulfill the ██ ██ ██ required to receive his degree; his academic records will reflect his expulsion; he will be handicapped in transferring to a comparable undergraduate institution; he will be handicapped in being admitted to graduate school or securing his desired employment; and he will suffer a permanent reduction in lifetime earnings.

246. Accordingly, Georgia Tech is liable to John Doe for negligence per se and for all damages arising out of that violation.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully prays that this Court enter judgment on behalf of Plaintiff and against Defendants, and order relief against Defendants as follows:

   a. That this Court issue preliminary and permanent injunctive relief restraining Defendants (1) from continuing to enforce any punishment against Plaintiff, and (2) from making any notation on Plaintiff's transcript, or keeping any record related to the disciplinary finding in Plaintiff's educational records, as its sanctions were the product of an

erroneous finding that Plaintiff violated the Sexual Misconduct

Policy, which was itself the product of a flawed disciplinary process;

b.  That Defendants be ordered to pay compensatory damages as

appropriate to compensate Plaintiff for his losses caused by the

University's misconduct; and

c.  That Defendants be ordered to pay punitive damages; and

d.  That this Court award Plaintiff his costs and expenses incurred in this

action, including attorneys' fees, as well as such other and further

relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues herein presented.

This 20th day of November, 2015.

Respectfully submitted,


*/s/ Christopher T. Giovinazzo*
Christopher T. Giovinazzo
Georgia Bar No. 142165
giovinazzo@bmelaw.com
**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone:  (404) 881-4100
Facsimile:  (404) 881-4111

57

*/s/ Justin Dillon*
Justin Dillon (motion for admission *pro hac vice* to be filed)
jdillon@kaiserlegrand.com
Scott Bernstein (motion for admission *pro hac vice* to be filed)
sbernstein@kaiserlegrand.com
**KAISER, LEGRAND & DILLON PLLC**
1401 K Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 640-2850
Facsimile: (202) 280-1034

*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF COMPLIANCE
## WITH O.C.G.A. § 50-21-35

I hereby certify that I have this date complied with O.C.G.A. § 50-21-35 by

sending a file-stamped copy of this **COMPLAINT** by Certified Mail, Return

Receipt Requested to:

> **CERTIFIED MAIL,**
> **RETURN RECEIPT REQUESTED**
> **NO. 7006 2150 0004 6963 2096**
>
> Sam Olens, Esq.
> Office of the Attorney General
> 40 Capitol Square, SW.
> Atlanta, Georgia 30334

This 20th day of November, 2015.

> */s/ Christopher T. Giovinazzo*
> Christopher T. Giovinazzo
> Georgia Bar No. 533512

Doe v. The Board of Regents of the University System of Georgia et al, Docket No. 1:15-cv-04079 (N.D. Ga. Nov 20, 2015), Court

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Northern District of Georgia; United States District Court for the Northern District of Georgia |
| **Federal Nature of Suit** | Civil Rights - Other[440] |
| **Docket Number** | 1:15-cv-04079 |

Bloomberg Law®

© 2016 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service