ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

NOV 2 3 2015

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | |
| THE BOARD OF REGENTS OF THE | ) | FILE NO. 1:15-CV-4079-SCJ |
| UNIVERSITY SYSTEM OF GEORGIA, | ) | |
| G.P. "BUD" PETERSON, *President of* | ) | |
| *the Georgia Institute of Technology, sued* | ) | |
| *in his official and personal capacities*, | ) | |
| JOHN M. STEIN, *Dean of Students and* | ) | |
| *Vice President of Student Life at the* | ) | |
| *Georgia Institute of Technology, sued in* | ) | |
| *his official and personal capacities*, and | ) | **JURY DEMAND** |
| PETER PAQUETTE, *Assistant Dean of* | ) | |
| *Students, Director of the Office of Student* | ) | |
| *Integrity & Deputy Title IX Coordinator* | ) | |
| *for Students at the Georgia Institute of* | ) | |
| *Technology, sued in his official and* | ) | |
| *personal capacities*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

Plaintiff John Doe respectfully requests, pursuant to Federal Rule of Civil

Procedure 65(a), that this Court grant a preliminary injunction enjoining

Defendants from enforcing a decision to expel him from the Georgia Institute of

Technology ("Georgia Tech" or "the University") and allowing him to attend class

when the spring semester begins on January 11, 2016.[1]  In light of the urgency of

this motion, Mr. Doe requests an expedited briefing and hearing schedule.[2]

## INTRODUCTION

Georgia Tech expelled John Doe—an engineering major with a ███████

and no disciplinary record (Doe Decl.[3] ¶ 6)—███████████████, based

on an erroneous finding that he committed sexual assault.  That finding was the

fruit of a deeply flawed process conducted by a single Georgia Tech administrator,

Peter Paquette, who has a proven history of bias in sexual misconduct cases.

Georgia Tech tasked Mr. Paquette with not only investigating the allegation, but

also with adjudicating—in a virtually unreviewable fashion—whether Mr. Doe had

---

[1] Due to the nature of the allegations in this lawsuit, Plaintiff is proceeding under
the pseudonym "John Doe" and identifies his accuser as "Jane Roe."  Plaintiff has
filed a motion to proceed anonymously.

[2] Defendant Board of Regents of the University System of Georgia ("the Board of
Regents") oversees Georgia Tech.  Pursuant to Georgia law, the Board of Regents
is the legal entity that must sue, or can be sued, in the place of Georgia Tech.  *See
Bd. of Regents of the Univ. Sys. of Ga. v. Doe*, 278 Ga. App. 878 (2006).  For ease
of reference in this motion, Plaintiff refers to these entities interchangeably.

[3] Declaration of Plaintiff John Doe ("Doe Decl."), attached hereto as Exhibit 1.

1

committed sexual assault under Georgia Tech's sexual misconduct policy. Mr.

Paquette—the Director of Georgia Tech's Office of Student Integrity ("OSI")—

conducted an investigation that made a mockery of the due process required of a

state school. For example:

- Mr. Paquette met *ex parte* with every witness and gave Mr. Doe only a paraphrased summary of those interviews.

- Mr. Paquette did not give Mr. Doe an opportunity to question or confront Ms. Roe or any of the witnesses against him.

- Mr. Paquette did not interview ███████ witnesses Mr. Doe asked him to interview, ███████ ██ ██████████████████████ ███████████████████.

- Mr. Paquette did not tell Mr. Doe the names of the witnesses against him until the same day that he expelled Mr. Doe.

- Mr. Paquette included damaging and prejudicial information that had nothing to do with Ms. Roe's allegations and went solely to Mr. Doe's character, which tainted subsequent review of his appeals.

The abuse of due process did not end there. The three administrators most

involved in the decision to expel Mr. Doe—Mr. Paquette, Dean Stein, and

President Peterson—were far from impartial. After Mr. Doe's expulsion was

upheld on appeal, ████████████████████████████████████████████

████████████████████████████████████████████████████

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Dillon Decl.[4]

Ex. A. Mr. Doe was never informed of this flagrant conflict of interest.

Mr. Doe's mistreatment was part of a pattern of gender discrimination by the University. Georgia Tech has been under intense scrutiny regarding its male-dominated culture since at least October 2013, when it was engulfed in a controversy regarding one of its fraternities. *See, e.g.*, Dillon Decl. Exs. B and C. In its rush to respond, Georgia Tech rewrote its Student Sexual Misconduct Policy and began to conduct its investigations such that an accused individual at Georgia Tech is now "almost always found responsible," according to an investigative report by the *Atlanta Journal-Constitution*. *See* Dillon Decl. Ex. D at 4.

Georgia Tech's findings against and expulsion of Mr. Doe violated Mr. Doe's rights under the Due Process Clause, were tainted by gender discrimination in violation of Title IX and the Equal Protection Clause, and constituted both negligence and a breach of its contract with Mr. Doe. The findings and expulsion are also causing, and will continue to cause, irreparable harm to him. The finding, as it now stands, will brand him responsible for sexual assault—which is, stripped of all euphemism, rape—in the eyes of any person or institution reviewing his educational records, causing him substantial reputational harm and emotional

---

[4] Declaration of Justin Dillon, attached hereto as Exhibit 2.

3

suffering.  If he cannot return to Georgia Tech next semester, he will not be able to

enroll in the [REDACTED] courses required for him to obtain his undergraduate

degree.  And even if he just misses the next semester and wins this case, he will

still have to explain the gap in his educational record to future schools and

employers—the definition of a Pyrrhic victory.  For these reasons and those set

forth below, Mr. Doe respectfully requests preliminary injunctive relief.

## FACTUAL BACKGROUND

**I.** [REDACTED]

**II.**

## III.   THE INVESTIGATION

On ▮▮▮▮▮▮▮, Mr. Paquette informed Mr. Doe of Ms. Roe's claim. Doe Decl. ¶ 23.  On ▮▮▮▮▮▮, Mr. Doe gave Mr. Paquette the names of ▮ witnesses ▮▮▮▮▮▮ ▮▮▮ and could testify about what happened there.  *Id.* ¶ 26; Investigation Report at 4.  On ▮▮▮▮▮▮, Mr. Paquette told Mr. Doe that he was being charged with non-consensual sexual contact, non-consensual sexual intercourse, and coercion.  Doe Decl. ¶ 30.

On or about ▮▮▮▮▮, Mr. Doe received a copy of Mr. Paquette's Investigation Report, which purported to support the charges.  Doe Decl. ¶ 31. Jane Roe's allegations, however, took a backseat to prejudicial and unsubstantiated rumors from unnamed sources regarding Mr. Doe's character:



- ███████████████████████████████████████
  ████████████████████████████████████

*See* Investigation Report at 3, 5 (emphasis added).

The Investigation Report also revealed that Mr. Paquette had almost entirely limited his interviews to witnesses who would support Ms. Roe's claim. When the report was released, only *one* of the ██ witnesses proposed by Mr. Doe had been interviewed at all. **In particular, Mr. Paquette had failed to interview Informant 11—*the only witness identified by anyone during the investigation process*** ████████████████████████████████████ ████████████. Investigation Report at 9. Instead, Mr. Paquette included a short written statement from Informant 11 in the Investigation Report. *Id.*

Mr. Doe was given only one opportunity to respond to the Investigation Report—a "final interview" on ██████████. *Id.* at 13; Doe Decl. ¶ 34. Thirty minutes before the meeting, Mr. Paquette revealed critical information to Mr. Doe. Doe Decl. ¶¶ 36-37. Mr. Paquette, *for the first time*, gave Mr. Doe the names of the witnesses who testified against Mr. Doe. *Id.* ¶ 36. And Mr. Paquette allowed Mr. Doe to see, *for the first time*, the documentary evidence Mr. Paquette had relied upon during his investigation. *Id.* ¶ 37. Among other things, the evidence included ██████████████████████████████████████████

7

█████████████████████████████████████████. *Id.* ¶¶ 38-39. At that point,

there was no time to meaningfully review, much less investigate, the new material.

But even if there had been more time, Mr. Paquette made it clear that he was

not going to consider any evidence from Mr. Doe. For instance, the day before the

"final interview," Mr. Paquette rejected Mr. Doe's request to interview Informant

11. *Id.* ¶ 35. And when Mr. Doe told Mr. Paquette during the interview that

Informant ████████████████████████████████████████████

████████████████████████████████████████████████████,

Mr. Paquette refused to re-interview her. *Id.* ¶ 40. Instead, he told Mr. Doe that he

had "done all the investigating that [he] need[ed] to do." *Id.* ¶ 41.

## IV.   THE DECISION, THE SANCTION, AND THE APPEALS

"The ████████, 'final interview' took place in the morning and lasted

approximately 30 minutes." Doe Decl. ¶ 42. Hours later, Mr. Paquette rendered

his decision to find Mr. Doe responsible on all charges and expel him. Doe Decl.

Ex. D. Mr. Doe appealed Mr. Paquette's decision on ████████, to the

"Sexual Misconduct Appeals Committee." Doe Decl. ¶ 45. On ████████,

Mr. Doe was emailed an appeal decision signed by John M. Stein denying his

appeal. *Id.* ¶ 46 and Ex. E (attached thereto). Mr. Doe next appealed to the

President of Georgia Tech, G.P. "Bud" Peterson. Doe Decl. ¶ 47. He denied Mr.

Doe's appeal on ▓▓▓▓▓▓▓. *Id.* ¶ 48 and Ex. F (attached thereto). Mr. Doe's final appeal was to the Board of Regents of the University System of Georgia. Doe Decl. ¶ 49. On ▓▓▓▓▓▓▓▓, a committee convened by the Board of Regents' Office of Legal Affairs affirmed the University's decision to expel Mr. Doe. *Id.* ¶ 50 and Ex. G (attached thereto). That appeal constituted Mr. Doe's final opportunity to pursue administrative relief. Dillon Decl. Ex. E (hereinafter "Sexual Misconduct Policy") at 11.

## ARGUMENT

To obtain a preliminary injunction, a plaintiff "must establish the following four elements: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damages the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Cellairis Franchise, Inc. v. Duarte*, No. 2:15-CV-00101, 2015 WL 6517487, at *5 (N.D. Ga. Oct. 21, 2015) (internal quotation marks omitted). "[N]one of the four prerequisites has a fixed quantitative value." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975) ("*Seatrain*"). All four weigh heavily in favor of granting John Doe preliminary relief.

9

## I.   JOHN DOE WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF.

"A finding of a substantial threat of irreparable harm is the 'sine qua non' of injunctive relief." *AT&T Mobility LLC v. NASCAR*, 487 F. Supp. 2d 1370, 1374-75 (N.D. Ga. 2007), *rev'd on other grounds*, 494 F.3d 1356 (11th Cir. 2007). Indeed, it is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. 1998). Here, absent preliminary relief, John Doe will continue to suffer irreparable harm.

Georgia Tech has branded Mr. Doe a sex offender, and the harm being done to his reputation is irreparable. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) ("[T]he Board's biased finding of inefficiency and incompetence will inflict *such severe injury to her professional reputation* that a monetary award would likely be inadequate and almost certainly speculative." (emphasis in original)).[5] It is all the more so in conjunction with the emotional suffering it is causing him. *See, e.g., Caspar v. Snyder*, 77 F. Supp. 3d 616, 640

---

[5] *See also Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed. 1998) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable.") (collecting cases).

(E.D. Mich. 2015) (noting that "loss of dignity and other emotional injury" are "not susceptible to quantitative calculation").

But that is not the only injury Mr. Doe will suffer if this motion is denied. If he is unable to enroll in classes next semester, he will "delay[ ] the time at which [his] ability to work . . . will come to fruition; [he] will have a gap in [his] education which [he] will be forced to explain through [his] professional life; and [he] will be deprived of the opportunity to complete [his] education with [his] fellow classmates." *See Jones v. Bd. of Governors of Univ. of North Carolina*, 704 F.2d 713, 716 (4th Cir. 1983). Moreover, because one of the ███████████ courses that he must take to fulfill his degree requirements is only offered in the spring semester, if he does not return to school in January, the next possible date that he could graduate would be May 2017. Doe Decl. ¶ 11 and Ex. B (attached thereto).

## II.   INJUNCTIVE RELIEF RISKS NO HARM TO OTHERS.

While courts have "recognize[d] [a] University's institutional interest in quickly resolving disciplinary charges and maintaining confidence in the integrity of its processes," Mr. Doe would suffer "far more substantial, concrete injury" if an injunction is wrongly withheld "than will [the University] if the injunction" is wrongly granted. *Jones*, 704 F.2d at 716. In other words, the University's possible

harm is generalized and speculative, while Mr. Doe's is concrete and far-reaching. *See supra* Section I.  Mr. Doe would also accept any reasonable restrictions that would prevent him from coming into contact with Ms. Roe on campus.

## III.  JOHN DOE IS LIKELY TO SUCCEED ON THE MERITS.

"[T]he importance and nature of the requirement [to show a substantial likelihood of success on the merits] can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship faced by each of the parties."  *Seatrain*, 518 F.2d at 180.  As discussed above, the magnitude of the injury that Mr. Doe would suffer if the Court denies this motion would be extraordinary, while any hardship faced by the University would be speculative.  And as discussed below, Mr. Doe is also highly likely to succeed on the merits.

### A.  Due Process

More than four decades ago, the Supreme Court established that a public educational institution may not expel a student for misconduct (or even suspend him for as few as ten days) "without adherence to the minimum procedures required by [the Due Process] Clause."  *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975).  The Court held that due process was required because the student had both

a protected property interest in public education under state law, and a "liberty interest in reputation." *Goss*, 419 U.S. at 576.  Due process requires, among other things, an impartial decision maker, an opportunity to be heard, and, where important decisions turn on questions of fact, an opportunity to confront and question adverse witnesses.  The University denied Mr. Doe each of these rights.

### 1.    The Opportunity to Be Heard

"A fundamental requirement of due process is the opportunity to be heard." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal quotation marks omitted). But that alone is not enough.  The decision maker must also be "willing to listen." *See Carter v. Harris*, 64 F. Supp. 2d 1182, 1189 (M.D. Ala. 1999).  Peter Paquette was not willing to listen to John Doe.  Although Mr. Paquette gave Mr. Doe the opportunity to provide a list of witnesses on ██████████, Mr. Paquette did not actually follow up with any of them before he charged Mr. Doe with sexual misconduct.  Doe Decl. ¶¶ 26-28.  He also failed to interview Informant 11, arguably the single most exculpatory witness in the investigation.  Investigation Report at 9.  And he refused to re-interview a witness (Informant 1) ██████████ ████████████████████████████████████████████████.  Doe Decl. ¶¶ 40-41.  Mr. Paquette did this because he had predetermined the outcome of his investigation—an outcome that he informed Mr. Doe of just hours after their

13

meeting ended. *Id.* ¶ 43.  "[A] body that has prejudged the outcome cannot render a decision that comports with due process." *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994); *see also D'Angelo v. Winter*, 403 F. App'x 181, 182 (9th Cir. 2010) ("A hearing with a predetermined outcome does not satisfy due process."). But that is precisely what Mr. Paquette did here.

### 2.    The Opportunity to Confront and Cross-Examine Witnesses

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (collecting cases). Where a school disciplinary hearing turns almost entirely on the complainant's credibility, universities must give students the right to challenge adverse testimony during disciplinary proceedings. *See, e.g., Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972) (stating that where a student disciplinary proceeding hinges on "a problem of credibility"—"where the decision maker ha[s] to choose to believe either the accused or his accuser"—"cross-examination of witnesses might . . . [be] *essential* to a fair hearing" (emphasis added))."[6]

---

[6] *See also Donohue v. Baker*, 976 F. Supp. 136, 146-47 (N.D.N.Y. 1997) ("[I]n light of the disputed nature of the facts and the importance of witness credibility . . . in this case, due process required that the panel permit the [accused student] to hear all evidence against him and to direct questions to his accuser through the panel"); *Dillon v. Pulaski Cnty Special Sch. Dist.*, 468 F. Supp. 54, 58 (E.D. Ark.

Here, Mr. Doe's case turned entirely on a credibility determination: whether Mr. Paquette believed Mr. Doe or Ms. Roe. Yet Mr. Doe was not allowed to question, *even indirectly through Mr. Paquette,*[7] the complainant or any adverse witness. Nor was he told what Mr. Paquette asked the witnesses and what they said in response; instead, he was given only short witness summaries that were stuffed with gossip, rumors, and innuendo about his character. And Mr. Doe was denied the right to know even the *identities* of the witnesses against him until 30 minutes before his ▮▮▮ "final interview." Doe Decl. ¶ 36. Mr. Doe could not, in short, meaningfully challenge the witnesses or the evidence against him in any way. He just had to sit there and take it. Such a system may be convenient for Georgia Tech, but it does not comport with due process.

### 3. An Impartial Decision Maker

It is axiomatic that the Due Process Clause of the Fourteenth Amendment requires an impartial decision maker. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 271 (1970) ("And, of course, an impartial decision maker is essential."). In the context of a student disciplinary proceeding, "the providing of a fair and impartial

---

1978) (holding that a school board violated due process when it expelled a student on an accusation made by a teacher but did not permit the student to cross-examine the teacher at the hearing), *aff'd,* 594 F.2d 699 (8th Cir. 1979).

[7] Mr. Doe is not arguing that he was denied due process because he was not permitted to pose questions *directly*, but rather because he was denied the opportunity to pose questions *at all*.

15

tribunal imposes [no] great administrative burden on the school." *Furey v. Temple Univ.*, 730 F. Supp. 2d 380, 395 (E.D. Pa. 2010) (denying the university's summary judgment motion as to the plaintiff's due process claim because a member of its student disciplinary panel had a "friendship" with the complainant). On the other hand, "[t]he plaintiff's interest in avoiding expulsion is great, as is the benefit of an impartial panel in safeguarding against an erroneous decision." *Id.*

Mr. Doe was given anything but an impartial decision maker. ███████ ████████████████████████████████████████████████████████ ███████████████████████████████████ with Mr. Paquette, Dean Stein, and President Peterson, the three University administrators most involved in the decision to expel Mr. Doe. Dillon Decl. Ex. A. This bias was also made clear in Mr. Paquette's report. Mr. Paquette barely mentioned what actually happened that night, instead focusing on tearing down Mr. Doe's character with unconfirmed gossip that tainted his findings and any subsequent review.

By contrast, when Mr. Paquette was presented with evidence proving that ███████████████████████████████████████████, he ignored it entirely and failed to mention it in his Investigation Report. Doe Decl. ¶¶ 38-39. Dean Stein and President Peterson then rubber-stamped that decision—and

violated the plain language of Georgia Tech's sexual misconduct policy while doing so. None of this can reasonably be described as impartial.

**B.  Gender Discrimination**

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In what is commonly referred to as an "erroneous outcome" claim under Title IX, a plaintiff must put forth "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* As explained above, there are substantial reasons to doubt Mr. Paquette's findings. *Id.* at 715 (noting that this element of an "erroneous outcome" claim does not create a "heavy" burden, and that doubt may be cast on the proceedings by "evidentiary weaknesses behind the finding" and "procedural flaws" that may have affected the finding). And as explained below, there is ample evidence—even pre-discovery—that those findings were motivated by gender.

In *Yusuf*, the Second Circuit identified allegations that would give rise to a plausible inference that an erroneous outcome was motivated by gender, such as "patterns of decision-making," "statements by members of the disciplinary

17

tribunal," or "statements by pertinent university officials" that "tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.  Here, Mr. Doe will establish a plausible inference of gender bias on two separate bases.  First, he will prove that Georgia Tech has engaged in a pattern of decision-making that reveals gender was a motivating factor in the school's decision to deny him a fair process.  And second, Mr. Doe will show that Peter Paquette has endorsed statements that indicate his mistreatment of Mr. Doe was motivated by gender.

### 1. A Pattern of Decision-Making Showing Gender Bias

The school's investigation and adjudication of Mr. Doe's case is part of Georgia Tech's larger reaction to intense scrutiny it has received regarding the behavior of its male students.  In October 2013, a Georgia Tech fraternity's e-mail, with the grotesque title "Luring Your Rapebait," sparked national outrage over misogyny on campuses and in fraternities.  Dillon Decl. Exs. B and C.  According to an investigation by the *Atlanta Journal-Constitution*, Georgia Tech changed its disciplinary policies in response to the scandal, and now "students accused at Georgia Tech [are] almost always found responsible."  Dillon Decl. Ex. D at 4.

After the scandal, OSI—which is run by Mr. Paquette—began rigging the disciplinary process to ensure that male students and student organizations are found responsible.  For instance, a fraternity subject to an OSI investigation in

2015 complained that Mr. Paquette "steadfastly refused to interview any of [the fraternity's] witnesses, or review [the fraternity's] evidence, or conduct an investigation that might support [the fraternity's] position." Dillon Decl. Ex. F at 2. Yet he "met repeatedly with the complainant." *Id.* Similarly, when OSI investigated a complaint made against a male athlete at Georgia Tech, it reportedly refused to interview key witnesses who saw both parties immediately after the incident. Dillon Decl. Exs. G and H. And when the male respondent told OSI that the female complainant had straddled and kissed him while *he* was unconscious—which multiple witnesses corroborated—it did not investigate the claim at all. Dillon Decl. at Ex. H ███████████████████████

████████████████████████████████████████

██████ ██ ████████████████████

These decisions indicate that John Doe's gender was a motivating factor in the investigation and adjudication of Jane Roe's complaint. *Cf. Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751 (S. D. Ohio 2014) (refusing to dismiss plaintiff's "erroneous outcome" challenge because of allegations that "Defendants were reacting against [the respondent], as a male, to demonstrate to the [U.S. Department of Education's Office of Civil Rights] that Defendants would take action, as they had failed to in the past, against males accused of sexual assault").

### 2. Statements Showing Gender Bias

John Doe will also be able to show that statements endorsed by Peter Paquette strongly suggest that Mr. Doe's gender was a motivating factor in his decision. Mr. Paquette has previously required male students he has disciplined to read and write a paper on the book *Guyland*.  Dillon Decl. Ex. I.  The book purportedly examines "mostly white, middle-class kids . . . in college . . . [that] live communally with other guys, in dorms, apartments, or fraternities."  *See* Michael Kimmel, *Guyland: The Perilous World Where Boys Become Men* 8 (2009). "Greeks and jocks live at the epicenter of Guyland," according to Kimmel.  *Id.* at 233.  The author argues that these "intensive all-male peer groups . . . foster rape-supportive behaviors and attitudes."  *Id.* at 237.  Kimmel claims, for example, that "athletes or frat guys are more prone to gang rape . . . because being frat guys or athletes confers on them an elite status that is easily translated into entitlement, and because the cement of their brotherhood is intense, and intensely sexualized, bonding."  *Id.* at 239.  ██████████████████████████, Mr. Paquette's endorsement of a book with as slanted a gender bias as *Guyland* "suggest[s] that gender bias was a motivating factor behind [Mr. Paquette's] erroneous finding." *Yusuf*, 35 F.3d at 715; *see also Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (inferring gender bias

from a presentation given by the university's Title IX Coordinator that endorsed

the article, *Is It Possible That There Is Something In Between Consensual Sex And

Rape . . . And That It Happens To Almost Every Girl Out There?*).[8]

### C. State Law Claims

Defendants' conduct also gives rise to two state law claims for which Mr.

Doe has a substantial likelihood of success: negligence and breach of contract.

### 1. Negligence

John Doe will prove that the University was negligent its investigation and

adjudication of Jane Roe's complaint. In Georgia, the elements of a cause of

action for negligence follow the common law: duty, breach, causation, and

damages. *Campbell v. Wells Fargo Bank, N.A.*, No. 1:14-CV-3341, 2015 WL

5797852, at *9-10 (N.D. Ga. Aug. 12, 2015.). In a student disciplinary proceeding,

schools have a duty to "refrain from conduct that will foreseeably cause injury to

others." *Doe v. Univ. of the South*, No. 4:09-CV-62, 2011 WL 1258104, at *21

---

[8] For the same reasons that there is a substantial likelihood Doe's Title IX claim
will be successful, there is a substantial likelihood his claim under the Equal
Protection Clause of the Fourteenth Amendment will succeed. *See, e.g.*, *Rollins v.
Bd. of Trustees of the Univ. of Ala.*, 2014 WL 4829540, at *17 (N.D. Ala. Sept. 29,
2014) ("[T]he court will utilize the same analysis for the Equal Protection and . . .
Title IX claim[ ].").

(E.D. Tenn. Mar. 31, 2011) ("*University of the South*").[9] There, the court concluded that "a jury could find that the harm caused by [a] University's allegedly and arguably haphazard implementation of its own Sexual Assault Policies was foreseeable, especially where . . . the harm was severe: a wrongful conviction by a disciplinary committee." *Id.* Here, Georgia Tech's one-sided investigation of Jane Roe's complaint breached the duty it owed to Mr. Doe and proximately harmed him.

### 2. Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing

John Doe's relationship to the University is contractual, and the Code of Conduct, Sexual Misconduct Policy, and other materials published by Georgia

---

[9] The University also owed Doe the standard of care prescribed by the United States Department of Education in its guidance to schools related to allegations of sexual misconduct on campus. *Cf. Combs v. Atlanta Auto Auction, Inc.*, 287 Ga. App. 9, 12 (2007) ("Under Georgia law, the violation of a statute, ordinance, or mandatory regulation may constitute negligence per se."). This guidance states, among other things, that schools must engage in "prompt, thorough, and impartial" investigations of sexual misconduct allegations. United States Department of Education, "Dear Colleague Letter," April 4, 2011 (available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html). For the reasons set forth in this memorandum, the University breached this duty.

Tech supply the terms of the contract.[10]  In its investigation and adjudication of

Jane Roe's complaint, the University breached that contract in at least four ways.

First, the Student Code of Conduct states that "[a]ny person may file a

complaint against a Student for violations of the Student Code of Conduct," which

include a "[v]iolation of the Georgia Institute of Technology Sexual Harassment &

Misconduct Policy."  Dillon Decl. Ex. J at 7.  But "[t]his complaint should be

submitted . . . no later than thirty (30) business days following the discovery of the

incident."  *Id.*  Georgia Tech allowed Jane Roe to submit her complaint ███████

████████ after the alleged incident.  Investigation Report at 1-2.

Second, according to the Sexual Misconduct Policy, an "Appellate

Committee" consisting of the "Dean of Students (or his/her designee) and two

trained administrators" decides a first appeal. But Dean Stein alone appears to have

decided Mr. Doe's appeal.  *See* Doe Decl. Ex. E ("After careful review, *I have*

*decided* to uphold the original findings related to [Jane Roe]") (emphasis added).

---

[10] Although it does not appear that a court in Georgia has yet recognized that a
*public* university has a contractual relationship with its students, Georgia courts
have found that expelled students can bring a breach of contract action against a
private educational institution.  *See e.g.*, *Morehouse Coll., Inc. v. McGaha*, 277 Ga.
App. 529, 531 (2005).  Courts in other states have recognized the contractual
nature of the relationship between a public university and its student.  *See, e.g.*,
*Savoy v. Univ. of Akron*, 15 N.E.3d 430, 436 (Ohio Ct. App. 2014) ("When a
student enrolls in a college or university, pays his or her tuition and fees, and
attends such school, the resulting relationship may reasonably be construed as
being contractual in nature.").

Third, the Sexual Misconduct Policy contains four bases for appeal: "whether the original investigation was conducted fairly and in conformity with prescribed procedures," "whether there was sufficient evidence to support the decision," "whether the Sanctions and Supplementary Requirements imposed were appropriate for the violation for which the Student was found responsible," and "whether new Information [*sic*], not available at the time of the investigation, is relevant to the final decision." Sexual Misconduct Policy at 10. But when President Peterson decided John Doe's final appeal at Georgia Tech, he cited only two of the categories and failed to consider whether Mr. Paquette's investigation was fair, whether there was sufficient evidence to support the decision, or whether expulsion was an appropriate sanction. *See* Doe Decl. Ex. F.

Finally, in Georgia, "every contract imposes upon each party a duty of good faith and fair dealing in the performance of their respective duties and obligations." *TechBios, Inc. v. Champagne*, 301 Ga. App. 592, 595 (2009). Thus, "where the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith." *Gladstein v. Aurora Loan Servs., LLC*, No. 1:11-CV-02784, 2012 WL 3758160, at *9 (N.D. Ga. Aug. 2, 2012). By refusing to review exculpatory evidence or interview exculpatory witnesses, Georgia Tech did not exercise in good faith its contractual promise to

24

Mr. Doe that he would have "the opportunity to provide information regarding his . . . involvement in the allegation." Sexual Misconduct Policy at 8.

## IV.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

Granting the injunction would also serve the public interest. Allowing a student to continue his education when the legitimacy of his expulsion is in such serious doubt, and when he would pose no threat to others, serves the public interest. The public interest demands that a student be allowed to continue his education while the flawed process producing the sanction is exposed.

## CONCLUSION

For the foregoing reasons, John Doe respectfully requests that the Court grant his motion for a preliminary injunction and demands a trial by jury.

This 23rd day of November, 2015.

Respectfully submitted,

*/s/ Christopher T. Giovinazzo*
Christopher T. Giovinazzo
Georgia Bar No. 142165
giovinazzo@bmelaw.com
**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

25

*/s/ Justin Dillon*

Justin Dillon (motion for admission *pro hac vice* to be filed)

jdillon@kaiserlegrand.com

Scott Bernstein (motion for admission *pro hac vice* to be filed)

sbernstein@kaiserlegrand.com

**KAISER, LEGRAND & DILLON PLLC**

1401 K Street NW, Suite 600

Washington, DC 20005

Telephone: (202) 640-2850

Facsimile: (202) 280-1034

*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that the foregoing document has been prepared in accordance with the font type and margin requirements of Local Rule 5.1 of the Northern District of Georgia, using a font type of Times New Roman and a point size of 14.

*/s/ Christopher T. Giovinazzo*
Christopher T. Giovinazzo
Georgia Bar No. 142165