```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION


 3


 4   JOHN DOE,                      )
                                    )
 5            Plaintiff,            )
                  v.                )   No. 1:15-CV-04079-SCJ
 6                                  )
     THE BOARD OF REGENTS OF THE    )
 7   UNIVERSITY SYSTEM OF GEORGIA,  )
     ET AL.,                        )
 8                                  )   PRELIMINARY INJUNCTION
              Defendants.           )   HEARING
 9   _____)


10
     ---------------------------------------------------------
11
                BEFORE THE HONORABLE STEVE C. JONES
12                  TRANSCRIPT OF PROCEEDINGS
                       DECEMBER 10, 2015
13
     ---------------------------------------------------------
14
     APPEARANCES:
15
     For the Plaintiff:        JUSTIN DILLON
16                             Attorney at Law

17                             CHRISTOPHER TODD GIOVINAZZO
                               Attorney at Law
18
     For the Defendants:       DEVON ORLAND
19                             Senior Assistant Attorney General

20

21   PREPARED BY:      WYNETTE C. BLATHERS, RMR, CRR
                        Official Court Reporter
22                      2314 U.S. Courthouse
                        75 Ted Turner Drive, SW
23                      Atlanta, Georgia  30303
                        (404) 215-1547
24

25
```

2

```
1              INDEX TO EXAMINATIONS

2  WITNESS                                      PAGE

3  PETER PAQUETTE

4      Direct Examination By Ms. Orland          63

5      Cross-Examination By Mr. Dillon           82

6      Redirect Examination By Ms. Orland       137

7  CARA APPEL-SILBAUGH, PH.D.

8      Direct Examination By Ms. Orland         144

9      Cross-Examination By Mr. Dillon          151

10     Redirect Examination By Ms. Orland       157

11     Recross-Examination By Mr. Dillon        158

12     Further Direct Examination By Ms. Orland 159

13     Further Cross-Examination By Mr. Dillon  159

14 KIMBERLY BALLARD-WASHINGTON

15     Direct Examination By Ms. Orland         161

16     Cross-Examination By Mr. Dillon          165

17

18

19

20

21

22

23

24

25
```

<table>
1       December 10, 2015
</table>

1       December 10, 2015

2        10:00 a.m.

3        - - -

4      P R O C E E D I N G S

5    COURTROOM SECURITY OFFICER:  All rise.  The United

6 States District Court for the Northern District of Georgia,

7 Atlanta Division, is now in session, the Honorable Judge Steve

8 C. Jones presiding.

9    THE COURT:  Good morning.  You all can be seated.

10 Ms. Wright, if you'll call the case this morning.

11    COURTROOM DEPUTY:  Yes, sir.  The Court calls the

12 matter of John Doe v. The Board of Regents of the University

13 System of Georgia and others, Civil Action No. 1:15-CV-4079.

14    THE COURT:  Good morning, Mr. Dillon.

15    MR. DILLON:  Good morning, your Honor.

16    THE COURT:  Good morning.  And you're --

17    MR. GIOVINAZZO:  Mr. Giovinazzo.

18    THE COURT:  Thank you.  You've kept me from

19 mispronouncing it.

20    MR. GIOVINAZZO:  I'm sure you would have gotten it.

21    THE COURT:  You've got more confidence in me than I

22 have in me.  Good morning.

23    MS. ORLAND:  Good morning, your Honor.  Devon Orland

24 for the defendants.  I'm here with Peter Paquette, one of the

25 defendants.

1          THE COURT:  Good morning.  Are you all ready to

2  proceed this morning?

3          MR. DILLON:  Yes, your Honor.

4          THE COURT:  We're here for a motion for preliminary

5  injunction brought by the plaintiff in this case, and the

6  defendants are here to defend it.  And we'll hear from you all

7  first.

8          MR. DILLON:  Thank you, your Honor.

9          Good morning, your Honor.  May it please the Court,

10  let me start, if I may, your Honor, by making clear what this

11  case is not about, what we're not asking for.

12          THE COURT:  Okay.

13          MR. DILLON:  We are not asking for full criminal

14  trial rights in this case.  Courts have made very clear that

15  you don't get those rights in campus proceedings, and we're

16  not asking for that.  And we agree with those Courts.

17          Number two, we are not asking this Court, a federal

18  court, to retry every campus case that comes out the wrong way

19  in the state of Georgia or I suppose in all of the Eleventh

20  Circuit.  We believe that schools have a right and a duty to

21  handle these cases and that Courts should generally defer to

22  how they do that.

23          And, third, we're not even asking you, your Honor, to

24  say what is required.  We're not asking you to write an

25  opinion either now or at the end of this case that is sort of

1 a code of conduct for schools, if you will, that lays out what

2 they're required to do.

3      THE COURT: Good.

4      MR. DILLON: So -- right. So I want to clarify that.

5 So to the extent that Ms. Orland suggests, as she did in her

6 brief, that these may be things that we're asking for or that

7 our argument is that we're entitled to these things, that is

8 not what we're asking for --

9      THE COURT: Well, she could have gotten that

10 impression from your exhibits.

11      MR. DILLON: I understand that, your Honor. But I

12 think -- and there's a very fine line, and the case law is,

13 frankly, developing in this area. But those are things that

14 we're not asking for, your Honor. I want to make that clear.

15 Let me make clear then what we are asking for, what we think

16 this case is about.

17      First, we're asking for your Honor to find that it

18 violates the due process clause for Georgia Tech, for any

19 state school, to vest in one man the power of police,

20 prosecutor, judge, jury, and executioner. No Court that I'm

21 aware of has ever blessed a system like that when the

22 allegations are so serious and quasi criminal in nature and

23 when the case comes down to a credibility determination.

24      Second, your Honor --

25      THE COURT: Well, you had said you're not asking me

1   to decide for all the colleges in Georgia, but if I issue a

2   ruling that says where it's not right for one person to have

3   that much authority, it's going to be good for all the

4   colleges in northern district, would it not be?

5   　　　　MR. DILLON:  That's exactly right, and let me be

6   clear.  We are saying that, but what I think you could do is,

7   frankly, you know, as judges can, your Honor, you could write

8   as broad of an opinion as you'd like.  But I think there's a

9   narrow opinion to be written here that says -- that relies on

10  the cases we've cited, just sort of what we know about due

11  process, from *Mathews v. Eldridge* and everything in that

12  world, and say, look, I'm not going to sit here in my opinion

13  and say let me make a checklist of what schools should do.

14  But I will cite cases that have said that, you know, you get

15  some sort of hearing; you get to know who the witnesses

16  against you are.  You should get to put questions to those

17  people, even if not in direct cross-examination through a

18  hearing panel.

19  　　　　THE COURT:  Well, aren't you really arguing with more

20  than Georgia Tech on that?  Aren't you also arguing with the

21  office of civil rights when you say you should have a right to

22  cross-examine witnesses?  Doesn't the office of civil rights

23  sort of discourage that?

24  　　　　MR. DILLON:  Well, nothing in the records shows that

25  they discouraged it.  In fact, it's in the brief, in Georgia

1  Tech's brief, they that they've discouraged it, but if you

2  read to the quote, it's not discouragement, much less strong

3  discouragement.  It just says if you give it to one side, you

4  have to give it to the other side, but it doesn't say don't do

5  it, at least from what I've seen.

6          THE COURT:  There's a section of that brief on page

7  15.  It was question and answers from Title IX on sexual

8  violence, OCR, Office of Civil Rights, "May every witness at a

9  hearing, including the parties, be cross-examined?  Answer,

10  OCR does not require that a school allow cross-examination of

11  witnesses, including the parties, if they testify at the

12  hearing.  But if the school allows one party to cross-examine

13  witnesses, it must do so equally for both parties."

14          Where in there do you see they're encouraging them

15  to, you know, do this?

16          MR. DILLON:  It's neutral.  It says it doesn't -- it

17  literally, the black and white text, your Honor, it doesn't

18  require it.  But if you're going to have it, you've got to be

19  fair about it, and that's Title IX, you know, Hornbook Title

20  IX, your Honor.

21          THE COURT:  Who got to cross-examine someone?

22          MR. DILLON:  Do what, your Honor?

23          THE COURT:  Who got to cross-examine anyone?

24          MR. DILLON:  No one did.

25          THE COURT:  So that's what I'm saying.  They didn't

1   allow anyone to do it.

2          MR. DILLON:  Right.  And I think if you look at due

3   process cases and if you look at say the *Nash* case and other

4   cases, when the stakes are what they are here --

5          THE COURT:  Let's go back to my question.  Isn't your

6   argument with more than Georgia Tech on this procedure?

7          MR. DILLON:  I think that what we're asking your

8   Honor to do is say that a state school cannot vest a single

9   investigator, invest all this power in one person.  So you do

10  need, I think, to write an opinion that says you have to have

11  something more than this, you have to have -- and I think,

12  again, the *Nash* case, which I'm happy to turn to right now,

13  speaks very much to that.  You have to have something more

14  than that because it can't be that the government -- you know,

15  basically it's the equivalent -- what we have here is the

16  equivalent of Mr. Doe was handed the police report and said --

17  and told you're guilty, what do you have to say about it.  And

18  you have to do something more than that.  I think all of the

19  cases point in that direction.

20          And let me just go to the *Nash* case, if I may, your

21  Honor.

22          THE COURT:  Yes.

23          MR. DILLON:  So the *Nash* case, I think, is in the

24  Eleventh Circuit, and their two veterinary school students

25  were charged with cheating.  Their lawyers said we didn't get

1  enough due process because, one, we only had six days notice

2  of the hearing.  Two, we didn't get a recess that we wanted,

3  and, three, we didn't get direct cross-examination.  I think

4  they were wrong.  I think the *Nash* case was rightly decided.

5  And if you look at what the *Nash* case said, the Court over and

6  over again when it rejected the argument, said that -- pointed

7  to what they did get.  They got a full hearing, which appears

8  to have been before a panel of at least three people.  There

9  were student justices.  I didn't notice a number, but I

10 think -- my impression was it was at least three.  None of the

11 people on that panel were the same person as the investigator,

12 which of course is not true here.

13         They got to give opening statements.  And, of course,

14 what does an opening statement do, your Honor?  It allows you

15 to sort of marshal everything and put everything together and

16 say -- not only to tell your story about what happened but to

17 say and let me tell you what else you're going to hear and why

18 you shouldn't credit that.  It allows you to sort of, you

19 know, marshal everything together.

20         In there, in the *Nash* case, the accused were able to

21 call witnesses in their defense.  Didn't happen here.  They

22 could pose questions through the panel.  Didn't happen here.

23 And the appeal was, frankly, much more thorough --

24         THE COURT:  Stop right there.  Let's say even if I

25 agree with you, you know, I've been in the law for a long

Case 1:15-cv-04079-SCJ Document 102 Filed 12/28/17 Page 10 of 217

1  time, an old man.  The process is different than what I deal

2  with every day.  But where does it say they have to do that?

3      MR. DILLON:  I think it says that in the -- I think

4  you have the *Jones* case; you have the *Nash* case.  And if you

5  just look at due process cases, let me just again be very

6  clear.  If we were talking of a private school -- you know,

7  I'm born and raised in Atlanta, your Honor, so if we were

8  talking about, you know, say a private school like Berry

9  and -- much different; right?  Private schools, they're not

10 state actors.  They can kind of -- it's a contract.  If you go

11 to Berry and, you know, and they say this is the system,

12 you're probably stuck with it, unless they breach that

13 contract or are negligent in how they do it.

14      But this is the government.  This is the government

15 trying to punish you for something and saying that you get

16 based -- you don't get to -- you don't even get to know the

17 names of the witnesses against you until the day the decision

18 is rendered.

19      And I will say this:  I think even Georgia Tech --

20      THE COURT:  Well, I'm not saying I agree or disagree

21 with you.  What I'm saying is that you're saying that he's

22 denied due process because of Georgia Tech's procedure.  But

23 is Georgia Tech's procedure per se wrong?

24      MR. DILLON:  I think that the way they've implemented

25 it as of right now is per se wrong, that a state school -- due

1    process does not allow a state school to vest authority in a

2    single investigator and deny everything else, no hearing, no

3    right to call witnesses, no ability to know the witnesses

4    against you.  And to be clear, your Honor, this goes back to

5    my initial point.  I don't think you have to write an opinion

6    that says I am striking down the single investigator model for

7    the state of Georgia.  You could write an opinion that says I

8    don't know where the balance is.  I don't know if you can't

9    use a single investigator model at all, but you've got to do

10   more than this. you've got to know the names before the day

11   of, and if I may --

12        THE COURT:  I wrote an opinion saying that it's going

13   to be the law until the Eleventh Circuit says otherwise to

14   everybody.

15        MR. DILLON:  I think -- I think, your Honor, in this

16   area the due process law is pretty clear.  I mean, there's

17   no -- I am not aware of any case in which there is sort of a

18   quasi criminal proceeding that turns entirely on credibility

19   where you don't get a hearing, you don't get to confront the

20   witnesses against you, you don't get to know their names until

21   the day that you're found guilty, you don't get to put

22   questions, not full cross.

23        And we even said in our briefs -- and I'll say it

24   again now -- we're not asking for full cross-examination.  If

25   you want to order it, we'll take it, but we're not asking for

1  that.  We're saying that you have to be willing to pose the

2  questions through the panel.  The panel may in its discretion

3  exercise some judgment about that, and that may be okay if

4  they exercise that judiciously.  But you have to at least have

5  that opportunity.  You have to be --

6        THE COURT:  But are you disregarding the checks and

7  balances?  In other words, there's an appeal --

8        MR. DILLON:  Sure, your Honor, but think about --

9        THE COURT:  Mr. Paquette does not have final say.

10  There is at least three levels of appeal.

11        MR. DILLON:  And that's true, your Honor, but I think

12  they're very low checks and balances, and it's actually

13  multiplied by this process.

14        THE COURT:  Well, didn't your client win on one of

15  the appeals?

16        MR. DILLON:  He did, your Honor, because it -- and I

17  think, you know, we didn't mention that because I think it's

18  sort of hard to argue your due process rights were violated

19  when you won, and I was, frankly, happy to see that Georgia

20  Tech raised it because that shows, I think, how bad an

21  investigation this was.  I mean, I'm happy to get into the

22  facts of that if you want --

23        THE COURT:  Does that also not show that there's no

24  check on Mr. Paquette?

25        MR. DILLON:  ███████████████████████████

Case 1:15-cv-04079-SCJ Document 194 Filed 12/28/15 Page 13 of 216

1 ████████████████████████████████████████████

2 █████████████████████████████████████████

3 █████████████████████████████████████████████

4 █████████████████████████████████████████████

5 █████████████████████████████████████████████

6 ██████████████████████████████████████████

7 ██████████████

8       THE COURT:  That's the one -- Victim No. 2, though,

9 is the one that your client lied about. ████████████████

10 █████████████████████████████████████████████

11 ███████████████████████████.

12       MR. DILLON:  That's right, your Honor, and I think --

13 I don't know what happened, and I think the appeal is a

14 complete black box.  Contrast that to Nash.  In Nash what did

15 the appeal consist of?  There was a recording of the hearing

16 in probably a transcript.  They had -- they were able to

17 review that.  There was a day-long meeting, which they

18 reviewed that, and there was live witness testimony.

19       Here, as you know from their own briefs, which,

20 frankly, I find kind of amazing, when it's on appeal, what do

21 they do?  They call Mr. Paquette to say, hey, you know, why

22 did you come out this way?  Why did you make this

23 determination?  I mean, that's kind of like the Eleventh

24 Circuit picking up the phone and calling you, Judge, and

25 saying, hey, your Honor, can you just tell us what your

1  thinking was here.

2          THE COURT:  I don't think that's going to happen.

3          MR. DILLON:  I don't think that's going to happen,

4  and I think it's improper.  And so I think the appeal process,

5  it is a total black box.  And just because he got lucky and

6  there was so little evidence, I don't think that proves the

7  point, your Honor, and it doesn't cure the defect.

8          THE COURT:  I still have a problem with your

9  argument, though.  You're arguing that he got lucky.  They did

10  reverse it based on the fact -- overlooking the fact that he

11  lied, they still reversed it.

12          MR. DILLON:  They did, your Honor, but that doesn't

13  mean that the initial process gives him due process.  I mean,

14  they are sort of logically separate things; right?  I mean, if

15  you have a, you know, a grossly unfair trial -- and I was a

16  federal prosecutor for five and a half years.  You've got

17  vouching, you've got all that bad stuff, and then it gets, you

18  know, reversed by the Eleventh Circuit.  And then let's say

19  you bring a 1983 action.  It's not really a no harm no foul

20  analysis; right?

21          Am I going too fast?  I'm sorry.  I was a high school

22  debater in Atlanta with Mr. Giovinazzo and --

23          THE COURT:  Have a drink of water so the court

24  reporter can catch up with you.

25          MR. DILLON:  Yeah.  Thank you very much, your Honor.

1  Sorry.  Bad habits I picked up early.

2        THE COURT:  I'm asking too many questions.  I'll let

3  you argue it.

4        MR. DILLON:  No, please.

5        THE COURT:  Listen.  I have not put a time limit on

6  you so you don't have to -- you're not on a 15-minute time

7  break.  I've given y'all all the day, even though I don't want

8  to stay here all day with you.  So just relax, take your time.

9        MR. DILLON:  I appreciate it.

10       And, your Honor, I don't need to sit up here and sort

11  of, you know, declaim and hear myself talk.  I would really

12  like to answer any questions the Court has, but I do think

13  that if you look at *Nash* and if you look at the *Jones* case and

14  the, you know, the *Northern District of New York* case and the

15  *Washington & Lee* case, you know, what do those cases show?

16  Time and again you've got to get something.  You've got to get

17  more than just a -- the government.  I mean, it's basically --

18       I don't know if your Honor is a "Les Mis" Fan.  I saw

19  it at the Fox Theater, I think, in '89.  But Inspector Javert,

20  you know, who goes after Jean Valjean, that's what this model

21  is.  It is the Javert model.  You are giving one man all this

22  power.  It is a one-man star chamber.  Whatever you want to

23  call it, that's what it is.  It's the Roger Goodell model, and

24  we've seen how successful that's been.  But that's what it is.

25  It's giving one man the ability to do all of this with no

1    checks.

2        And, again, your Honor, maybe what you can have is

3    one man, but you have to be able to call witnesses.  You have

4    to be able to have live testimony.  You have to be able to put

5    questions to witnesses.  Maybe there is a hybrid model.  And,

6    again, that's why I want to make very clear I do not think

7    that you have to strike down the entire single investigator

8    model.  I don't think you have to do that.

9        What you can say is that the way -- if you wanted to

10   be supremely minimalist, the way it was done here, based on

11   what we know about Mr. Paquette, that he did not interview

12   very exculpatory witnesses, let me just talk briefly about

13   Informant 11.  What happened with Informant 11?  Informant 11

14   ███████████████████████████████████████████████████████████

15   ████████████████████    ██████████████████████████████████

16   ███████████████████████.

17        Mr. Paquette did not interview him.  ██████████████

18   ███████████████████████    ██████████████████████████████████

19   ███████████████████████    ██████████████████████████████████

20   ███  ██████████████████████████    ███████████████████████

21   ████████████.  He had a duty to do more than that, and if

22   there was a hearing, of course he could have been called as a

23   witness --

24        THE COURT:  The attorney general's office argues on

25   his behalf that he did not need to talk to the monitor because

1   all ████████████████████████████████, and that was

2   already established.

3          MR. DILLON:  Well, a couple things about that:  One,

4   every other witness he interviewed said the same thing, but he

5   talked to those people because they were her witnesses.

6          THE COURT:  True.

7          MR. DILLON:  Number two, this was not in his report,

8   but it's actually in her initial statement.  There are two

9   reasons in that, frankly, we didn't highlight this in our

10  brief, so I'd like to highlight it now.

11         THE COURT:  All right.

12         MR. DILLON:  In her statement she said two things

13  that I think make Informant 11's testimony even more

14  important.  ██████████████████████████████

15  ████████████████████████████████████████

16  ██████████████████████████████████████████

17  ████████████████████████████████████████

18      ████████████████████████████████████████

19  ████████████████████████        ████████████

20  ██████████████████████████████████████

21  ████████████████████████████████████

22  ██████████████    ████████████    ████████████████

23  ████████████████████████████████████

24  ████████████████    ████████████████████████

25  ████████████████████████████████████████

Case 4:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 18 of 216



3    But he was -- and Mr. Paquette knew this because it

4 was in her original statement, yet he spent so much time in

5 his report asking friends of hers who weren't there.  I mean,

6 and just the innuendo, your Honor, I mean, you know, I think

7 the -- just the horrible innuendo that belongs nowhere in the

8 report.  You know,

24    I would think that's incredibly important

25 evidence.

1          And why is it bad?  And I think if there had been a

2    hearing, if he had been able to call witnesses, if he didn't

3    have to rely on simply the good graces of Peter Paquette to

4    ferret out the evidence, he could have called that witness.  I

5    mean, again, your Honor, I was a prosecutor, and prosecutors

6    are supposed to ferret out Brady material and search for it

7    and disclose it as early as they can.  But there's a system of

8    checks and balances that makes -- that keeps them honest.

9          THE COURT:  My concern is still that you're saying

10   that the one person's determination -- and I may be

11   misinterpreting you or misunderstanding you -- is wrong, but

12   there's a case called *Dixon* from the old Fifth Circuit.

13          MR. DILLON:  Yes, sir.  Yes, sir.

14          THE COURT:  I'm sure you're quite familiar with it.

15          MR. DILLON:  Yes, sir.

16          THE COURT:  It doesn't say you're entitled to a full

17   hearing.

18          MR. DILLON:  Absolutely, your Honor, but it says

19   that --

20          THE COURT:  Well, that's what you're asking for.

21          MR. DILLON:  I mean, the *Dixon* case, right.  I mean,

22   it's from the early sixties, and it says you've got to get

23   something.

24          THE COURT:  You're entitled to put up a defense, tell

25   your side, but it doesn't say anything that you have a right

1   to question anyone, cross-examine anyone, get an opening

2   statement.  You have a right to tell your side.

3          Did your client have a right to tell his side?

4          MR. DILLON:  I think not to someone who is willing to

5   listen, your Honor, and I think that matters.

6          THE COURT:  Let's hear more about that part.

7          MR. DILLON:  Sure.

8          THE COURT:  Your argument said his mind was already

9   made up.

10         MR. DILLON:  My argument -- I'm sorry.

11         THE COURT:  Your argument said Mr. Paquette's mind

12  was already made up?

13         MR. DILLON:  Yes, your Honor.  I mean -- so let me

14  actually -- if I may, may I stay on *Dixon* for a second?

15         THE COURT:  Yes.

16         MR. DILLON:  It says, *Dixon* says -- and it's 61 -- he

17  should also be given the opportunity to be present -- to

18  present to the board, or at least to an administrative

19  official at the college, his own defense against the charges

20  and to produce either oral testimony or written affidavits of

21  witnesses on his behalf.

22         And I think here he tried to do that.  I mean, he

23  tried -- he said, please go talk to these people,

24  Mr. Paquette.  Here are six people I would like you to talk

25  to.  And I think seven -- because remember he wanted



 1 | Mr. Paquette to reinterview Informant 1, ███████████████

 2 | ████████████████████████████████████████

 3 | ██████████

 4 |          THE COURT:  ███████████████████████████

 5 | ████████████████████

 6 |          MR. DILLON:  I'm sorry.  What?

 7 |          THE COURT:  That witness supposedly had said nothing

 8 | happened.

 9 |          MR. DILLON:  ███████████████████████

10 | █████████████████████████████████████

11 | ██████████

12 |          THE COURT:  Can't remember.

13 |          MR. DILLON:  Right.  But he wouldn't even go -- so,

14 | you know, he never asked her about that.  Imagine if a

15 | prosecutor -- and this is, again, Mr. Paquette is police,

16 | prosecutor, judge, jury, and executioner.  So here what you

17 | have is a prosecutor who hears ████████████████████

18 | ██████████████████████████████████████

19 | ████████████████████████████████████████████

20 | ███████████████████

21 |              ████████████████████████████████████

22 | █████████████████████████████████████

23 | █████████████████████████████████

24 | ████████████████████████████████████████

25 | ████████████████████████  ███████████████

1  ███████████████  He didn't interview either of those two people

2  or go reinterview Witness 1.  If that were -- if this were a

3  criminal case, your Honor, you would throw that out as a Brady

4  violation in a heartbeat.

5          THE COURT:  Well, that's the key right there.

6          MR. DILLON:  I hear you.  I hear you.  And my point

7  is, your Honor, is that you don't -- and, again, we're not

8  saying that you have to bring to bear all of the criminal

9  trial rights.  But if you're going vest it -- if you're going

10  to vest the government with all of this power, there have to

11  be some rudimentary things that everyone who knows what due

12  process is will recognize as due process, whether that is the

13  right to an actual hearing, the right to present some

14  questions of a witness, you know, to call witnesses and to

15  make sure they get interviewed --

16          THE COURT:  Let me interrupt you for a second for the

17  court reporter.

18          MR. DILLON:  Sure.

19          THE COURT:  For the record it's *Dixon v. Alabama*

20  *State Board of Education*, 294 F.2d 150, Fifth Circuit, 1961.

21          Go ahead, sir.

22          MR. DILLON:  Thank you, your Honor.

23          So I think that, you know, there's got to be -- and

24  here again what you have is a very serious quasi criminal

25  charge that is life changing.  I mean, I think no one would

1   dispute that getting expelled from college --

2           THE COURT:  Let's talk about those four requirements

3   you have to be able to establish.

4           MR. DILLON:  Yes, your Honor.

5           THE COURT:  Likelihood of succeeding.

6           MR. DILLON:  Lack of what?

7           THE COURT:  Likelihood of succeeding, prevailing in

8   this case.

9           MR. DILLON:  I'm sorry.  I have a cold, your Honor,

10  so my ears are stuffed.  I'm --

11          THE COURT:  The first requirement for the injunction

12  is you have to show a likelihood --

13          MR. DILLON:  Likelihood of success, yes, your Honor,

14  yes.  And I think that's the merits argument.  I mean, I think

15  that's part of what I've been trying to do is convince you

16  that -- of course you're not ruling now.  But, you know, the

17  *Jones* case, when the Fourth Circuit looked at facts very much

18  like this, a nurse was being expelled through an unfair

19  process, you know, somewhat similar to this where she got a

20  hearing and was acquitted at the hearing.

21          And then a single administrator acting alone through

22  applying who knows what standard reversed and expelled her.

23  She got an injunction because she was about to graduate from

24  nursing school, and the Fourth Circuit upheld that injunction

25  and --

1            THE COURT:  Let's look at what you're alleging.

2            MR. DILLON:  Sure.

3            THE COURT:  You're alleging, first of all, a

4    violation of due process --

5            MR. DILLON:  Yes, your Honor.

6            THE COURT:  -- a breach of contract, and failure to

7    conduct a fair investigation.  But you yourself acknowledge

8    for public universities or public colleges there's not a

9    contractual relationship that's been acknowledged by any court

10   in this state.

11           MR. DILLON:  I think for today's purposes, your

12   Honor, I'll just focus on due process, Title IX, and to a

13   lesser extent equal protection --

14           THE COURT:  So you want to just deal with Counts I,

15   IV and V?

16           MR. DILLON:  I think so, your Honor.

17           THE COURT:  Could it be said, not that you're saying

18   this, but could it be said that you might agree with the

19   defense that the Eleventh Amendment might eliminate the other

20   ones?

21           MR. DILLON:  I think on contract, yes.  I'll just say

22   that flat out.  I think on the --

23           THE COURT:  What about also on Count III, violated

24   Title IX?

25           MR. DILLON:  Violate Title IX?  Did you misspeak,

1  your Honor?  That's not --

2          THE COURT:  Excuse me.  Breach of good faith and fair

3  dealing.

4          MR. DILLON:  Right.  I think on the contract base

5  counts we'll concede that.  I think on the negligence base

6  counts at the end of day, when we're briefing this for the

7  motion to dismiss, you know, we may concede it there.  I

8  think --

9          THE COURT:  Negligence per se, Count VII?

10          MR. DILLON:  Again, I think the -- I'd like to

11  reserve that.  I'll give it to you.  I'll concede it on the

12  contract counts.

13          THE COURT:  I respect the person that moves forward

14  and doesn't argue --

15          MR. DILLON:  Right.  And, again, your Honor, I

16  think -- I don't want to concede negligence because I want to

17  just make sure there's not a --

18          THE COURT:  Contract will you concede?

19          MR. DILLON:  I'll concede contract, sure.

20          THE COURT:  Go ahead.

21          MR. DILLON:  But for today I think -- I mean, let's

22  put it this way:  There is no way on God's green earth I will

23  convince you that we are likely to succeed at this stage on

24  negligence claim.  So I'd like to focus on where I think the

25  real rubber meets the road.

 1          THE COURT:  I don't want to cut off your argument,

 2    but I wanted to just see where you're at.

 3          MR. DILLON:  Yes, your Honor.  Okay.  So, again, I

 4    think on likelihood of success on the merits, I mean, I think

 5    I've tried to play that out as much as I can in the due

 6    process thing.  And, again, you do not have to invalidate the

 7    single investigator model.  You could write an opinion that

 8    says, you know, just as applying this case, I'm troubled by

 9    the fact that, you know, he didn't interview exculpatory

10    witnesses.  Due process requires that you do that.  I'm

11    troubled by the fact that he didn't give the names of the

12    witnesses against him to Mr. Doe until the day of the hearing.

13    And I think -- I will say this:

14          I think Georgia Tech actually kind of knows it has a

15    problem there because it said in its brief that they are,

16    quote, I believe, easily identified by -- let me get the

17    quote -- their position and knowledge.  So college kids, they

18    don't have positions.

19          If you look at -- if you look -- I went through the

20    list.  There are 11 informants which, again, is sort of a

21    police state Orwellian world -- word that I think goes --

22    helps my argument a little bit.  It says clearly identified by

23    their position and knowledge.  If you go through and you look

24    at them, of the 11, 6, 6, more than half, are identified only

25    as friends of Ms. Roe or something equally vague.  And I

Case 1:15-cv-04079-SCJ Document 192 Filed 04/26/17 Page 27 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 27 of 216

27

1  think -- and Mr. Paquette himself -- and this is in their

2  exhibits; it's in the affidavit, Exhibit 1 -- wrote Mr. Doe an

3  email when he sent him the report on ▮▮▮▮▮▮▮ and said,

4  quote, it may be difficult to decipher who is who due to the

5  names being redacted, but I'm happy to clarify that when we

6  talk tomorrow, end quote, tomorrow being the final interview.

7          So you could write an opinion that says I'm not going

8  to strike down the single investigator model in all of

9  Georgia.  I'm not doing that.  But you have to -- but what I

10 know that you can't do is not -- is refuse to interview

11 potentially exculpatory witnesses, to not let people have some

12 sort of -- whether it's compulsory process or not, put people

13 in front of the fact finder and say ▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮

18          And, again, think about what kind of case this is.

19 This is not, your Honor -- and why we need these protections.

20 It was not a case in which you have, say, a contemporaneous

21 report, even a nearly contemporaneous report, where the

22 memories would still be fresh.  This is not a case where

23 there's a lot of physical evidence where you could look at

24 rape kit or a sane examination or something like that.  It's

25 not one of those.

1      You have a -- this report took ███████ to file.
2  Your Honor knows, I think, as a former prosecutor and as the
3  judge, evidence gets stale.  And what should you be able to do
4  as a defendant if all the people that you would have called,
5  you know, from ████████ before may by that time have
6  forgotten what went on ████████████████? You should
7  have some rights to say at least let me know who's saying
8  these things about me.  At least let me put in front of you so
9  you will listen to people who say ████████████████████
10 ██████████████████████████.  You know, you have to
11 have some ability to do that.
12      So I think you can write a narrow opinion that says
13 you have to do something, whether it's -- and maybe it could
14 be this, your Honor.  I'm not going to strike down on the
15 single investigator model, but I do think looking at *Nash* and
16 what *Nash* emphasized as being essential to due process --
17      THE COURT:  Does *Nash* say you can't have a single
18 investigator?
19      MR. DILLON:  No.  But what it does, when it's
20 blessing what they had here, right, when it's turning back --
21 and I think rightly so the due process challenge there -- it
22 says, no, you didn't have all of these things, but let's talk
23 about all the great process that you did have.  And I think
24 it, you know, speaks very highly of that, and it doesn't
25 certainly say it's all required.  But it says --

1      THE COURT:  That's the point right there, that I

2 could say when they, a Cadillac model -- and I'm not saying

3 Georgia Tech does not have a Cadillac model.  Let's say that

4 Georgia Tech has a -- I've got to be careful here.  Let's say

5 they have a Lexus model.  Okay?

6      MR. DILLON:  Okay.

7      THE COURT:  As long as they have a model that meets

8 the requirements, it may not be -- and some people may say the

9 Lexus is better than a Cadillac, but let's just go with this

10 for today.  They may not have the Cadillac, but as long as

11 they meet the requirements, would I not be second guessing

12 them by saying, well, I think you should have did this, should

13 have that?  But if they're meeting the requirements, you're

14 saying to me I should still go ahead and say you've got to

15 have more than one person?

16      MR. DILLON:  You should look at cars and say, you

17 know what, every car needs a brake.  Yours only had an

18 accelerator.  And I can say that.  And what due process is,

19 what it's all about, is a break on government power; right?

20 It is all about saying even if the government knows you did

21 it, they got it on videotape, they got a confession from you,

22 you still have rights.  And even college kids at public

23 schools still have rights.

24      THE COURT:  And you won't get any disagreement from

25 that.  But my question still is this, is that did they meet

1    the requirements that they are required to meet?  That's the
2    first question I have to answer when I'm looking at it.
3         MR. DILLON:  Sure.  Absolutely not.  And, again,
4    there is no court, I can't think of a single context, any
5    context where you have sort of a judge, you know, police,
6    prosecutor, judge, jury, executioner, that has blessed this.
7    And I will say -- let me turn to the *Withrow* case.
8         THE COURT:  Okay.
9         MR. DILLON:  Even the *Withrow* case, your Honor, which
10   the defendants cite, it's the Supreme Court 95 -- excuse me --
11   421 U.S. 35, 1975.  In *Withrow* basically the Wisconsin Medical
12   Board acted as both the investigator and the adjudicator.  The
13   plaintiff said you can't do that; you can't be both.  And it
14   said bias should be presumed.  The Supreme Court said no, no,
15   no, bias should not be presumed, and there are certain times
16   when you can have that.
17        But I think there are two things about *Withrow* that
18   are very importantly distinguishable in a way that favors
19   Mr. Doe.  Number one, both times that's a board.  It's not a
20   single person.  It's a board.  And if you look at Footnote 3,
21   there's a very explicit "reserval," a reservation of what this
22   case is not about.  And I'll read Footnote 3.  Quote, apart
23   from his claim that the tribunal at the contested hearing
24   would be biased, appellee has not contended that that hearing
25   would not be a full adversary hearing.  No issue has been

1  raised concerning the circumstances, if any, in which the

2  board could suspend a license without first holding an

3  adversary hearing.

4       And I don't think any reasonable person could

5  describe what Georgia Tech did here as an adversary hearing.

6  One man talked to everybody.  One man decided who he would

7  choose to talk to and not talk to.  One man packed his report

8  with the most ridiculous and unsupported innuendo, to be clear

9  would never be allowed, about the complainant.  In a million

10  years that report never would have gone to some other people

11  and said let's talk about her sexual history, let's talk about

12  her reputation.  That would never be allowed, and that kind of

13  thing should not be allowed.  But it was allowed here.

14       So what I'm saying, your Honor, is you don't have to

15  say I'm striking down the single investigator model.  You can

16  look at what went wrong here and say I'm troubled.  I'm not

17  striking out the single investigator model, but I am troubled

18  that he did not get -- that he had no power to call witnesses

19  and that this man didn't interview the witnesses that I think

20  are objectively exculpatory.  This man did not interview those

21  witnesses.

22       I am troubled by the fact that he was attacked by

23  anonymous people whose names he didn't learn until the day he

24  was expelled when, I might add, the report was already

25  written.



12    I'm troubled by the fact that there's all this rumor

13  and innuendo packed in here with no ability for him to

14  challenge it in any way.  I'm troubled by the fact that, you

15  know, Mr. Paquette didn't do the same sort of good character

16  interviews with some of Mr. Doe's friends to say I've known

17  him for years, he's a good man, he's a gentleman, I know how

18  he treats people.  He didn't do any of that.

19    So, again, you don't have to strike down the single

20  investigator model whole sale.  There are enough things that

21  went wrong here that you could write a narrow opinion that

22  says I don't know what it looks like in its perfect form, but

23  I know this isn't it.  And I think that is enough.

24    And I think there is no case -- your Honor is going

25  to find cases, and I'm sure your, you know, able law clerks

1  have found you cases that talk about, well, it's okay, just as

2  the *Withrow* case says, to sometimes vest adjudicatory and

3  investigative authority in the same body.  You're going to

4  find plenty of cases that say that.

5           THE COURT:  You have?

6           MR. DILLON:  Absolutely.  None of them, none of them

7  that I'm aware of deal with quasi criminal allegations that

8  turn almost entirely, really entirely, on credibility.  There

9  are much different cases, social security benefits, welfare

10 benefits, you know, medical licensing.  These are unique

11 cases, your Honor, and *Mathews v. Eldridge* is a flexible test.

12          THE COURT:  How is your client's property interest

13 any different than their property interest?

14          MR. DILLON:  Property interest in what way?

15          THE COURT:  Your client's property interest in

16 education.

17          MR. DILLON:  And liberty, property and liberty.

18          THE COURT:  That's what you're arguing?

19          MR. DILLON:  Yeah; both of them.

20          THE COURT:  How is that different than a person going

21 through a social security hearing?

22          MR. DILLON:  It's not.  It's just I think that is

23 sort of -- the way I've always thought of it is that's just

24 sort of the first box you check, is are we even talking about

25 due process here because in order to talk about due process,

1   you've got to identify liberty or property interest.  There's

2   both.  So I don't know if they're any different, and I don't

3   think they have to be because it's -- does that make sense?

4   And I think -- and I think that then you look at sort of

5   overall what is the import of the deprivation of that.  And

6   here again it is quasi criminal.

7           It is -- I mean, it's -- it takes you out of school.

8   I mean, for the rest of your life you have to explain to

9   employers -- it's on transcript -- all these things, why were

10  you expelled from Georgia Tech three classes shy of

11  graduation?  And again, again, I'm not saying that, you know,

12  you don't have to write -- what I want and what you have to

13  write are different things.  But you don't have to write an

14  opinion that says you can't be the investigator and the

15  adjudicator, no, absolutely not.  You don't have to write an

16  opinion that says you get full blown cross.  Absolutely not.

17  You can look at this, and you can say I don't know what the

18  model is, but I can identify the failure to look at

19  exculpatory evidence, the failure to submit questions, the

20  failure to even know who your accusers are until the day that

21  you're expelled.

22          I mean, I will say this:  I think -- the reason I

23  think Georgia Tech kind of knows it has a problem with that is

24  that, you know, they take pains to say, again, you know, these

25  witnesses are clearly identified by their position and

```
 1   knowledge.  Again, that's provably untrue.  You can look at
 2   the investigative report, and more than half of them are not.
 3   And why do they do that?  Because I think they probably know
 4   that, you know, secret witnesses, that doesn't sound like due
 5   process.  I mean, it sounds like a star chamber and it's, you
 6   know -- and what's the limiting principle of this, your Honor?
 7   Right?  So, you know, if the Court rules that you can do what
 8   Mr. Paquette did here, what's the limiting principle?  So the
 9   next student who comes up and is charged Mr. Paquette looks
10   him in the eye and says, I don't want to talk to any of your
11   witnesses, I think they're all lying, I think they're all
12   biased, they're all your boys ███████████████████████████
13   ███████████████, and I have feelings about those guys.  I'm
14   going to talk to all of her witnesses.  I'm not going to ask
15   them any questions that you want.  I'm not going to even tell
16   you really why I've rendered the decision that I'm going to
17   render.  But, you know, I'm going to conduct my investigation,
18   talk to her witnesses, and I'll see in a month.
19           Are there no due process limits?  And maybe that's a
20   question for Ms. Orland like what are the limits?  Because all
21   I'm saying, my position is the modest one.  My position is
22   modest.  I am saying time and again courts, Nash, Jones, you
23   know, the W & L case, all these courts, have laid out some
24   sort of framework for what's a bare minimum of process that
25   you should get because you've got to get something.  And I
```

1 | don't think there's a limiting principle on Georgia Tech. I
2 | think they're going to say -- I think they'll argue the
3 | logical extension of their argument is we can do anything we
4 | want, we can vest all the power in one person, you don't have
5 | the right to question, you don't have the right to call
6 | witnesses, you don't have the right to even know who the
7 | witnesses against you are. You just have to sort of trust us
8 | that we're going to get it right.
9 | THE COURT: What if they argue that? Are they
10 | arguing what the case law is now?
11 | MR. DILLON: Absolutely not. And, your Honor, and I
12 | understand like I know -- I will try to convince you of this.
13 | I mean, there is no case that blesses that full stop. There
14 | are cases that say at a high level of generality, like
15 | *Withrow*, you know, an adjudicator and investigator can be the
16 | same person --
17 | THE COURT: Let's have one person arguing.
18 | MR. GIOVINAZZO: Okay.
19 | THE COURT: Thank you.
20 | MR. DILLON: So we're not saying that. It's at that
21 | high level of -- so you'll find cases at that level of
22 | generality, but if you actually break it down and you look at
23 | sort of what the *Nash* court said was necessary, you know --
24 | not was necessary, what it blessed, when other courts have
25 | blessed, in all of those cases I think to a one you're going

1  to see when it says it's okay to have them both, in every case

2  that I've read there's at least a hearing.  There's at least a

3  chance to call witnesses --

4       THE COURT:  Let's do this.  Let's do this.  I think

5  we've argued this point.  Let's move on to the next points.

6  And you've got a note behind you.  Let's argue that note, and

7  then let's move on to the next points.

8       MR. DILLON:  So, yeah, let met just actually, if I

9  may, just read from *Nash*, and then I'll move on.  So due

10  process -- this is on page 664.  Due process requires that

11  appellants have the right to respond, but their rights in the

12  academic disciplinary process are not coextensive with the

13  rights of litigants in a civil trial or with those of

14  defendants in a criminal trial.

15       THE COURT:  Right.

16       MR. DILLON:  Although appellants were not allowed to

17  ask questions directly of the adverse witnesses at the June

18  12th hearing, it is clear that they heard all of the testimony

19  against them.  Appellants were told that they could pose

20  questions of the accusing witnesses by directing their

21  questions to the presiding board chancellor who would direct

22  appellants' questions to the witnesses.  Appellants were

23  clearly informed.  When the time came for them to ask

24  questions in the prescribed manner, that they did not avail

25  themselves of this opportunity, the opportunity to question

1   the witnesses through the chancellor, cannot be characterized

2   as a denial of process.

3           Following the testimony by the accusing witnesses in

4   a recess that appellants requested, appellants presented

5   statements and witnesses in their behalf, the testimony of

6   whom, if given credence by the board, was capable of

7   challenging the inferences suggested by the testimony of the

8   accusing witnesses.  We do not suggest the opportunity to

9   question witnesses would not have been valuable in this case.

10  Such a process would be more important in a disciplinary

11  action such as the present case than, for example, in the case

12  of a student's dismissal for deficient academic performance.

13          So, I mean, again, what they're saying is they

14  weren't allowed to ask questions directly, but they got to

15  pose questions.  They were told when that happened.  They were

16  able to call witnesses in their behalf.  *Nash* is our case.  It

17  is a good case for us.  And I think, again, you don't have to

18  strike down the whole thing.  You can just look as applied

19  what happened here and say you've got to -- he's got to be

20  able to put his case forward.  Mr. Paquette didn't let him do

21  that.  Because if he says -- I mean, what they want you to do

22  is essentially rule that even if you have exculpatory

23  witnesses, we don't have to talk to them, and there's nothing

24  you can do about that.

25          Even if let's say you know that someone is testifying

1  against you because of -- let me frame it this way:  Six

2  witnesses, anonymous witnesses, are saying terrible things

3  about you.  You're not allowed to know their names because,

4  you know, maybe you'd be able to point out that one of them

5  has a bias against you from a sort of pre-existing

6  relationship or something like that.  You don't get to know

7  any of that.  You just have to trust us, and I'm sorry.  And I

8  don't think that can be the law.

9          So now, okay, I'll move on to Title IX.  So Title IX,

10  the *Yusuf* case, I think, is the leading case.  They're decided

11  by Courts all over the country, and there's sort of a

12  two-prong test for erroneous outcome claims.  Number one,

13  plaintiff must put forth particular facts sufficient to cast

14  some articulable doubt in the accuracy of the outcome of the

15  disciplinary proceeding and, two, particular circumstances

16  suggesting that gender bias was a motivating factor.

17          I think the first prong is pretty straightforward.

18  This does not -- *Yusuf* says this is not a heavy burden and

19  that you can -- doubt can be cast by evidentiary weaknesses

20  behind the finding and procedural flaws that may have affected

21  it.  I think I've probably amply told you our position on why

22  there were evidentiary weaknesses and why there were

23  procedural flaws.

24          I think to the second prong, you know, usually, to be

25  honest, your Honor, you don't have as much evidence of gender

1    bias in a lot of these cases as you do here.  This case is

2    much more like the *W & L* case where the Title IX coordinator

3    had written an article, you know -- and she was the person who

4    picked all the panelists -- about kind of gray rape.  And the

5    thesis of it was if you have sex that you regret the next day,

6    that that's rape.  The Court found itself troubled by that and

7    that someone with that position would be picking the board

8    members in that case and also would, I think in that case,

9    refuse to interview witnesses.

10           THE COURT:  But in this case you're saying

11   Mr. Paquette's gender bias is shown in a number of ways.  I

12   think one of the ways is the book that he requires them to

13   read?

14           MR. DILLON:  Yes, your Honor.

15           THE COURT:  Tell me about that.

16           MR. DILLON:  Sure.  So the book is called "Guyland,"

17   and, you know, it contains, I think, incredibly --

18           THE COURT:  I think you argued that it's anti

19   middle-class, white, male fraternity athletes.

20           MR. DILLON:  I mean, it says -- I mean, it talks

21   about intensive all male peer groups foster rape supportive

22   behaviors and attitudes.  ████████████████████████████████

23   ███████████   ██████████████████████████   And it says, athletes

24   or frat guys are more prone to gang rape because being frat

25   guys or athletes confers on them an elite status that is

1    translated into entitlement, and because of the cement of

2    their -- and because the cement of their brotherhood is

3    intense and intensely sexualized bonding.

4         So that's one thing. And I think that's -- he is

5    obviously -- if he's assigning this book as a remedy, as a

6    punishment in these cases, he's clearly endorsing it; right?

7    I mean, it's sort of strange credulity to think he would

8    assign a book in an effort to say don't do that; right? So

9    he's trying to use this book to educate people. He's

10   endorsing it. And if that were all we had, your Honor, I

11   don't think that would be enough, but I think there's the

12   totality of the circumstances.

13        I think when you look at the school's reaction to the

14   rapebait email, you look at the treatment of the fraternity,

15   you know, the fraternity case, and, you know, if you read

16   their appeal, your Honor, you know, which we of course

17   attached as an exhibit, what do they say time and again that

18   he did? He refused to look at their evidence. He refused to

19   interview their witnesses. He refused to like look at,

20   apparently, videotape that seriously undermined the claim that

21   was being made.

22        Now, the defendants say, well, that was about a

23   racial slur; that has nothing to do with gender. But I think

24   that's not quite right. I mean, they've sort of looked past

25   two things. This was an all male organization. And, two,

 1   even by the admission of some of the people that were

 2   interviewed, some of the women that were interviewed, he

 3   showed a very strong bias towards the women there because he

 4   helped prepare them for the hearing.  I mean, he's the

 5   investigator, and he's helping prepare the witnesses for the

 6   hearing.  And, again, I think that is -- that's indicative of

 7   gender bias and that's, you know -- and, again, that's the --

 8   I think the *Wells* case, the *Wells v. Xavier* case, and the *Doe*

 9   *v. W & L*.  Both show that.  There's both been a -- there's

10   been a pattern of decision making that shows gender bias, and

11   there have been statements, the endorsement of "Guyland," that

12   shows that.  I mean, I would bet you if you ask him, he says

13   he assigns it because he thinks it's a good book; right?  He

14   might be able to say I don't agree with everything in it.  Any

15   good witness would say that.  But why else is he assigning it?

16   And, again, it's got these incredibly inflammatory statements

17   about the exact kind of person that Mr. Doe was at a high

18   level.  Of course he's more than that.  ██████████████████

19   ████████████████████████████████; right?  He's, you know,

20   he's far more than the caricature that's made of him in the

21   investigative report.  But I think those two things are

22   indicative of gender bias.  And, again, what else do you have?

23   You just have -- you can look at -- sort of look back at the

24   facts from the procedural due process thing.  Why wouldn't he

25   talk to Informant 11?  Why would any neutral investigator not

1  make move –– you know, move mountains to talk to ████████

2  ████████████████████████████████████████████████?  Why

3  would a ––

4       THE COURT:  ████████████████████████████████

5  ██████

6       ████████████  ████████  ████████  ████████

7  ████████████

8       ████████  ████████████████████████████

9       ████████  ████████████████████████

10      ████████  ████████████████████████

11      MR. DILLON:  Absolutely, your Honor.  I mean, it's,

12  you know –– it is ever thus in almost every sexual assault

13  case ever; right?  I mean, it's very rare that you have live

14  witnesses.  So it's, I mean, think ––

15      THE COURT:  ████████████████████████████████

16  Here's my question ––

17      MR. DILLON:  ████████████  ████████████████

18  ██████

19      THE COURT:  It's your argument then, again, that

20  gender bias is shown by the fact he didn't talk to ████

21  ██████.

22      MR. DILLON:  Is that a factor?  Yes.  Absolutely.

23  Can you look at that and say, you know –– again, it's not any

24  one thing.  Courts in Fourth Amendment cases, you know, say

25  all the time it's the totality of the circumstances.  So

1  it's -- if you just had "Guyland," no, if you just had the

2  fraternity case --

3          THE COURT:  How would you address the argument that

4  Ms. Orland is going to make in about 15-20 minutes from now,

5  judge, you're not supposed to go behind the decision maker?

6          MR. DILLON:  I mean, of course you are.

7          THE COURT:  Okay.  Tell me.  She's going to argue

8  that.  I may be wrong, but I think she will.

9          MR. DILLON:  I think they are the government.  You

10  are a judge.  I mean --

11          THE COURT:  Well, address the question, though.  If

12  she's going to argue, Judge, you're not supposed to go behind

13  the decision making, your argument is that he did a bad

14  investigation.  And his bad investigation is based on the fact

15  of gender bias, and one person shouldn't be there and he

16  didn't do it right, he didn't do it correctly, and based on

17  that, this is the decision he made.  Ms. Orland is going to

18  argue, Judge, the law and the courts say you as a Court should

19  not be second guessing the decision making.

20          MR. DILLON:  So, first of all, no cases say that.

21  There is throat clearing in a lot of cases that talk about

22  that and they cite --

23          THE COURT:  Well, let's just answer the question --

24          MR. DILLON:  -- Davis v. Monroe County.  They cite --

25  so they cite the Davis --

          THE COURT:  Let's stop right -- just answer the

question I just asked you.  What do you say?  Should I be

second guessing the decision making?  I think the question is

yes.

          MR. DILLON:  Yes, of course.  I mean, just as if --

if this were an employment case and they didn't promote my

client because she's a woman and Ms. Orland stands up here and

says, your Honor, you're not supposed to go behind these

decisions, this a campus issue -- or let's say -- make it more

academic.  They didn't grant me tenure because I'm a woman.

And, you know, you came in here -- and she came in here and

said, your Honor, you just have to trust us on this.  Even

when we had statements let's say from the chair of the

department that might raise a suspicious judicial eyebrow, I

mean, of course you have to look behind it.  That's not to say

that you, you know, retry them all.  And, again, we're not

saying that.

          They cite for that quote, and it's, you know, it's

instructive.  I think it's the Davis v. -- I think it's *Davis*

*v. Monroe County*, if I'm remembering correctly, to say that,

you know, courts should not get involved in these things.  Do

you know what the holding of that case was --

          THE COURT:  What if that Court should not get

involved?

          MR. DILLON:  They should accord a lot of deference to

1    it or -- I don't have the exact quote.  But the holding of

2    that case is involvement; right?  That was throat clearing by

3    the Supreme Court to say, look, we're not saying that you've

4    got to get deeply involved, but if you can prove deliberate

5    indifference to student-on-student sexual harassment, that's a

6    Title IX violation.  So in the Supreme Court case that they

7    cite for that proposition, the Courts did, in effect, I mean,

8    literally get involved and second guess the decision making;

9    right?  It's the same thing.

10           So there is a lot of throat clearing about that in a

11   lot of cases, but I think that it's -- there are limits to it.

12   It's kind of like the government saying, you know, during the

13   war on terror everything we do is unreviewable, you're just

14   going to have to trust us.  Judges have pushed back against

15   that and said no, no, no, we have a role to play here.  So I

16   don't think -- again, you're going to have -- we're going to

17   do a full blown criminal or civil trial where we bring

18   everybody in, Informants 1 through 11, and do that.  That's

19   not what we're saying.  They want to keep this at a very high

20   level of generality, your Honor.  That's what they're hoping

21   to convince you of.  Don't retry these cases.  Look at all the

22   cases that say that.  It's okay to have an investigatory and

23   adjudicatory body in the same person.  They want to keep it up

24   here.

25           They don't want -- pay no attention to the man behind

1   the curtain.  They want you to look only at the forest, but

2   we're asking you to look at the trees, which is what Courts do

3   all the time; right?  And if you look at the trees here, what

4   you see in terms of what was done to Mr. Doe here was that it

5   wasn't right.  And you can't -- there's evidence of bias.

6   There's evidence of, you know, again, of not -- many

7   violations of due process.  So I think, again, with respect to

8   bias -- and to be clear, you don't have to find bias today;

9   right?  I mean, all you have to do to grant the injunction is

10  say, you know, I think -- you should pick one and say I don't

11  know if, you know, Mr. Doe is ultimately going to win on the

12  due process thing, but I am troubled by this.  And, I mean, we

13  have talked about irreparable harm --

14          THE COURT:  But I have to do more than that.  I have

15  to answer all four of the elements.  I have to do more than

16  just that one.

17          MR. DILLON:  So let me, if I can do them then, if you

18  don't -- so I think we've -- unless you'd like more questions

19  for me, I think I've -- likelihood of success on the merits, I

20  feel like I've --

21          THE COURT:  You argued it.

22          MR. DILLON:  I've argued it, and if you have anymore

23  questions, your Honor, I'm happy to answer them.

24          So on irreparable harm, I mean, the defendants admit

25  that this is the number one fact.  And here I think it's -- I

1  mean, we win this, I think, running away.  There's a, you

2  know -- and just look at the *Jones* case.  There's going to be

3  a gap in his educational record.  The earliest he could

4  graduate would be May of 2017.  He's going to start his career

5  late.  He can never get that back.  He's not --

6          THE COURT:  Should that outweigh the argument that

7  Georgia Tech is going to make that Mr. Doe being on campus

8  poses a danger to the, you know, students on campus?  Your

9  argument is that there's going to be a gap that he's going to

10  have to explain at some point to a future employer that's not

11  right.  You can't change that if that gap is there.

12          MR. DILLON:  Right.

13          THE COURT:  I'm assuming their argument is going to

14  be but, Judge -- they are arguing it through their briefs.  He

15  poses a danger being on this campus.  Does that outweigh --

16          MR. DILLON:  So that's a different prong; right?

17  That's balance of harm.  So, I mean, I think our -- and I'll

18  move to that.  I think there's no question that we win that

19  one.  ███████████████████████████████████████████

20  ██████████████████████████    ███████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ██████████████████████████    ██████████████████████████████

23  ███████████████████████████████.

24          The one thin case was reversed on appeal, so he has,

25  as far as this Court, I think, should fairly look at it, a

```
1   completely clean disciplinary record ████████████
2   That's number one.
3        Number two -- and I can't say this strongly enough --
4   he will accept as many restrictions as this Court wants to put
5   on him.  He will have no contact with Ms. Roe.  To be clear,
6   he has never violated that.  There's no hint that he's ever
7   violated the no contact order.  He will live off campus.  He
8   will agree to only go to campus for academic reasons, you
9   know, to and from class, labs, because I guess that's what
10  engineers do -- I was an English major -- you know, no
11  parties, no fraternity events, no basketball games, nothing.
12  And, your Honor, if you want to add a stack of requirements
13  onto that, he'll do anything.  All he wants to do is be able
14  to go back, ████████████████ --
15       THE COURT:  If this a trial of this case, what's the
16  total relief that your client is seeking?
17       MR. DILLON:  You know, I think -- that's a good
18  question, your Honor, and I think we're not there yet.  I
19  mean, I'm happy to -- I'll answer it, but I think that the
20  remedies in these cases -- this is a developing area of law;
21  right?  I mean, there's been -- there's only one case.
22       THE COURT:  Well, would it be fair to say the number
23  one relief that your client is seeking is to be allowed to go
24  back to Georgia Tech, do these classes, and graduate?
25       MR. DILLON:  Yes.  And I think are you going -- isn't
```

1   that all he wants?  Absolutely not.  He'll still have a -- he
2   can still have a mark on his transcript and then still have
3   the finding against him.  So remember, I mean, all we're doing
4   is saying let him go back ███████████████████.  We're
5   not, you know -- look.  We'd love it if you'd remove any --
6           THE COURT:  Once again the argument is made to the
7   courts that if you give him that, you're giving him all his
8   relief practically.
9           MR. DILLON:  Absolutely not.  Let me be very clear as
10  to why.  He wants to attend graduate school, I think a
11  credible desire ████████████████████; right?
12          THE COURT:  At Georgia Tech.
13          MR. DILLON:  Yeah; or somewhere.  He would be happy
14  to never come back to Georgia Tech I'm sure, I mean, if -- you
15  know, depending on how this case results.  But he wants to go
16  to graduate school.  When you apply to graduate school -- and
17  I do these case, your Honor, all across the country -- almost
18  every school asks questions like have you ever been
19  disciplined or anything like that.  He would have to answer
20  yes, and then he'd have to explain.  What typically happens is
21  that he has to sign a FERPA waiver that goes to Tech.  They
22  send a file.  So absolutely not.  He has still been
23  adjudicated a rapist by Georgia Tech.  All he's doing is
24  getting his bachelor's degree and preventing a gap in his
25  educational record.  So that is absolutely not all the relief

1   that he seeks.  He was the victim of a, you know, I think, a

2   very deeply flawed process, and that's what he wants.

3        And I will say, you know, with respect to the

4   school's concerns, I think that you're going to -- yeah,

5   you'll hear some of the parade of horribles.  Oh, what if it

6   happens and liability.  ████████████████  Nothing has

7   happened.  And let me emphasize something else.  Schools do

8   this all the time, all the time.

9        When an initial allegation is brought, they say stay

10  away from each other, you know, you can't do here or you can't

11  go there.  While these cases are pending they do this all the

12  time where they have an accused rapist on their campus, and

13  they say we're going to lock you down something tight so we

14  can make sure that while we're figuring this out you don't

15  cause anymore harm.  So this is not -- I think Tech wants to

16  paint this as an extraordinary remedy.

17       The no contact order was put in place ███████████.

18  There's been literally no problem since then, not by Mr. Doe.

19  There's no allegation that any of his friends have gone and

20  done anything.  He has been a boyscout.  So I don't think

21  there is -- I think that is completely elusory, ████████████

22  ████████████████████████████████████, and that this

23  can be -- there are all sorts of other things that this Court

24  can order to minimize whatever risk that is, I mean, he'll

25  wear an ankle bracelet.  I mean, he literally said that to me.

1  And so anything the Court wants. So I think there is no, you

2  know -- whereas there is nothing that he will -- if your Honor

3  doesn't grant the injunction, even if we win, you know, I

4  don't know when that's going to be, your Honor. It's

5  certainly not going to be until the summer, fall. I don't

6  know. You know, this is not my jurisdiction, so I don't know

7  how -- when it's going to be.

8          THE COURT: Well, you've got your normal discovery

9  period. You've got your motions, so it's not going to be

10 before April of this year.

11         MR. DILLON: My father was a lawyer in Atlanta for 30

12 something years and so, yes, I know it's --

13         THE COURT: Let the record reflect that in the

14 northern district we move them along.

15         MR. DILLON: No, and, your Honor, let me say I'm from

16 the -- one of my main areas is the Eastern District of

17 Virginia, the Rocket Docket, so I don't fear speed. But it's

18 still -- there's speed, and there's court speed.

19         THE COURT: As I said, you've got the discovery

20 period. I think this is on a four-month track so --

21         MR. DILLON: Right. And I think then -- so there's

22 going to be this -- and he can never get that back. So even

23 if at the end, you know, he wins everything, he's going to

24 then go to a job interview or, you know, to a graduate school

25 application and be asked, that's weird, you know, your last

1    time at Tech was the ████████████, and you didn't get your

2    diploma until, you know, ████████████.  Why is that?  He

3    has two choices.  He can lie -- or three.  He can say nothing,

4    and there's, you know, he'll get the adverse inference.  He

5    can lie, which I don't think would help anybody, or he can be

6    honest and say, well, I was found guilty of rape, and I sued.

7    And, you know, later on the judge found that, you know, I

8    didn't get a -- they didn't treat me fair.  But to some

9    extent, your Honor, that's a little bit of a when did you stop

10   beating your wife situation to be in; right?  It's a bell

11   that's very hard to unring.

12        THE COURT:  Well, I don't quite understand your

13   argument there, is that if he prevails, wins this suit, he

14   gets to tell future employers, graduate school.  And your

15   argument is that that's not going to be good enough.  In other

16   words, I'm not quite following your argument.

17        MR. DILLON:  Sure.  It's he'd win on procedural

18   grounds, not on substantive grounds.  So it's the same thing

19   as being you're accused of murder, but the government tests

20   these or something like that; right?  You're accused of

21   something.  You're found guilty of something.  Oops.  The

22   government committed a massive Brady violation.

23        THE COURT:  Well, let's keep in mind what this case

24   is about.  This case is not going to find that he did it, and

25   it's not going to find that he didn't do it.  This case is

1 talking about whether or not Georgia Tech treated him properly

2 and correctly. This is not going to be a criminal trial.

3     MR. DILLON: And that is precisely my point, which

4 I'm clearly not making well. If he wins, he only wins on the

5 ruling would be he was not treated fairly. I don't know if he

6 did it or not, but I know he wasn't treated fairly. So does

7 that make sense?

8     THE COURT: Well, but my question is this: He still

9 would have to explain, you know, that he got charged with

10 this, wouldn't he?

11     MR. DILLON: No. No, he won't, because if you grant

12 the injunction and he graduates in May and then he wins the

13 case, no one is going to know; right? Because then he will

14 go -- you know, then he'll go -- there will be no gap in his

15 transcript.

16     THE COURT: No one will know if somebody asks him did

17 you ever get charged or accused?

18     MR. DILLON: It depends on how it ends; right? And

19 it can end a lot of different ways. I don't know. It can end

20 in settlement. It can end in a new hearing. It could end in

21 reversal of the finding. It could end a lot of different

22 ways.

23     THE COURT: But we know it's not going to end with a

24 finding one way or the other regarding him. Even if he loses,

25 that does not mean that he -- there's been a finding that he

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 55 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 55 of 216

55

1    did this.

2            MR. DILLON:  Not by the Court but by Georgia Tech.

3    So I guess I'm really not making this point clearly, and I

4    apologize.  One of the reasons the harm is irreparable is

5    that, again, the gap in the educational record means it's

6    something he's always going to have to talk about.  Even if he

7    wins in front of this Court, it is still not exoneration, but

8    we don't know.  If he wins, it's unclear what form the win

9    would take; right?  There's a form of win in which he is

10   exonerated, and let's say maybe the Court orders a new

11   hearing.  Maybe the Court -- you know, who knows what could

12   happen, and I think we're a long way from there.

13           The remedies in these cases can be very different,

14   but there is a way that if he wins, he is actually exonerated.

15   And there's a way that if he wins, he's not actually

16   exonerated.  But if you don't grant the injunction, he will,

17   regardless of what the ultimate remedy is, he will always have

18   to explain it.  Does that make -- so because they'll always

19   have to say why did you take ████████ to graduate.  So even

20   if he wins and is completely exonerated, he'll say I was found

21   guilty of rape, I sued, the judge ordered a new hearing for me

22   in front of a three-hearing panel, and I got to bring my

23   witnesses.  And after that, you know, they found that it was

24   more likely than not that I didn't do it.  But that took ████

25   ████ of my life and everything like that.

1          So he's still going to have to tell the story and I
2    think -- which again he won't -- and let me just emphasize
3    this.  If there's no gap, he may never have to tell that.  If
4    there's no gap and he's ultimately exonerated --

5          THE COURT:  That's where I think you're -- that's why
6    I'm having a problem with your argument here.  You're saying
7    he may not ever have to tell the story.

8          MR. DILLON:  And that's what the point of an
9    injunction is, is we don't know what's going to -- no, we
10   don't know what's going to happen.  What we do know is if he
11   doesn't get the injunction, he's toast.  I mean, even if he
12   wins, he's always going to have to explain to someone why were
13   you out of school for ████████; right?  That's the problem.
14   Whereas if you grant the injunction, he still is not by any
15   means getting all the relief he wants.  He wants to be
16   exonerated through a fair process but -- does that make sense?

17         THE COURT:  I understand your argument.

18         MR. DILLON:  You're leaving the window open, whereas
19   if you don't grant the injunction, he is suffering the -- so
20   the harm that -- again, the *Jones* court.  *Jones* squarely
21   looked at this.  The Fourth Circuit in *Jones* 30 years ago said
22   the gap in the educational record, the inability to graduate
23   with your class, and the -- what was the third one?  Not being
24   able to start your career on time, that that's irreparable,
25   and she could never get that back.

And the Court took pains to say in *Jones*, you know, we express no opinion about the ultimate merits of what's going to happen here, but we think that that harm is irreparable. And I would submit to the Court that it objectively is. You can't -- he can't get that back. It is beyond even the broad equitable powers of this Court to give him that back, whereas if you don't give the injunction, you are essentially dooming him. If you don't give the injunction, he is always going to have to tell the story. If you do give the injunction, he may not.

And I will tell you and I think what should influence that is what we're asking for, just to put it in sort of more familiar terms; right? Just give him a fair trial, whatever that looks like. Just give him a fair trial. If he gets a fair trial and he loses, okay. He's back where he is. But if you give him a fair trial and you allow Informant 11 to come and you, you know, have the two people who talked to Informant 1, all these witnesses, and you allow him to do something that he was never allowed to do, which is marshal evidence in his favor, you know, you take things out.

You take all these horrible rumors about him out, and you allow him to sort of get what I think anyone would recognize as a fair process. He should have a shot to do that, but if you don't grant the injunction, he's never going to be able to do that. And he'll -- I mean, he may get all

1    that, but it is, as we said in the papers, it's the definition

2    of a Pyrrhic victory because there's nothing -- he's still

3    going to have to explain it for the rest of his life.  And

4    there's -- again, given that the balance of harms totally

5    favors him because both by what has been shown historically,

6    that he's been, you know, clean as a whistle ███████████,

7    and by what he is absolutely willing to agree to, there's just

8    no -- there's no reason not to.  There's no compelling reason

9    not to just let him go back, let him finish his degree, and

10   have a chance to do this.

11            I'm happy to answer any other questions, your Honor.

12            THE COURT:  I don't have any other questions.

13            MR. DILLON:  Thank you very much.

14            THE COURT:  Thank you, sir.  Ms. Orland.

15            MS. ORLAND:  Thank you, your Honor.  If I can get the

16   Court's guidance on something, I do have some witnesses here

17   to put up some additional evidence.  Specifically,

18   Mr. Paquette is here to talk about the evidence that was

19   proffered to him by the plaintiff, to talk about the specific

20   allegations of bias, and the process itself.  I also have Cara

21   Appel-Silbaugh here to talk a little bit more about the

22   appellate process and Kimberly Ballard-Washington to talk

23   about the Board of Regents process.

24            THE COURT:  We can do it one of two ways.  We can let

25   you make some argument, put your witnesses up or we can let

1  you go straight to your witnesses and then close it out with

2  argument on your behalf. If you have some witnesses here that

3  may need to go somewhere, you might want to start with your

4  witnesses first. The only thing I can tell both of you is I

5  have to stop at 1:00 o'clock for an appointment I have. But

6  I'll tell you what, you prepared a strategy. You proceed on

7  your strategy.

8      MS. ORLAND: Your Honor, if I could just do a brief

9  opening statement --

10      THE COURT: Yes.

11      MR. ORLAND: -- and then I'll put up our witnesses.

12      I do think it's important initially to explain to the

13  Court the process itself. We obviously did that in the brief,

14  but after this lengthy argument, it seems important to address

15  the fact that the plaintiff in this case was not given -- not

16  just one opportunity to give his story to Mr. Paquette, he was

17  offered the opportunity on two prior occasions to actually

18  talk to Mr. Paquette, tell him who his witnesses were, offer

19  any exculpatory evidence.

20      The ███████ meeting was a final meeting. He was

21  never ever kept from who his accusers were. In fact, the

22  first act that Mr. Paquette did upon the accusations coming to

23  him were, stay away from this person, she's engaged you --

24  she's alleged you've committed sexual misconduct. So the idea

25  that he didn't have any opportunity to know who his accusers

1   were is a complete fallacy.

2   ████████████████████████████████████████████

3   ████████████████████████████████████████████

4   ██████████████████████████████████████████████

5   █████████████████████████████████████.

6           But I think it's also important to look at the timing

7   of things.  When the alleged Victim 1 came in, it was

8   ██████████████.  The plaintiff was contacted.  He didn't reach

9   back out to Mr. Paquette until ███████████████ and didn't

10  arrange a conversation until ████████████████.  If you look at

11  when the bulk of the interviews occurred, they occurred prior

12  to the contact.  So --

13          THE COURT:  The biggest part of the argument coming

14  forth from the plaintiff's side is ███████████████ not being

15  talked to.

16          MS. ORLAND:  And I certainly understand that.  He was

17  spoken to.  He was interviewed or given the opportunity to

18  interview.  But the point, I guess, I'm trying to make is that

19  all these witnesses were testifying basically ██████████████

20  ██████████████████████████████████████████.  But at the

21  point that those interviews were occurring, Mr. Paquette

22  didn't know what the issues in dispute were because he didn't

23  know if the plaintiff was going to agree that -- there's

24  really two issues here; right?  ████████████████████████████

25  ████████████████████████████████████████████████████████████

1 ████████████████████████████.  He had no idea whether the

2 plaintiff was going to contest one or both of those things.

3       THE COURT:  But at the point in time before he sent

4 this report over that made his findings, made his charges up,

5 he did have the facts then; right?

6       MS. ORLAND:  He did, but he didn't -- was he to

7 redact his entire investigation prior to that point?  I think

8 it's important to put it in context of how things occurred.

9       THE COURT:  Well, if what he has is incorrect, yeah.

10       MS. ORLAND:  Well, he needs to point out that it's

11 incorrect, which he did, but when you're -- even a law -- and

12 I really am very reluctant to rely on a law enforcement type

13 investigation because that's not what this is clearly.  But in

14 a law enforcement investigation when a police officer takes a

15 statement or writes a summary, you write it as it's given to

16 you, good, bad, and ugly.  And then when you're trying to

17 filter through and there is a --

18       THE COURT:  That's not what's being argued here, that

19 he didn't put down what they told him.  To a certain degree in

20 the briefs I think it is, but the argument this morning is

21 that why did he not talk to ███████████████████

22 ██████████████████████████.

23       MS. ORLAND:  And what I would say is he did.  He did

24 speak to him, and so I will have Mr. Paquette testify to that

25 fact.  But I think that generally the issue that ███████████

1  ███████████████████████████.  And even if there

2  was additional information out there, the fact that he didn't

3  make greater inquiry means that he perhaps didn't do the best

4  investigation.  But that doesn't necessarily equate to a due

5  process violation.

6       THE COURT:  Well, that is the question, is it not,

7  though, whether or not this was so bad that due process was

8  denied.

9       MS. ORLAND:  So in that framework, your Honor, I'd

10 like to put Mr. Paquette on the stand to talk about why he did

11 what he did, and I think when there's an opportunity for the

12 Court to understand that thought process, it will be quite

13 clear that in this particular case that that was not the

14 situation.

15      Now, I am certainly not going to advise the Court on

16 how it should rule.  I am never going to presuppose that nor

17 am I going to sit here and try to tell the Court what its

18 limits are.  That's not something I'm going to do.

19      THE COURT:  You're a smart lawyer.  All right.  Do

20 you want to call your first witness?

21      MS. ORLAND:  I do.  And just to be clear, we're quite

22 content being called the rambling wreck model.  That will work

23 for us today.  So if I may call Peter Paquette.

24      COURTROOM DEPUTY:  Raise your right hand, please.

25                    PETER PAQUETTE,

1      herein, having been first duly sworn, was examined

2  and testified as follows:

3      COURTROOM DEPUTY:  Have a seat.  If you could please

4  state your name, and if you could spell your last name for the

5  record, please.

6      THE WITNESS:  Sure.  My name is Peter Paquette, and

7  it's P-a-q-u-e-t-t-e.

8                     DIRECT EXAMINATION

9  BY MS. ORLAND:

10  Q   And where do you work, sir?

11  A   I work at Georgia Tech.

12  Q   And what is your position?

13  A   Assistant Dean for Student Integrity, Director of the

14  Office of Student Integrity as well.

15  Q   And how long have you been in that position?

16  A   Three and a half years.

17  Q   And what did you do before that?

18  A   I worked at Dickinson College as Assistant Dean of

19  Students.

20  Q   Okay.  I'm going to ask that you speak up because if I'm

21  having a hard time hearing you, it's possible others are as

22  well.

23  A   Sure.

24  Q   So can you talk about what happens when a student comes in

25  and complains about sexual misconduct.

1    A    Sure.  The first thing we do is send out that no contact

2    to both parties.  We're going to take the account of what

3    occurred that day from the student, and then we're going to

4    build sort of a list of folks that we need to talk to to

5    figure out what transpired.  And we're going to meet with each

6    of those people individually to get their account of what

7    happened, and then we will charge somebody, if we believe it

8    reaches that threshold, and give each party a final chance to

9    review all the information and respond.

10   Q    So to be clear, you're saying you'll determine who it is

11   you're supposed to speak to.  Who do you determine that from?

12   Who do you speak to to make those assessments?

13   A    Sure.  We allow both students or multiple students if

14   there are multiple students in the allegation.  But we allow

15   each of them a chance to submit names of who they'd like to

16   have us talk with.

17   Q    I would like to show you Defendant's Exhibit 1, and it was

18   tendered as part of the preliminary injunction.  I'm going to

19   do my best not to recreate the wheel, but it's just easier if

20   I do it here.

21            If I may approach, your Honor?

22            THE COURT:  You may.  Let me make one correction on

23   something, if I might have a break here.  You are allowed to

24   tell me how you think I should rule and how I should find

25   things.  That's why you're here.

1    MR. ORLAND:  Well, your Honor, let me rephrase my

2    comment, which is I certainly will encourage you to rule in

3    our favor in this case, but I'm certainly not going to

4    encourage you to craft your order in a particular way.

5    THE COURT:  Okay.  Okay.  All right.

6    BY MS. ORLAND:

7    Q   Mr. Paquette, do you recognize Defendant's 1?

8    A   Yes.

9    Q   And what is it, sir?

10   A   It's our student sexual misconduct policy.

11   Q   And what does that mean?

12   A   It's what we use to investigate and adjudicate all

13   allegations of sexual misconduct when they involve students.

14   Q   And is it different than your student conduct -- code of

15   conduct policy?

16   A   Yeah.  It's different than the student code of conduct.

17   Q   And can you describe sort of -- obviously there's lots of

18   differences, but can you describe the main differences in that

19   policy versus the student code of conduct?

20   A   Sure.  The main difference is the student sexual

21   misconduct policy is the adjudicator -- investigator and

22   adjudicator model.  So the investigator will meet with all the

23   folks involved, as I said, will make decisions about facts,

24   will make decisions about credibility, and then will

25   ultimately make a decision in the case.  The code of conduct

1  process is very different in terms of generally that person is

2  not the fact finder until the person who's been charged

3  decides which route they want to go, if they want to go before

4  a panel of their peers or if they want an administrative

5  resolution with one.

6  Q   And did you establish this policy or was this a policy

7  that was established before you?

8  A   There was a policy that was established when I got there.

9  There have been different -- there have been -- it's been

10 altered since that point by a committee.

11 Q   And what's your understanding behind the single

12 investigator model and why you do that?

13 A   Yeah.  I think that there are differing schools of

14 thoughts, but I'm part of the Association for Student Conduct

15 Administrators.  And it's definitely the route that we are

16 going, I think, although the recommendation is that you sort

17 of get away from having students involved in making those

18 decisions and do all you can to protect both parties' sort of

19 information, and so that model allows for that.

20 Q   So the intent is to do, with the single investigator

21 model, is to do what?

22 A   I think the intent is to allow the fact finder to sort of

23 have an interaction with each party and then make their

24 decision about facts and about the credibility.  Does that

25 answer your question?

1  Q   Yes.

2  A   Okay.

3  Q   So how did you hear about the allegations in this case?

4  A   Yeah.  A victim advocate had notified me that she had a

5  student who wanted to report a case of sexual misconduct.

6  Q   And the plaintiff in this case has discussed quite a bit

7  about the timing of it.  ████████████████████████████

8  ████████████████

9  A   Correct.

10  Q   The report didn't happen until ████████████████ ?

11  A   Correct.

12  Q   Could you explain to me why you would consider an

13  allegation that occurred that much later than the actual

14  event.

15  A   That's not uncommon at all in a college sexual misconduct

16  process.  We don't have a statute of limitations or anything

17  of that nature for our sexual misconduct policy so we're going

18  to -- no matter if it's Day 2 from when the event happened or

19  ████████████████████████ we're going to treat them all the

20  same.

21  Q   And why is that?

22  A   I think to a lot of times -- it's not uncommon that folks

23  won't be able to articulate what happened to them until

24  sometime later.  It's not uncommon that folks won't name what

25  happened to them right away.  That's pretty common.

1    Q    So you've obviously heard the plaintiff's argument in this

2    case, and I want to start with what steps did you take in

3    investigating this case and why did you take those steps.

4    A    Sure.  The first step, as has been said, I sent the no

5    contact order to both students, reached out to both of them --

6    well, I already had heard from one -- but reached out to the

7    respondent to ask him to schedule a time to meet with me.  At

8    the time I was not aware, I don't believe, that ████████████

9    ██████████████████████████████████████  ████████████

10   █████████████████████████████████████  to

11   have the conversation, talk over the phone or send me a

12   statement of events.

13        And so that took a little while for him to respond.

14   So in the process, you know, generally speaking, I think the

15   OCR guidelines are 60 days, so I'm going to keep going because

16   I hadn't heard back from him.  So I met with the names that I

17   had, which were all names from the alleged Victim No. 1 in the

18   case at that point.  So met with all those folks and then met

19   with him once he responded and proceeded to gather all that

20   information.

21   Q    When you spoke to the plaintiff in this case, did he offer

22   you witnesses on his behalf?

23   A    I know that he did.  I don't recall what -- at what point.

24   I know that he did not on our first phone call.  He did not at

25   that point, no.

Case 1:15-cv-04079-SCJ Document 192 Filed 04/26/17 Page 69 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 69 of 216

69

1  Q   Okay.  So when did you first get the names of the

2  witnesses?  Was it when he wrote his statement on ████████?

3  A   I would have to look at that statement to see if he

4  included a list of names in there.  I don't recall.

5  Q   Well, they're redacted out so --

6  A   Okay.

7  Q   Hang on one second.

8  A   Well, even if there are names in there.

9          (Brief Pause.)

10         MR. ORLAND:  For the record I'm about to hand

11  Mr. Paquette his affidavit, which has the attachments.

12         THE COURT:  Okay.

13         MR. ORLAND:  See if this refreshes your memory.

14         I'm sorry, your Honor.

15         THE COURT:  No, take your time.

16         MS. ORLAND:  It would be Exhibit D.  Your email is

17  Exhibit D.  Your email to him is Exhibit D, and E is his

18  statement.

19         I'm going to let him find it.

20         THE COURT:  Okay.

21  BY MS. ORLAND:

22  Q   While we're looking, the plaintiff in this case has

23  alleged that you didn't talk to any of his witnesses,

24  ███████████████████████████████.

25  A   Correct.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 70 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 70 of 216

70

1 Q   Can you explain your reasoning behind your failure to

2 speak to the █████████████.

3 A   Certainly.  Again, as I said earlier, I had spoken to most

4 of her witnesses by the time I had spoken to him, and so at

5 that point really the two questions in my mind as an

6 investigator are: ████████████████████  █████████████████████

7 █████████████████████████████████████████████████  ███████

8 █████████████████████████████████████████████

9 ██████████████.  Everyone agreed on that, including him, so there

10 wasn't, you know, to me there wasn't anything further there.

11 Q   Did you get a statement from █████████████████?

12 A   I did, yes.

13 Q   And what was that statement?

14 A   Oh, gosh.

15 Q   Generally.  You don't have to --

16 A   Yeah.  The statement corroborate that, that he – ███████

17 █████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████████

19 █████████████████████████████████.

20 Q   Okay.  So I'm going to give you a second to find the

21 statement that the plaintiff wrote.

22 A   Yes.

23 Q   When --

24 A   This is the preliminary statement is what I'm looking for,

25 his very first --

1  Q    Yes.  Right.  His very first statement given to you

2  ████████████.

3  A    Okay.  I have --

4  Q    You have it?

5  A    This isn't the actual report but yes.

6  Q    Okay.  All right.  And in that statement did he give you

7  witnesses?

8  A    Just the name or ████████████████ is the only person

9  listed in there.

10 Q    Okay.  And when you met with the plaintiff on ████████ --

11 I'm going to show you what's marked as Defendant's Exhibit

12 2 -- did he bring with him any statements of folks?

13 A    He did, yeah.

14 Q    Okay.

15 A    A number of statements.

16 Q    Do you recognize that?

17 A    Yes.

18 Q    What is that?

19 A    It's a list of statements that he brought from witnesses.

20 I think most of them are character witnesses.  I know that the

21 first name -- the first two names are folks that I did meet

22 within my investigation, so I know that they were there.  But

23 the rest are unfamiliar to me, so I believe that they are

24 character witnesses.  But it's a full list of information

25 about him, who he is.

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 72 of 217
Case 4:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 72 of 216

72

1    Q    So you did speak to ████████████ -- I can't say the

2    name.  I'm sorry.  Obviously just testified about ████████

3    ██████████.  You did speak to those two people?

4    A    If I'm correct ██████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ██████████████████.

7    Q    And you spoke to both of those --

8    A    Correct.

9    Q    Had contact with both of those before making your

10   findings?

11   A    Correct.

12   Q    And the rest of these people you read -- did you read the

13   statements?

14   A    Yes.

15   Q    And you read the statements before reaching your

16   conclusion?

17   A    Correct.

18   Q    So had the plaintiff brought any additional statements to

19   you, would you have considered them?

20   A    Yeah.  Yes.

21   Q    If the plaintiff had brought any evidence to you, a

22   statement from somebody saying that the alleged victim was

23   lying, would you have considered that?

24   A    Certainly, yeah.

25   Q    If the plaintiff had brought to you evidence that somebody

1  had changed their version of events and had more information

2  for you that would shed light on her credibility, would you

3  have reinvestigated or reinterviewed anybody?

4  A    Definitely, yes.

5  Q    Okay.  And did any of that happen in your ▮▮▮▮▮▮

6  meeting?

7  A    It did not.

8  Q    Did you provide the plaintiff with information about who

9  the people accusing him of the offense were?

10  A    I did on that morning, yes.

11  Q    The names of the actual alleged victims, did he have that

12  prior to even that morning?

13  A    The list of names of the victims?  Sorry.

14  Q    The actual victims.

15  A    Yes, victims he had the names of.

16  Q    And when did he have that?

17  A    He had the first victim's name, I think it's the day

18  that -- ▮▮▮▮▮▮▮ is when he got the updated one with both

19  victims' names on there.

20  Q    And the first one he would have gotten ▮▮▮▮▮▮▮▮?

21  A    Yes.  I believe that's the correct date.

22  Q    Now, one of the things that the plaintiff is contending is

23  that there are inflammatory things in the investigation --

24  A    Uh-huh.

25  Q    -- and as the fact finder, that those inflammatory things

1　are in the report and that they were improperly considered.

2　First of all, did you consider the rumors that he was a bad

3　person and bad to women and all the innuendo in the

4　investigation?

5　A　Sure.  I think the -- you know, my training is you follow

6　the information where it goes.  So I always have to -- if

7　there's possibly additional victims out there, I need to know

8　that, you know.  I think the difference here is that it's the

9　university driving the process, different than one person

10　coming forward and saying do this, you know, I want to bring

11　charges against another student.  It is us driving that

12　process.  And so can you repeat the first question?  Sorry.

13　Q　I can try.

14　A　That's fine.

15　Q　So one of the allegations is -- I'm sorry.  Judge, did you

16　have a question?

17　　　　　THE COURT:  No, no.  I was -- I'll wait.

18　BY MS. ORLAND:

19　Q　One of the allegations is that there's a lot of rumor and

20　innuendo and character evidence in your summary reports, and

21　that's of concern because it appears that you were biased in

22　writing those reports.  So what I'm asking you is, why is that

23　information in there, and what did you consider.

24　A　Sure.  Yeah.  And that is -- I don't edit out any

25　information that comes to me.  So if it's shared with me in my

```
 1   investigation, it goes in the report.  Did any of it help with
 2   my decision making?  No.  Because none of those folks were
 3   actually there when the alleged assault occurred.
 4   Q    So when this case boiled down to when you made your fact
 5   finding, what was it you were trying to decide?
 6   A    Yeah.  I think the, as I said earlier, the two main things
 7   were ██████████████████████████████████████████████.
 8   Q    And you've testified that it was your belief that the
 9   ████████████████████████████ wasn't in dispute?
10   A    Correct.
11   Q    So that left the question of ████████████████████████████?
12   A    Correct.
13   Q    And in the first instance as to Victim 1, which is really
14   why we're here, you obviously made the determination that it
15   had.  Can you explain your thought process.
16   A    Yeah.  I believe -- I'm pretty sure that there were -- the
17   main -- I decided both cases at the same time, so the
18   credibility really became the problem.  When the respondent
19   came in that day and shared his account of me -- with me of
20   what happened and it matched very closely with Victim 2's, it
21   made me question his credibility for everything.
22   Q    Why is that?
23   A    Because he was willingly lying to an administrative
24   official against the advice of his attorney that day, and so
25   that was, I think -- to me it said if you're willing to lie to
```

Case 4:15-cv-04079-SOJ   Document 94   Filed 12/28/15   Page 76 of 216



1    me at this level, I don't know what else of this is actual

2    factual information.

3    Q    Were there other instances?  When you're saying he's

4    lying, he had lied, when would the lie have -- the lie didn't

5    occur that day -- or you really don't know.  But he had

6    previously given you a different version of it?

7    A    Correct.  Correct.  He had previously said ██████████

8    ████████████████████████████, I believe.

9    Q    And as to the first victim, were there any inconsistencies

10   in his version?

11   A    I think the -- I think there was a small one that was

12   noted in the report ████████████████████████████████

13   ████████████████████████████████

14   ████████████████████████████████████████

15   ████████████████████████████   ████████

16   ████████████████████████████████████████

17   ████████████████████████████████

18   ████████████.

19   Q    ███████████████████████████████████

20   ████████████████████████████████████

21   ████   ██████████████████████████████

22   ████████████

23   A    ████   █████████████████████████

24   ████████████████████████████████

25   ████████████████████   ████████████████



13  Q    Okay.  So your basis of credibility was based initially or
14  almost entirely upon the fact that he had lied to you?
15  A    Uh-huh, correct.
16  Q    Okay.  So why did you include the inflammatory statements
17  in your report?
18  A    Because they were given to me, and so they are part of the
19  information that was provided.
20  Q    And when you found an inconsistency, did you also put that
21  in your report?
22  A    Yes.
23  Q    The plaintiff has discussed a situation where you had as a
24  sanction ordered people to read the book "Guyland."  Can you
25  describe that, the situations and why you would have done

1  that.

2  A    Sure.  That was for a different incident and not uncommon

3  for educators in this role, that we're going to find a book

4  that may have some things that relate to the case and ask the

5  student to read it, ask them to write a response about the

6  parts they agree with and that they think are part of their

7  experience and also write a pretty good argument for me about

8  what they don't agree with, sort of an educational exercise.

9  Q    So can you describe the context by which that book was

10  assigned.

11  A    Yes.  It was -- I think it's their -- two different

12  incidents I'm pretty sure.  One was a hazing incident, and one

13  was a -- I believe was a situation where a student had jumped

14  over a fire at a fraternity house and injured himself.

15  Q    So neither of the incidents involved a gender situation.

16  They were all involving men?

17  A    Correct.

18  Q    And the -- basically the person harmed was also a male?

19  A    Correct.

20  Q    So there was nothing about gender bias in those

21  assignments?

22        MR. DILLON:  Your Honor, object to leading, even

23  though it's just a hearing.

24        THE COURT:  I think I can know the difference.

25        MR. ORLAND:  I'm just trying to move some things

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 79 of 217

1  along, your Honor.

2          THE COURT:  Go ahead.

3  BY MS. ORLAND:

4  Q    So another instance came about, about a situation with a

5  fraternity and a hazing incident -- not hazing, a racial

6  epithet was -- can you describe your role in that case and how

7  it differed from your role in the case at bar.

8  A    Sure.  The very important difference is we're looking at

9  different policies.  Going back to what I said earlier, one

10 was a sexual misconduct policy, and in that process I am the

11 fact finder and decision maker.  And in this case I -- the

12 chapter had not decided they wanted to be the fact finder yet,

13 so I was not accepting any information from them until they

14 make the decision.

15 Q    And did you ultimately become the fact finder?

16 A    I was not the fact finder in that case.

17 Q    So there was no reason for you to accept information from

18 them?

19 A    Correct.

20 Q    All right.  So the plaintiff in this case has tried to

21 make issue with the fact that you were preparing witnesses

22 that happened to be women in that case.  Were the complainants

23 in that case all women?

24 A    No.  The first incident was a woman.  The second incident,

25 I believe there were four women and one man.

1  Q   So the plaintiff has represented that you were prepping

2  the women to testify.  What is your role in the process of a

3  student hearing panel?

4  A   Sure.  At that point my role was to talk with them, to

5  answer questions, ask if they understood what was about to

6  answer, and that was about it.

7  Q   And the people who were the respondents in that case,

8  would that have been your role to explain those things to them

9  if they had wanted to?

10  A   No.  That would be my coordinator, who was organizing

11  things that day.

12  Q   Okay.  And were those folks represented by counsel as

13  well?

14  A   Yes.

15  Q   So it would have been a little unusual for you to

16  participate in their process?

17  A   Right.

18  Q   When you're investigating a case, you have a time limit;

19  is that right?

20  A   Yes.

21  Q   And what is that time limit?

22  A   60 days is the time limit from OCR, suggested time limit.

23  Q   And who is OCR?

24  A   Office of Civil Rights.

25  Q   And why is that significant?

1  A    Because it's sort of the framework we operate within to

2  make sure that we're in compliance with that expectation.

3  Q    Okay.  Does the Office of Civil Rights also dictate other

4  processes, as you understand it, with regard to how an

5  investigation is to occur?

6  A    Not that I'm aware of.

7  Q    As far as cross-examining witnesses and that sort of

8  thing, what is your understanding about the ability of an

9  accused to cross-examine a victim or vice versa and how that

10  should transpire and what you've been taught?

11  A    Yeah.  In a sexual misconduct investigation that is not

12  something that we offer them, that we need to require for

13  them, the chance to cross-examine.

14  Q    And is it your understanding about whether or not that's

15  encouraged or discouraged?

16  A    My understanding is it is discouraged, that they do not

17  interact, and they don't have the chance to interact and ask

18  questions of each other.  Mostly I understand due to a

19  chilling effect.

20  Q    So there's another case that the plaintiff has referenced,

21  another incident involving a student who was expelled for

22  alleged sexual misconduct in his brief, ██████████.  So can

23  you explain to me what your involvement in that case was.

24  A    In that case I was not the investigator.  I did not find

25  fact or make a decision in that case.  I did interact with

1   both parties briefly, more around accommodations and process.

2           MS. ORLAND:  I don't have anything further.  I'm

3   assuming you'll have some cross.

4           THE COURT:  Okay.  I'll allow him to do his cross

5   now.

6           MR. DILLON:  Thank you, your Honor.

7                         CROSS-EXAMINATION

8   BY MR. DILLON:

9   Q   Good morning, Mr. -- so it's Paquette; we've all been

10  saying your name wrong.  Is that right?

11  A   You're correct, yes.  Well, my family pronounces it

12  incorrectly but yes.

13          THE COURT:  I apologize.

14  BY MR. DILLON:

15  Q   Sorry.  So if I go back to Paquette, I will apologize in

16  advance.

17  A   That's all right.

18  Q   Okay.  I'll go somewhat in order, and then I think we'll

19  skip around.  So, first, good morning.

20          So, Mr. Paquette, Ms. Orland showed you a copy of the

21  sexual misconduct policy, and you said that is what governs

22  the time frame for bringing a complaint of sexual misconduct;

23  is that correct?

24  A   Correct.

25  Q   Do you still have that in front of you?

1   A    I do, yes.

2   Q    Can you turn -- may I approach, your Honor?

3        THE COURT:  Yes, you may.

4        MR. DILLON:  Do I need to ask permission every time?

5   Do you need me to?

6        THE COURT:  You know, I used to say no, but my

7   colleagues want me to do that so you all don't develop bad

8   habits.  So, yes, you have to.

9        MR. DILLON:  Will do then.

10       So isn't it true, having you look at 1, that, in

11  fact, that doesn't say anything about a time frame; right?

12       THE WITNESS:  Correct.

13  BY MR. DILLON:

14  Q    And what that policy is about is about the investigation

15  and adjudication of complaints; correct?

16  A    Correct.

17  Q    But the student code of conduct says that complaints

18  should be brought within 30 days; correct?

19  A    Yes.  That would be non-sexual misconduct complaints.

20  Q    Right.  But it actually doesn't say anything.  It doesn't

21  say except for non-sexual misconduct; correct?

22  A    Correct.

23  Q    It just says complaints should be brought within 30 days;

24  correct?

25  A    I believe it's 30 days of when they are discovered, yes.

1  Q   And here -- and you would agree that, you know, this was
2  ██████████ before Georgia Tech discovered this; is that right?
3  A   Correct.
4  Q   And here your argument -- you're saying -- your position
5  is that the sexual misconduct policy, that doesn't have a time
6  frame, so that sort of lack of a time frame trumps the
7  specific time frame in the student code of conduct; is that
8  right?
9  A   Correct, because the code of conduct is not being used in
10 that process.
11 Q   Okay.  So let's go to Informant 11 just to clarify.  You
12 never spoke, with your mouth, spoke with Informant 11, did
13 you?
14 A   I'm trying to remember the --
15 Q   ██████████?
16 A   No.
17 Q   Okay.  So just clarify that for the record.  I believe you
18 actually told Ms. Orland that you spoke to him, and that's not
19 accurate, is it?
20 A   Correct; email exchange.
21 Q   You emailed him, asked --
22 A   I did give him the option to speak with me, and he chose
23 not to.
24 Q   Right.  And you --
25        THE COURT:  You gave him the option?

1        THE WITNESS:  I did, yes.

2   BY MR. DILLON:

3   Q   And you emailed him.  Was it on ████████?  Do you

4   remember?

5   A   I don't know that.

6   Q   Do you have it in front of you?

7   A   I don't think I -- do I have it?

8        MS. ORLAND:  You have your investigation in front of

9   you.

10       THE WITNESS:  I don't think it says -- I don't think

11  the investigation report says when I reached out to him.

12  BY MR. DILLON:

13  Q   But you did that very late in the investigation?

14       THE COURT:  Well, Ms. Orland, do you want to make

15  sure he has it up here so he can take a look at it?

16       THE WITNESS:  I did do it late, yes.

17  BY MR. DILLON:

18  Q   What?

19  A   I did do it later in the investigation, correct.

20  Q   And you got his name on ████████; correct?

21  A   Correct; in the statement from -- yes, I got his name on

22  ████████, the statement from the respondent.

23  Q   And turn to page 9 of your investigative report, if you

24  will, sir.

25  A   Okay.

1  Q    Midway down the page you see Informant 11, account of

2  events?

3  A    Uh-huh.

4        MR. DILLON:  May I approach?

5        THE COURT:  Yes.

6  BY MR. DILLON:

7  Q    Make sure we're looking at the same copy.  So you do see

8  that?

9  A    Yes.

10  Q    Okay.  Sorry.  I didn't hear you say yes.

11        So there it says -- and I'll just quote -- due to

12  scheduling conflicts, I was not able to meet Informant 11 in

13  person, but he provided the following statement via email;

14  correct?

15  A    Correct.

16  Q    And that doesn't say anything about when you reached out

17  to him; correct?

18  A    It does not.

19  Q    And, in fact, it was ███████████, wasn't it?

20  A    Yeah.

21  Q    Probably at least a couple of weeks after you first got

22  his name from Mr. Doe; correct?

23  A    Correct, yes.

24        THE COURT:  Let me just ask this question while it's

25  a break.

1          THE WITNESS:  Yes.

2          THE COURT:  You're positive you offered him an

3    opportunity to speak with you, and he elected to send you an

4    affidavit or a letter?

5          THE WITNESS:  I know that I asked him to come meet

6    with me.  I don't know what I offered him.  I'd have to look

7    at the email to decide how that transpired.

8    BY MR. DILLON:

9    Q    And, in fact, you asked him to come in.  I believe it was

10   that same day; right?  Don't you remember that?

11   A    I don't remember that but --

12   Q    You don't remember -- so you don't remember emailing him

13   the say day and having him write back that ███████████████

14   ██████████████████████████?

15   A    █████████████████████.

16   Q    So just to be clear, you emailed him and asked him to come

17   in that day; right?

18   A    Sounds like that is correct.

19   Q    Okay.  So it wasn't that you emailed him earlier ████████

20   and said I'm going to give you a bunch of time; you can come

21   in any time in the next couple of weeks.  You emailed him

22   essentially giving him the same day of notice; correct?

23   A    Correct.

24   Q    And that was right around, I think ████████████████,

25   right when you finished -- you had just finished writing your

1  report; correct?

2  A    Writing --

3  Q    The investigative report.  I'm sorry.

4  A    So the investigative report is a moving target.  I add to

5  it after every time I talk to a student.

6  Q    Okay.  But you added Informant 11's account late in the

7  process, like right around the ███████.  Is that accurate?

8  A    Sure.

9  Q    And then you emailed it to Mr. Doe, I believe, on or about

10  ███████ because you were going to meet with him the next day

11  on ███████; correct?

12  A    Correct.

13  Q    Okay.  So just to be very clear, you waited at least three

14  weeks to interview Informant 11; correct?

15  A    Correct.

16  Q    And then you said, I would like to meet with you today.

17  You didn't give him notice, did you?  Let me -- I'm not going

18  to characterize it.  When you finally reached out to him, you

19  said can you come in today; correct?

20  A    I don't know what that email says.

21  Q    Okay.  You don't remember that?

22  A    I remember reaching out to him.  I just don't know the

23  time frame I gave him.

24  Q    As you sit here today, do you remember giving him a lot of

25  time?

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 89 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 89 of 216

89

1  A    No, because at that point we were trying to get to the

2  ████████, I think, is when we agreed to meet.  So I wanted to

3  make sure I met with him before I met with the respondent.

4  Q    So would you say that it was within a day or two of the

5  final meeting you were supposed to have with Mr. Doe?

6  A    Probably.

7         MR. DILLON:  If I can just have one second, your

8  Honor.

9         (Brief Pause.)

10 BY MR. DILLON:

11 Q    And so you emailed Informant 11 and he -- do you recall

12 that he told you -- you said you recall that he told you ██

13 ████████████████████████████████████████; is that right?

14 A    ██████████████████████████████.

15 Q    And so he emailed you a very short statement; correct?

16 A    Yes.

17 Q    And you never followed up with that, did you?

18 A    I don't believe.

19 Q    And you could have; right?

20 A    Yeah.

21 Q    And you know that ████████████████████████████████████

22 ████████████████████████████████████; correct?

23 A    I don't know if I -- I'd have to look at my statement.  I

24 know ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

1 ████████████████████████████████.

2 Q   You don't know that he's the only -- do you recall any

3 other witness ████████████████████████████████?

4 A   No.

5 Q   Do you recall that Informant 11 said ██████████████

6 ████████?

7 A   Yes; in his statement.

8 Q   So as you sit here today, isn't it true that he, as far as

9 you remember, ████████████████████████████████████

10 ████████?

11 A   Yes.

12 Q   Isn't it also true that ████████████████████████

13 ████████████████████████████████████

14 ██████

15 A   I don't recall that.  If it's in the statement, then it

16 did occur.

17         MR. DILLON:  May I approach, your Honor?

18         THE COURT:  Yes.

19 BY MR. DILLON:

20 Q   Do you have -- go back to the first exhibit.

21 A   This one?

22 Q   Yes.  Do you have the attachments to that?

23 A   Yes.

24 Q   Okay.  If you could turn to her statement, which is -- I

25 think that will be page 18 of 24 -- no, actually -- sorry.

1  Let me say turn to page 19 of 24, next page, 19 of 24.

2  A    Okay.

3  Q    And just take a minute to review it.  That is the

4  statement, the initial written statement, she initially gave

5  you; correct?

6  A    ███████████████████████████████████████████████████

7  ███████████████████████████████   ████████████████████████

8  ███████████████████████████████████████████.

9  Q    When did you get the statement?  When did you receive that

10 statement?

11 A    I don't know --

12         MS. ORLAND:  I'm sorry.  Which statement are you

13 talking about?

14         MR. DILLON:  The one on page 19 of 24.

15         THE WITNESS:  It starts on 18.

16         MR. DILLON:  On 18.

17         THE WITNESS:  I don't when I -- I'm not sure when I

18 received that.

19 BY MR. DILLON:

20 Q    Early in the investigation?

21 A    Probably.

22 Q    And I want to direct your attention to page 19, the last

23 few lines.  ████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 92 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 92 of 216

92

1    ███.  That's what it says; right?

2    A    Uh-huh.

3    Q    Is that a yes?

4    A    Yes.

5    Q    Okay.  So you knew before you -- early on in the

6    investigation that ████████████████████████████████

7    ████████████████████; correct?

8    A    I didn't -- again, I did not use this to make my decision.

9    I used the statement she gave to me.

10   Q    I'm not asking what you used to make your decision.  I'm

11   asking whether you were aware that she had said that before

12   you made your decision.

13   A    I'm aware that it's in writing in this document, yes.

14   Q    Did you look at this document before you made your

15   decision?

16   A    Yes.

17   Q    Okay.  So you were aware, just to be clear ████████████

18   ████████████████████████████████████████████████; correct?

19   A    Yes.

20   Q    You never asked Informant 11 about that, did you?

21   A    No.

22   Q    Next page, page 20 of 24, about six, seven lines down,

23   middle of the page or high middle I'm going to read here.  ████

24   █████████████████████████████   ██████████████████

25   ██████████████████████████████████.  Do you

1   see that?

2   A    Yes, I see it.

3   Q    Did you interview █████████████? 

4   A    I did.

5   Q    ██████████████████████████████████████

6   ██████████

7   █  ████████████████████████████.

8   Q    Is there anything that -- you can look at your

9   investigative report.  Is there anything in your investigative

10  report that suggests that you asked ██████████████ that?

11  A    No.

12  Q    But you know she had alleged this?

13  A    I don't think she alleges it because this to me was not

14  the document I used to make my decision.

15  Q    Let's talk about that.

16  A    Sure.

17  Q    So you used one document to make your decision, and then

18  she had this other document, both talking about the same

19  event; right?

20  A    Yes.

21  Q    Why did you -- tell us about the first document.

22  A    ███████████████████████████████████

23  ████████████████████████    ███████████

24  ████████████████████████    ███████████

25  ████████████████████████.

1    Q    And by document you mean the notes that you took of your

2    investigation?

3    A    Yes, yes.

4    Q    That you summarized in the investigation report?

5    A    Correct.

6    Q    So you put no weight on the fact – ███████████████████

7    ████████████████████████████████████████████████████████

8    ██████

9    A    ████████████████████

10   Q    No weight at all?

11   A    No.

12   Q    ████████████████████████████████████████████████████████

13   ████  ████████████████████████████████

14   A    Yes.

15   Q    Why?

16   A    Because I would follow where it leads because I have to.

17   Q    Well, let's talk about where this led.  ██████████████

18   ████████████████████████████████████████████████████████

19   ██████.  You didn't follow that evidence, where it led, did

20   you?

21   A    I went off what she told me when we met.

22   Q    ████████████████████████████████████████████████████

23   ████████████████████████████████

24   A    I went off what she told me when we met.

25   Q    Let me just see if I can ask it a third way.

1   A   Okay.

2   Q   Well, actually the same way.  You didn't follow what she

3   said ███████████████████████, where that led, did

4   you, Mr. Paquette?

5   A   █████████████████████████████████████,

6   no.

7   Q   You didn't follow ██████████████ where it went, did

8   you?

9   A   No.

10  Q   ██████████████████   ███████████████████████████

11  █████████████████████, you didn't follow that

12  statement, where it led, did you?

13  A   I don't -- I honestly don't know the answer to that

14  question.  I don't know what I asked him because I don't have

15  my questions.

16  Q   Do you know -- why don't you turn back to your

17  investigative report.  ████████████████████████████

18  ████████

19  █ ██████████████████████████████████

20  █ ████████████████████████

21  █ ███████████████

22  █ ██████████████████████████████████████████

23  █

24  █ ████████████

25  Q   It's kind of hard to tell without names, isn't it,

Case 1:15-cv-04079-SCJ   Document 192   Filed 04/26/17   Page 96 of 217
Case 4:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 96 of 216

96

1   Mr. Paquette?

2   ██   ███████ .

3   ██   ████████   ██████████████

4   ██   ██████████

5   ██   ███████████

6   ██   █████████████

7   Q    What?

8   A    ████████████████████████████████████████

9   ██████████

10  Q    Maybe you're seeing that, and I'm not seeing that.  Can

11  you tell me where that is.

12  A    Hold on.  It's Informant 4.  My -- I was --

13  Q    Okay.  So let's see here.  So Informant **4** ██████████

14  ████████████████████████████████████████

15  ██████████████████ ; right?

16  A    Correct.

17  Q    And Informant **4** ██████████████████████████████

18  ██████████████████ ; correct?

19  A    Correct.

20  Q    And you never asked him about that, did you?

21  A    I don't know.

22  Q    Do you think if you would have asked him about it, it

23  would be in your report?

24  A    Yes.

25  Q    So looking at your report -- because you said earlier you

1   just -- you know, you're basically a stenographer; right?  You

2   don't pick and choose what goes in.  You just put it all down;

3   right?

4   A   Correct, yes.

5   Q   So is it accurate to say then if you had asked him about

6   that, it would be in your report?

7   A   Correct.

8   Q   So you never asked him about that?

9   A   Correct.

10  Q   You also testified on direct examination when Ms. Orland

11  asked you if Mr. Doe gave you any witnesses, and you said the

12  only names that he gave you were the name of ███████████

13  ████████; is that right?

14  A   On ██████████ when he gave me the statement, correct.

15  Q   Right.  That was the only -- so he only gave you the name

16  of Informant 11; is that right?

17  A   I believe, based off looking at it here, yes.

18          MR. DILLON:  May I approach?

19          THE COURT:  You may approach.

20  BY MR. DILLON:

21  Q   Can you show me what you were looking at.

22  A   I don't have the actual statement.  I went off of this,

23  and I copied and pasted.

24  Q   So you weren't actually looking at the email he sent you

25  when you answered that question, were you?

1  A    I was not.

2        MR. DILLON:  I'm going to mark this as, I think,

3  Plaintiff's 2.  This is listed as Document 25-6.  So that

4  would be --

5        THE COURT:  Any objections?

6        MS. ORLAND:  No, your Honor.

7        THE COURT:  Admitted.

8        MS. ORLAND:  Thank you.

9        MR. DILLON:  And to be clear I'm going to just -- for

10  the record, any time we say 25, I think it's going to become

11  26.  All of the exhibits by the defense were refiled.  I'll

12  take that up at the end but that will -- but I may misspeak

13  and say -- because this literally says 25, but they will be

14  renumbered as 26.

15        May I approach?

16        THE COURT:  Yes.

17  BY MR. DILLON:

18  Q    Okay.  So I'm showing you what's been marked for

19  identification as Plaintiff's Exhibit 2.  Do you recognize

20  this?

21  A    Yes, I do.

22  Q    Just flip through it.  It's three pages; right?

23  A    Okay.  Yes.

24  Q    And the first page is the written statement that Mr. Doe

25  submitted to you about Victim 1; correct?

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 99 of 217
Case 4:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 99 of 216

99

1   A    Correct.

2   Q    The second page is basically -- second and third page is a

3   two-page email chain between you and Mr. Doe; correct?

4   A    Correct.

5   Q    And I want you to go there, to the bottom of page 1, an

6   email that he sent you on ███████████████████████.    And

7   let me read this, and tell me if I've read it accurately.

8            ████████████ ████████████████████████████████████

9   ████████████████ ███████████████████████████████████████

10  ██████████████████████████████████████████████████████████

11  ██████████████████████████████.

12            And then he proceeds to talk about a lot of

13  witnesses, doesn't he, Mr. Paquette?

14  A    ████████████████████████████████████████████

15  █ ████████████████████████████████████████████████████

16  ████████████████████████; correct?

17  A    Correct.

18  Q    And this is redacted, but that's more than just Informant

19  11; right?

20  A    I think it's 10 and 11 definitely.    I don't know who else.

21  Q    In my statement I mentioned that ████████████████████████

22  ██████████████████████████████ █████████████████████████

23  ██████████████████████████.

24  A    That's Informant 10.

25  Q    There's two people; right?

Case 1:15-cv-04073-SCJ Document 102 Filed 04/26/17 Page 100 of 217
Case 1:15-cv-04073-SCJ Document 94 Filed 12/28/15 Page 100 of 216

100

```
1   A    Yeah.

2   Q    So it's not just Informant 10.  There are two people?

3   A    ███████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████

5   ██████████

6   Q    So let me just go back so we have a clear record.

7   A    Okay.

8   Q    There's a sentence that says ██████████████████████████

9   ████████████████████████████████████████████?

10  A    Correct.

11  Q    So that implies at least two people?

12  A    Uh-huh.

13  Q    █████████████████████████████████████████████████

14  ██████████████████████████████████████████████; right?

15  A    Correct.

16  Q    And he is happy to speak with you regarding the events of

17  ████████████████; right?

18  A    Correct.

19  Q    ████████████████████████████████████████████████████████

20  ██████████.  All of these people that I mentioned are willing

21  to set up an appointment to communicate with you regarding the

22  events █████████████████████████████████; correct?

23  A    Correct.

24  Q    You did not talk to literally anyone he mentioned in this

25  email except for Informant 11; correct?
```

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 101 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/16 Page 101 of 216

101

1  A    10 and 11.

2  Q    Okay.  And you waited at least three weeks to do that;

3  correct?

4  A    Correct.

5  Q    Because you just -- but you talked to people that Ms. Roe

6  had named; right?

7  A    Yes.  I'm not sure I have a good timeline to know if there

8  were any after I talked with him.  But, again, as I said

9  earlier, the reason for that was ████████████████████████████

10 ████████████████████.

11 Q    So let's talk about who you chose to talk to.  So if you

12 could just turn to page 4 of 24, I think we're back at Defense

13 1.  It's your investigative report.

14 A    Where --

15 Q    It's page -- at the top of the page it should say 4 of 24,

16 Document 25-11.

17 A    Okay.

18 Q    Are you there?  Do you see where it says Informant 1,

19 account of events?

20 A    Yes.

21 Q    Okay.  That Informant 1, as it says there  ████████

22 █████████████████████████████████████████████████████████

23 ████████; correct?

24 A    Correct.

25 Q    And you interviewed her; right?

Case 1:15-cv-04070-SCJ   Document 102   Filed 04/26/17   Page 102 of 217
Case 1:15-cv-04070-SCJ   Document 94   Filed 12/28/15   Page 102 of 216

102

1  A   Yes.

2  Q   And Mr. Doe told you on, and his lawyers, told you on

3  ███████   during your final meeting, ██████████████████

4  ████████████████████████████████████████████████████

5  ██████████████████████████████████████████████

6  ████████████████████████████████████████; correct?

7  A   I don't recall that.

8  Q   You don't recall them telling you that?

9  A   ██████████████████████████████   I don't recall

10 the details of the discussion.

11 Q   So as you sit here today, you don't remember -- do you

12 remember that they told you that Informant 1 had talked to two

13 people?

14 A   I don't recall that.  I remember talking about Informant

15 1, but I don't remember the details of the conversation.

16 Q   Do you remember them asking you to reinterview Informant

17 1?

18 A   Again, I don't recall that.  I remember talking ████████

19 but I don't remember what we talked about.

20 Q   And during that meeting, you didn't talk about all the

21 informants, did you?

22 A   No.

23 Q   Okay.  But you did talk about Informant 1?

24 A   Correct.

25 Q   And as you sit here today, you don't remember what they

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 103 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 103 of 216

103

1  asked you about?

2  A    No.   The reason I recall talking about Informant 1 is it

3  became clear in my investigation that █████████████████████

4  ██████████████████████████ and so the credibility ██████came

5  into question as well.

6  Q    Tell us why did it become clear that ████████████████

7  █████████████████████████.

8  A    Sure.  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ████so I didn't know what information she was -- it was

12 unclear.

13 Q    ██████████████████████████ as far as you remember?

14 A    Oh.   The details, I don't remember the details, but it was

15 essentially about ████████████████████████████████

16 ███████████████████████████.  Are you recalling

17 what I'm --

18 Q    Yeah.  █████████?

19 A    Yes.

20 Q    ███████████████████████████████████

21 ████████████████████████

22 A    ███████████████████████████ I just -- I decided on was

23 there credibility there because it seemed like ███████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

Case 1:15-cv-04070-SCJ   Document 102   Filed 04/26/17   Page 104 of 217
Case 1:15-cv-04070-SCJ   Document 94   Filed 12/28/15   Page 104 of 216

104

1   █████████████████████████

2   Q    Do you believe -- so do you believe that when -- so you

3   characterize that as a credibility problem.  You wouldn't

4   characterize that as an innocent misrecollection; is that

5   right?

6   A    It could be either -- no, I think it was a credibility

7   problem.  I mean, I think that -- it was clear in my

8   conversation talking with her.  That's part of what I'm doing

9   when I'm talking with folks is judging their credibility, ████

10  ███████████████████████████████████████████

11  █████████████████████████████████████

12  ███████████████████

13  Q    And what made you -- what specific facts led you to

14  believe that ██████████████████████████?

15  A    █████████████████████████████████████████

16  ██████████████████.

17  Q    That's not anywhere in your narrative of Informant 1

18  account of events, is it?

19  A    I don't recall.

20  Q    Can you read it, please.

21  A    You want me to read the whole thing?

22  Q    Yes, please, just Informant 1 account of events.  Tell me

23  if that's there.

24  A    On ████████████████████ --

25  Q    No, no, no, to yourself, just to yourself.

Case 1:15-cv-04078-SCJ  Document 102  Filed 04/26/17  Page 105 of 217
Case 1:15-cv-04078-SCJ  Document 94  Filed 12/28/15  Page 105 of 216

105

1  A    I don't believe it's there.

2  Q    Okay.  But you just remember it?

3  A    Yeah.

4  Q    But you didn't put it in your report?

5  A    Correct.

6  Q    Even though you said that your job is just to be a mere

7  stenographer and write down everything you're told; correct?

8  A    Correct.

9  Q    So you made a credibility determination about Informant 1,

10 and you just left it out of your report; correct?

11 A    Correct.

12 Q    And Mr. Doe has no way to know that, does he?

13 A    I don't know what our conversation was.  I believe I told

14 him that it was clear to me that she -- that I have decided

15 that witness is not relevant or credible.

16 Q    That was the same day you rendered your decision; right?

17 A    I rendered the decision later that day, yes.

18 Q    Right.  So the morning that you're going to expel him, you

19 tell him that you didn't believe Informant 1, and that's the

20 first time that he hears of that; correct?

21 A    Correct.

22 Q    Because even though you had sent him the report you never

23 put that in your report, did you?

24 A    Correct.

25 Q    In fact, you didn't even put anywhere in your report that

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 106 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 106 of 216

106

1  Informant 1 said different things to different people, did

2  you?

3  A   The reason I didn't do that -- I did not because the

4  reason for that is that at the time there was nothing that

5  that person was sharing that was relevant to the decision

6  making.  So when he brought up something he deemed was

7  relevant, that is when I then explained why I've already

8  deemed that I don't -- I can't trust the credibility of that

9  person.  So we had that conversation.

10 Q   You didn't think what Informant 1 said was relevant?

11 A   Some of ▆▆▆ information is relevant, yes.

12 Q   What was relevant?

13 A   Relevant that this whole thing happened, to help me

14 understand what went on, but relevant to was there -- ▆▆▆▆▆▆

15 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

16 ▆▆▆▆▆▆▆▆▆▆.  Not relevant.

17 Q   Do you think that it's relevant that someone's

18 credibility -- you would admit, wouldn't you, that someone's

19 credibility is relevant to your determination of the case?

20 A   As I train my folks, if the facts alone don't answer the

21 question, then you have to go to the credibility.  If the

22 facts alone don't answer the case, then we have to look at

23 credibility.

24 Q   And how do you determine credibility?

25 A   I think consistency, other motives, sort of how they

Case 1:15-cv-04878-SCJ   Document 102   Filed 04/26/17   Page 107 of 217
Case 1:15-cv-04878-SCJ   Document 94   Filed 12/28/15   Page 107 of 216

107

1    present each time.

2    Q    And you didn't put anything anywhere in your investigative

3    report about how any of the witnesses presented, did you?

4    A    No.

5    Q    But that did go into your determination of their

6    credibility; correct?

7    A    For the witnesses?

8    Q    Yes.

9    A    Yes.

10   Q    But that's just in your head; right?

11   A    Sure.

12   Q    It's not in the report.

13   A    Again, that wasn't relevant to the decision making.

14   Q    Your opinion of the credibility of the witnesses was not

15   relevant to the decision making?

16   A    In terms of ████████████████████████████████████

17   ████████████████████████████.

18   Q    Whether you believe the witnesses, regardless of who they

19   are --

20   A    Sure, yes.

21   Q    -- is that relevant to the determination in the case?

22   A    Yes.

23   Q    So if you had witnesses who made you doubt the victim's

24   credibility, that would be relevant; correct?

25   A    Sure.

Case 1:15-cv-04079-SCJ Document 192   Filed 04/26/17   Page 108 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 108 of 216

108

1  Q   And if you had evidence that the victim had said one thing

2  about what happened that night to one person and another thing

3  to another person, so an inconsistency, that would be relevant

4  to your credibility; correct?

5  A   It could be, yes.

6  Q   It would be; right?

7  A   Again, if you're referring to the document in here, I view

8  it as a narrative story, not as an account, but yes.

9  Q   Well, I'm not -- I didn't actually ask about that.  But

10 just in general do you think that if a person says one thing

11 to one person and one thing to another person, that that could

12 go to their credibility?

13 A   It could.

14 Q   And --

15 A   By itself probably wouldn't answer the question.

16 Q   By itself what?

17 A   By itself I don't think it would stand alone and answer

18 the question but it could lend cred -- yeah, it could help

19 sway.

20 Q   It could help sway.  Okay.

21 A   Uh-huh.

22 Q   So let's take an example that you talked about.  You said

23 and you've put in your conclusions that one of the

24 inconsistencies that you highlighted was the fact that the

25 first time you spoke to Mr. Doe he said that ███████████

Case 1:15-cv-04070-SCJ   Document 192   Filed 04/26/17   Page 109 of 217
Case 1:15-cv-04070-SCJ   Document 194   Filed 12/28/17   Page 109 of 216

109

1 ████████████████████████████████████████████

2 ██████████████████████; right?

3 A   Yes.

4 Q   And you saw that as a credibility problem; right?

5 A   Right.

6 Q   And you said that that went to ██████████████████

7 or something like that; right?

8 A   Sure.

9 Q   Who walked -- did you walk into the courtroom with

10 Ms. Orland today?

11 A   I walked in behind her.

12 Q   Okay.  Did you came with her?

13 A   Yes.

14 Q   But you have a specific memory of walking in behind her?

15 A   Uh-huh.

16 Q   What about when you came through security?

17 A   I was by myself.

18 Q   You were by yourself.  Okay.  And you think -- and that

19 was just what, two hours ago; right?  Or we've been going for

20 a while, probably three hours ago; right?

21 A   Right.

22 Q   You asked Mr. Doe ████████████████████████████████,

23 some account, I think, ████████after the event; correct?

24 A   Yes.

25 Q   And you considered it a strike against his credibility

Case 1:15-cv-04878-SCJ   Document 102   Filed 04/26/17   Page 110 of 217
Case 1:15-cv-04878-SCJ   Document 94   Filed 12/28/15   Page 110 of 216

110

1  because at Time 1 he said ██████████ and at Time 2 he

2  said ██████████?

3  A   As I mentioned before, it can lean towards that.  As soon

4  as he told me that he had lied about the entire other case, it

5  definitely went towards that.

6  Q   What do you mean by lean towards that?

7  A   It could suggest to me that it was a lie or it could

8  suggest to me that it was ██████████ of memory.

9  Q   So what did you decide?

10 A   I decided that it was most likely falsified information.

11 Q   Because of what he said about V2?

12 A   Uh-huh.

13 Q   Is that a yes?

14 A   Yes.

15 Q   Okay.  So let's talk about V2.  The only evidence that you

16 have of V2 -- ████████████████████

17 ██████████████████

18 █ ██████████████████.

19 Q   Right.  And you didn't interview any other witnesses, did

20 you?

21 A   There were no other witnesses.

22 Q   I mean, you didn't look for them, did you?

23 A   There were no other witnesses.

24 Q   Did you ask V2 if she had talked to anybody about what

25 happened?

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 111 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 111 of 216

111

1   A    Neither party recalled anybody else being around that

2   night, as far as I recall.

3   Q    Did you ask if -- did you -- let me ask it this way:  You

4   would agree that if someone -- if something bad happens to

5   somebody and they tell them like run home, and they say, hey,

6   this bad thing just happened, that sort of a contemporaneous

7   report can sometimes add to the credibility; right?

8   A    Sure, yeah.

9   Q    But you didn't ask V2, you know, after this happened, did

10  you talk to anybody about it?

11  A    I don't recall.

12  Q    You don't remember even asking her about that?

13  A    Can I look quick?

14  Q    Yes, sure.  Please.

15  A    ████████████  ████████████████████████████████████

16  ██  ██████

17  ██  ████████████████████████████████

18  ██  ██████████████████████

19  ██  ████████████████████████  ██████████████████████████

20  ██████████████████████

21  ██  ████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████

24  ██  ████████████████████

25  ██  ████████████████████████████

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 112 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 112 of 216

112

1   ████████████████████████████████████████████

2   Q   And let's talk about V2 then.  So when you called Mr. Doe

3   to tell him that he was now being investigated for V2, he

4   already knew about the V1 allegation; right?

5   A   Yes.

6   Q   And he was ████████████████ at the time; right?

7   A   Correct.

8   Q   And as far as you knew, at that point he didn't have a

9   lawyer; right?

10  A   Correct.

11  Q   And at that point you didn't actually tell him what the

12  allegation was, did you, from V2?

13  A   I don't recall what our conversation was.

14  Q   Feel free to look at it, page 8 of 24.

15  A   This 8 of 24 is not the no -- the no contact directives?

16  Q   I have that as Victim 2 account of events on Exhibit 1.

17  Is that --

18  A   Right, right.  But as far as what I told him, it wouldn't

19  show on there.

20  Q   So is there any record of what you told --

21  A   There is not I don't think.

22  Q   Okay.  And so he was -- he knew he was being investigated.

23  So you don't even know if you told him as you sit -- as you

24  sit here today, you don't know if you told him she's saying

25  that you raped her?  You don't even remember that?

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 113 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 113 of 216

113

1   A   I don't recall.

2   Q   And what did he tell you in response?  Let me ask -- I'll

3   shorten it.  ████████████████████████████████████████

4   ████████████████████████████

5   ██  ████████  ██████████████████████████████████████

6   ████

7   Q   Okay.  And he was already under investigation for one

8   thing; right?  For one act of sexual misconduct; right?

9   A   Correct.

10  Q   And he ██████████████████; correct?

11  A   Correct.

12  Q   ██████████████████; correct?

13  A   Correct.

14  Q   ████████████████████████████████████  ██████████

15  ████████████████████████████

16  A   ████████

17  Q   ████████████  ████████████████████  ████████████

18  ██████████████████████████  You called him on the

19  phone; right?

20  A   The very first time we're talking about?

21  Q   With V2.

22  A   I don't recall.

23  Q   It says on ██████████ I had a conversation with respondent

24  regarding this incident; right?

25  A   Yes.

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 114 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 114 of 216

114

1  Q   So you actually -- you didn't tell him before the phone

2  call.  You didn't email him and tell him that he's been

3  accused; right?  You just said I need to talk to you?

4  A   On ██████████ he got the no contact directive that says.

5  Q   But that doesn't say what it's about it, does it?  It just

6  says you have a no contact; right?

7  A   Correct.

8  Q   Okay.  So the first time he had any idea of what this

9  woman was saying he did was when you -- you just sprung it on

10 him on the phone; right?

11 A   Both times I'd went through the process and let him know

12 that he does not have to tell me anything today.  He's welcome

13 to share in a written account, answer my questions or ██████

14 ███████████████     ████████████████████████████████████████

15 ██████████████████████████████████████████████████████████.

16 Q   Right.  But to be clear, the first time that this person

17 who, you know, even you realize he had -- ████████████████████

18 ████████████████████████████, the first time he knew

19 what the allegation was was when you sprung it on him on the

20 phone; right?

21 A   Possibly, yes.

22 Q   That's the first time you told him; right?

23 A   Yes.

24 Q   And as far as you know, did he ever violate the no contact

25 order?

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 115 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 115 of 216

115

```
 1   A    No.

 2   Q    So you're probably the only person who could have told

 3   him; right?

 4   A    Correct.

 5   Q    And the first time he had any idea what this was about was

 6   when you sprung it on him on the phone ███████████████████

 7   and already under investigation with something else?

 8   A    Correct.

 9          MR. DILLON:  Now, if I can approach, your Honor?

10          THE COURT:  Yes.

11   BY MR. DILLON:

12   Q    So Defense 2, the witness statements provided at the

13   ████████████████, hearing, that didn't go as an exhibit to your

14   report, did it?

15   A    I don't know the -- in terms of?

16   Q    Like this little packet of statements, you did not attach

17   that to your report?

18   A    I don't know.

19   Q    I mean, did you -- you looked at --

20   A    I mean, I reviewed it.  Is that what you're asking?

21   Q    Right.  You didn't actually make it part of your report?

22   A    No.  It would be an appendix with all the rest of the

23   other -- like the email or the text message exchange, all that

24   would be an appendix to the report.

25   Q    So you didn't -- your testimony here today under oath is
```

1  that you put this in an appendix as part of the official

2  record?

3  A   I reviewed that.  I don't know that it went in the

4  appendix.

5  Q   How would you know that?  It's nowhere in your

6  declaration, so I'd like to figure that out.  Documents

7  reviewed.  Okay.

8  A   Uh-huh.

9  Q   So it's not 1, 2 or 3.  We're looking for the record at

10 Document 25-10.  This is the investigative report?

11 A   Correct.

12 Q   So let's turn the page.

13     MS. ORLAND:  Your Honor, this is a little harassing.

14 Can he move back?

15     THE COURT:  Yes.

16 BY MR. DILLON:

17 Q   So just to be clear, you talked about the documents that

18 you reviewed.  You did not list any of these witness

19 statements in the documents, did you?

20 A   That looks like an administrative oversight.  You're

21 correct.  I did review them, however.

22 Q   But you didn't talk about them in your investigative

23 report; correct?

24 A   Correct.

25 Q   And you didn't attach them as an appendix to your

1  investigative report; correct?

2  A    Correct.

3  Q    So as far as any appellate body, anybody reviewing what

4  you did, they would have absolutely no idea that you looked at

5  these, did you -- would they?

6  A    Correct.

7         THE COURT:  Mr. Dillon, do you have a question?

8         MR. DILLON:  Yes, your Honor.  Sorry.  I did not

9  realize we were doing a hearing, so I'm doing this on the fly

10  as fast as I can.  And I never got a copy of this because it

11  wasn't attached to anything.

12         So Informant 11 then.  So you learned from the -- so

13  I'll move on.

14         And just to be clear, after you read these witness

15  statements, not only did you not talk about that in your

16  report, not mention their existence in your report, not attach

17  them to your report, you did not go back and interview any of

18  these people, did you?

19         THE WITNESS:  Correct.  And the reason for that is

20  most of those are character witnesses.  The two that were not

21  character witnesses that were there were already in the

22  report.

23  BY MR. DILLON:

24  Q    Right.  But you hadn't talked to Informant 11, had you?

25  A    Email only.

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 118 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 118 of 216

118

1   Q    You had not -- you had gotten a short email statement, but

2   that was it; correct?

3   A    Correct.

4   Q    And you said you considered what Informant 11 said before

5   you made your decision; correct?

6   A    Correct.

7   Q    But, I mean, to be clear, Mr. Paquette, you had already

8   made your decision as of ████████████; right?

9   A    I made my decision after I met with him on ████████████.

10  Q    So you had written the entire report except for the last

11  piece about your finding; right?

12  A    Correct.

13  Q    And your testimony is that they came in on ████████████, and

14  you were completely open-minded at that point.  You had not

15  reached any initial conclusions?

16  A    Correct.

17  Q    None at all?

18  A    I mean, it charged so clearly felt that there was enough

19  information to violate the policy, but other than that, hadn't

20  made a decision.

21  Q    You testified on direct examination that if you had

22  evidence that a witness had lied or changed their version of

23  events, that you would consider that; correct?

24  A    Sure.

25  Q    And, again, you had evidence that Ms. Roe had changed her

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 119 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 119 of 216

119

```
 1   version of events between what she gave -- ████████████████
 2   ██████████████████████████████████████████; correct?
 3   A   Correct.
 4   Q   But you didn't consider that, did you?
 5   A   I didn't think it was relevant.
 6   Q   You also had evidence that Ms. Roe had told Informant 1
 7   that -- had told Informant 1 ████████████████████████████
 8   ██████████████████████████████████████████████████████████
 9   ██████████?
10   A   If it's in the report, I did, yes.
11   Q   They told you that in the meeting; right?  About Informant
12   1?
13   A   Who is they?
14   Q   Mr. Doe and his lawyers.
15   A   The conversation --
16   Q   Right.
17   A   Again, as I said before, I don't know the details of our
18   conversation.  I do recall we talked about Informant 1.
19   Q   And would you agree that if they had told you that
20   Informant 1 -- ████████████████████████████████████████████
21   ████████████████████████████████████, that you should have
22   followed up on that?
23   A   Thought something -- can you clarify?
24   Q   Sure.  If what Ms. Roe had told Informant 1 ████████████
25   ████████████████████████████████████, would you agree
```

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 120 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 120 of 216

120

1  that that's something that you should have followed up on?

2  A   Yes.

3  Q   But after th ████████████, you never interviewed

4  Informant 1, did you?

5  A   Correct.

6  Q   Can you turn to page 1 of your investigative report.  It

7  will be marked as page 2 of 15, bullets up at the very top

8  under summary -- sorry.  I'm using the pagination from the

9  top.  Okay.  Do you see the three bullets under summary?

10  A   I do.

11  Q   The third bullet says, in addition, throughout the course

12  of the investigation, Informant 9 stated that ███████████

13  ████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████

16  █████.   Informant 9 states that after that interaction,

17  respondent continued to send her text messages of a sexual

18  nature; right?

19  A   Correct.

20  Q   O ██████████ when Mr. Doe and his lawyers walked into the

21  meeting with you, they offered to show you the text messages;

22  correct?

23  A   Correct.

24  Q   And you said at that point I don't need to see them;

25  right?

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 121 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 121 of 216

121

1  A    None of the charges were in relation to that event --

2  Q    Just to be clear --

3  A    -- correct.

4  Q    -- you had a statement that ████████████████████████

5  ██████████████████ that is literally the third bullet in your

6  report, and you had Mr. Doe and his lawyers saying we have the

7  ██████████████████████; correct?

8  A    Correct.

9  Q    And you said to them, I don't need to see them; correct?

10 A    That is correct.

11 Q    But you still left in the bullet on the top of page 1 of

12 your report?

13 A    Yeah.

14 Q    Even though you knew it had been proven beyond any shadow

15 of a doubt that it was actually not true?

16 A    Again, the charges didn't relate to that, so it wasn't

17 germane to the decision that I had to make on that day.  It is

18 germane to the full report.

19 Q    Why did you put -- was it ever germane?

20 A    If someone brings allegations, yeah.

21 Q    Why?  Why would it have been germane ever that he ███████

22 █████████████████████████████████████████?

23 A    Because it could result in an additional charge.

24 Q    Like what?

25 A    Sexual harassment.

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 123 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 122 of 216

122

1  Q   So, well, maybe -- let's stay away from the First

2  Amendment.

3       THE COURT:  Let's keep in mind this is a preliminary

4  injunction hearing.

5       MR. DILLON:  I understand, your Honor.  We'll stay

6  away from the First Amendment.

7       But at the end of the day, you investigated and had

8  no evidence of sexual harassment; right?

9       THE WITNESS:  Correct.

10 BY MR. DILLON:

11 Q   And you had evidence that proved beyond any shadow of a

12 doubt that there was no sexual harassment of Informant 9;

13 correct?

14 A   Beyond a shadow of a doubt, no.  More --

15 Q   You had the --

16 A   -- likely than not is our threshold.

17 Q   You had ███████████████████; right, Mr. Paquette?

18 A   Uh-huh.

19 Q   You looked at them?  Is that a yes?

20 A   Yes.

21 Q   And you looked at them, yes?

22 A   Yes.

23 Q   And you saw that ████████████████████;

24 correct?

25 A   Correct.

Case 1:15-cv-04078-SCJ   Document 102   Filed 04/26/17   Page 123 of 217
Case 1:15-cv-04078-SCJ   Document 94   Filed 12/28/15   Page 123 of 216

123

1  Q   But you still kept in that bullet, didn't you?

2  A   Yes; exactly as I said.

3  Q   And you also kept in that, earlier in the bullet, that she

4  said respondent stated that ████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████; correct?

7  A   Uh-huh.

8  Q   Is that yes?

9  A   Yes.

10 Q   And Informant 9 said that there was -- let's see, right.

11 And then a narrative of what Informant 9 said on page 9 of 15,

12 it said, that comment made Informant 9 concerned ██████

13 ████████████████████████████████████████████████████

14 ██████; correct?

15 A   Correct.

16 Q   But you had literally no evidence that there ██████████

17 ████████████████  in this case; correct?

18 A   Correct.

19 Q   And, in fact, Mr. Doe told you that ████████████████

20 ████████████████████████████████████████████████████

21 ████████████████; correct?

22 A   Correct.  He shared that, yes. ████████████████████,

23 but he shared that information.

24 Q   So you not only had zero evidence that ██████████████

25 ██████████, but you also had an explanation -- ██████████

Case 1:15-cv-04070-SCJ   Document 192   Filed 04/26/17   Page 124 of 217
Case 1:15-cv-04070-SCJ   Document 194   Filed 12/28/17   Page 124 of 216

124

1 ███████████████████████████████████████████████████;

2 correct?

3 A    Correct.

4 Q    And you still kept that comment, top of page 1 of your

5 report; correct?

6 A    Correct.

7 Q    Now, you said that you didn't interview the witnesses that

8 Mr. Doe asked you to interview except for 10 and 11 because

9 none of them were there that night; right?

10 A    None of them were in the room when the sexual act

11 happened, yes.

12 Q    Right.  And so you thought they were irrelevant; correct?

13 A    They wouldn't be able to answer the questions I was

14 asking.

15 Q    Okay.  Let's go through who could.  Informant 1, this

16 is -- we're going to go person by person.  Page 4 of 24, look

17 at Informant 1 account of events.  Could she answer anything

18 about what happened that night?

19 A    No.  Again, as I said, I would have probably talked to the

20 other people earlier if the respondent had gotten back to me

21 sooner and I could --

22 Q    We're going to get to the 60-day requirement,

23 Mr. Paquette.

24 A    Sure.

25 Q    But to be clear, Informant No. 1 had no information about

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 125 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 125 of 216

125

1   what happened that night; correct?

2   A   Correct.

3   Q   But Ms. Roe suggested you talk to her; correct?

4   A   Correct.

5   Q   So you talked to her; correct?

6   A   I did.

7   Q   Informant 2, bottom of 5 of 24, who was ███████████

8   ████████████████████████.   Informant 2 didn't have any

9   information about what happened that night, did she?

10  A   Correct.

11  Q   But you still talked to her; correct?

12  A   Correct.

13  Q   Because Ms. Roe suggested that you talk to her; correct?

14  A   Correct.

15  Q   Informant 3, another who was identified as someone who,

16  quote, ████████████████████████████████████████

17  █████████.   Informant 3 had no information about what happened

18  that night, did she?

19  A   Correct.

20  Q   But you interviewed her?

21  A   Correct.

22  Q   Because Ms. Roe asked you to interview her?

23  A   Correct.

24  Q   Informant 4, who was identified ██████████████████████

25  ███████████████████████████████████████████████;

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 126 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 26 of 216

126

1  right?

2  A    Yes.

3  Q    And do you believe that person had relevant information?

4  A    Yeah; that could be relevant information, yeah.

5  Q    So do you think that they provided relevant information?

6  A    Do I think -- no.  There was nothing in his account that

7  helped me decide that.

8  Q    Okay.  Informant 5.  Informant 5, does she have any

9  information about what happened that night?

10 A    No.

11 Q    But you put her in?

12 A    Correct.

13 Q    Because Ms. Roe asked you to?

14 A    Correct.

15 Q    And you put in things that she said about ███████████

16 █████████; correct?

17 A    Correct.

18 Q    If a witness had told you -- if you had interviewed a

19 witness who had said Ms. Roe has a reputation for being -- for

20 sleeping around a lot, you know, would you have put that in?

21 A    Yeah.

22 Q    You would?

23 A    (Nods head.)

24 Q    If someone had said she will sleep with anybody, you would

25 have put that in your report?

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 127 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 127 of 216

127

1   A    If it was -- yeah.

2   Q    If it was what?

3   A    Relevant, yes.

4   Q    How could it be relevant?

5   A    Gosh, in all the cases I've done, I would take a little

6   while to argue why it would be relevant, but, yes, it's

7   information that's shared with me.  I'll put it in there.

8   Q    Let's say that Informant 10 had said I have known Victim 1

9   for a year, and she is sexually promiscuous.  She said she'll

10  sleep with anybody, and, you know, I think she just sleeps

11  with anybody who asks her.  You would have put that in your

12  report?

13  A    I'll put it in there doesn't answer the question about

14  ███████████████████████████████████████████████████████████

15  ██████████████████.

16  Q    But you still would have thought that that was information

17  that should go in your report?

18  A    Yes.

19  Q    I want to ask you about the book "Guyland," the book that

20  you assigned people.

21  A    Yes.

22  Q    So I'm just going to read an excerpt from this, and let's

23  just assume that I'm telling you the truth about this is what

24  it says.

25  A    Sure.

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 128 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 128 of 216

128

1  Q   So assuming that I'm reading this accurately, the book

2  says -- the author says that, with respect to fraternities,

3  that these intensive all-male peer groups foster rape-

4  supportive behaviors and attitudes.  Do you believe that?

5  A   No.

6  Q   What do you believe about kind of the effect of

7  fraternities on Georgia Tech's campus?

8  A   I think that they are a great place to start leadership

9  experience and contribute to the community.

10  Q   Mr. Kimmel also says that athletes or frat guys are more

11  prone to gang rape.  Do you believe that?

12  A   No.

13  Q   He also says that frat -- being frat guys or athletes

14  confers on them an elite status that is easily translated into

15  entitlement.  Do you believe that?

16  A   An individual in school it might for athletes, but I

17  wouldn't say beyond that.

18  Q   So why do you assign the book?

19  A   To engage the student in an academic exercise to see if

20  they agree or disagree.  There's a lot in that book that also

21  argues the counter of the excerpts you found.

22  Q   The author, Mr. Kimmel, has a different argument than

23  that?

24  A   No; in terms of the benefits of as well.

25  Q   He talks -- he endorses that; he says that I think they're

1   actually beneficial organizations?

2   A   He talks about the fraternity experience.

3   Q   So an author who's just said that intensive all-male peer

4   groups foster rape-supportive behaviors and attitudes, you're

5   saying later in the book endorses fraternities is a good

6   thing?

7   A   I don't have the entire book in front of me, but, yes, he

8   talks about the good and the bad, which is why I have students

9   read it and then write a reflection paper.  And in their

10  reflection paper they have to make an argument to me about

11  what they support and what they disagree with.

12  Q   Now, let's talk about the time limit that you mentioned,

13  60-day time limit by OCR.  That is not a rule; correct?

14  A   It's guidance.

15  Q   It's guidance?

16  A   Correct.

17  Q   And it recommends, that guidance -- is that from the 2011

18  dear colleague letter?

19  A   Yes.

20  Q   Promulgated by the Office of Civil Rights, I think, in

21  April of 2011?

22  A   Yeah; April 4th.

23  Q   And that letter says that in general sexual misconduct

24  investigations should be conducted within 60 days; correct?

25  A   Uh-huh, correct.

Case 1:15-cv-04079-SCJ Document 182 Filed 04/26/17 Page 130 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 130 of 216

130

1  Q    But it does say, goes on to say in that same paragraph,

2  that, however, that's not a hard and fast rule and that

3  certain investigations, if they're more complex, may require

4  more time than that; correct?

5  A    Correct.

6  Q    So it's not a 60-day deadline to complete an

7  investigation, is it?

8  A    Correct.

9  Q    What you're supposed to do is just kind of not drag your

10 feet; correct?

11 A    Correct.

12 Q    So when you had information that Informant 11 could have

13 talked to you about ██████████████████████████████████

14 ████████████████████, you didn't fail to interview him because

15 of the 60-day deadline, did you, Mr. Paquette?

16 A    No.

17 Q    Okay.  So, I mean, you before, I think on direct

18 examination, said that there's a -- you know, one of the

19 reasons I had to sort of wrap this up is because of a 60-day

20 time limit; right?

21 A    Correct.

22 Q    But, in fact, there is no 60-day time limit; correct?

23 A    It's the guidance that we try to follow.

24 Q    And the guidance just says we'd like you to do it within

25 60 days, but if it's complicated and you need more time, you

Case 1:15-cv-04069-SCJ Document 102 Filed 04/26/17 Page 131 of 217
Case 1:15-cv-04069-SCJ Document 94 Filed 12/28/15 Page 131 of 216

131

1  can have more than that.  That's what it says in substance;

2  right?

3  A   It doesn't say that, but that's the spirit of how you're

4  interpreting it.

5  Q   And you would agree that I'm interpreting it properly?

6  A   Yeah.  We had a case that I investigated this fall that

7  happened over the summer abroad, and there were a number of

8  moving parts, three individuals.  And, yes, that one took much

9  longer than 60 days because of the complicating factors.

10 Q   Do you agree that -- I just want to get out what you

11 think, what your understanding of the guidance is.  Do you

12 agree that right after the guidance -- the dear colleague

13 letter says 60 days, it goes on immediately to say that

14 there's an exception for that if there's a complicated case?

15 A   Yes.  I wouldn't view this as a complicated case.

16 Q   But the bottom line is OCR says you can take longer than

17 60 days if you need it; right?

18 A   Yes.

19 Q   And you don't view a case in which there are -- there's

20 one witness ████████████████████████████████████████████

21 ██████  and then a complaint that took ██████████to bring, you

22 don't view that as a complicated case?

23 A   No.  It's very common, based on our cases.

24         THE COURT:  Okay.  Mr. Dillon, the court reporter

25 needs a break.  I was going to go to probably about 12:45, but

```
 1    this may be a good place to stop and start back up at 1:30.
 2              MR. DILLON:  Okay.  Thank you, your Honor.
 3              THE COURT:  Excuse me.  2:30.  My lunch appointment
 4    is at 1:00, and it's going to take an hour.  So we'll start
 5    back at 2:30.
 6              MS. ORLAND:  Thank you.
 7              MR. DILLON:  Thank you, your Honor.
 8              THE COURT:  Thank you all.
 9              COURTROOM SECURITY OFFICER:  All rise.  Court stays
10    in recess until 2:30.
11              (Whereupon, a recess was taken from 12:32 p.m. until
12    2:33 p.m.)
13              COURTROOM SECURITY OFFICER:  All rise.  Court is now
14    in session.
15              THE COURT:  Mr. Dillon --
16              MR. DILLON:  Yes, sir.
17              THE COURT:  -- I understand the need to get points
18    across, but can I ask you, you've got to slow it down.
19              MR. DILLON:  I know.
20              THE COURT:  If the court reporter can't get it down,
21    it didn't happen.
22              MR. DILLON:  I know.  I understand.  We were just
23    having a conversation about that.  I told her I could give her
24    the names of some nice court reporters in D.C. who like me as
25    a person but hate to see me in court, and I'll do my best.
```

Case 1:15-cv-04078-SCJ   Document 102   Filed 04/26/17   Page 133 of 217
Case 1:15-cv-04078-SCJ   Document 94   Filed 12/28/15   Page 133 of 216

133

1    THE COURT:  We don't hate to see you in court.  It's

2    just, plus, you know, we want to hear everything you say.

3    MR. DILLON:  Yes, sir.

4    THE COURT:  Just slow it down a little bit.

5    MR. DILLON:  Yes, sir.  I will do my level best, sir.

6    Okay.  And I'm almost done, your Honor.

7    Okay.  Good afternoon again.  You remember you're

8    still under oath?

9    THE WITNESS:  (No response.)

10   BY MR. DILLON:

11   Q    You need to say yes or no for the record.

12   A    Sorry.  I didn't hear what you said.

13   Q    You remember you're still under oath?

14   A    Yes.

15   Q    Okay.  Mr. Paquette, on direct examination I think a few

16   times you used the word "we" in discussing your investigation.

17   Did anyone else work on this investigation besides you?

18   A    Nobody else did meetings with students, no.

19   Q    You were the sole investigator?

20   A    Correct.

21   Q    Now, and to be clear, you interviewed every witness that

22   Ms. Roe asked you to interview?

23   A    I believe.

24   Q    And Mr. Doe on ████████ gave you a list of six witnesses,

25   as I showed you today, that he wanted you to interview;

Case 1:15-cv-04070-SCJ Document 182 Filed 04/26/17 Page 134 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 134 of 216

134

```
1   correct?

2   A   Correct.

3   Q   And, in fact, when I initially asked you, you didn't even

4   remember that list.  All you remembered was Informant 11;

5   correct?

6   A   Correct.

7   Q   And of the six witnesses that he gave you, you only spoke

8   with one of them?

9   A   In person?

10  Q   Yes.

11  A   Yes ███ --

12  Q   That was Informant 10; correct?

13  A   Did we speak in person or was that also in writing?  I

14  don't recall.

15  Q   I believe it was -- your report it says it was in person.

16  A   Okay.  If the report says that, yes.

17  Q   So of the six witnesses he gave you, you spoke to one of

18  them in person; correct?

19  A   Uh-huh, correct.

20  Q   And Informant 11, you never spoke to him at all in person;

21  correct?

22  A   Correct.

23  Q   And you interviewed Informant 10, according to your

24  investigative report, on ████████████; correct?

25  A   That sounds correct.
```

Case 1:15-cv-04079-SCJ Document 192 Filed 04/26/17 Page 135 of 217
Case 1:15-cv-04079-SCJ Document 194 Filed 12/28/17 Page 135 of 216

135

1   Q   And so that was, again, three weeks to the day from the

2   day that you got the list of witnesses from Mr. Doe; correct?

3   A   Correct.

4   Q   And you wrote your report chronologically; right?  So do

5   you know what you mean by that?

6   A   Yes.

7   Q   So, you know, the dates -- Informant 8 was interviewed

8   before Informant 9 before Informant 10; correct?

9   A   Correct.

10  Q   So Informant 11 was interviewed after Informant 10

11  because Informant -- let me rephrase that.  You got the

12  statement from Informant 11 after Informant 10 because 11

13  comes after 10; right?

14  A   Correct.

15  Q   So you would have gotten that statement on or about

16  ██████████████, something like that; correct?

17  A   Correct.

18  Q   Again, more than three weeks after Mr. Doe gave you his

19  list of witnesses; correct?

20  A   Correct.

21  Q   So Mr. Doe, sort of through you, tried to call six

22  witnesses in his defense, and you only spoke to one; correct?

23  A   Correct.

24  Q   Now, with respect to the people that you did interview for

25  Ms. Roe, Mr. Doe never saw any of those people talk to you;

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 136 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/17 Page 136 of 216

136

1  correct?

2  A    Correct.

3  Q    He never saw a transcript of those conversations?

4  A    Correct.

5  Q    He never heard a recording of those conversations?

6  A    Correct.

7  Q    He never saw your maybe handwritten notes during the

8  process of those conversations?

9  A    Correct.

10  Q    He just relied on your summary of the conversations?

11  A    Correct.

12  Q    And that's a summary that you've admitted today sometimes

13  you leave things out of it?

14  A    Correct.

15  Q    And Mr. Doe never got to pose questions to any of those

16  people; correct?

17  A    Correct.

18  Q    And you never told Mr. Doe that if you wanted to ask them

19  any questions, he could ask them through you; correct?

20  A    Correct.  He never made that request either.

21  Q    Right.  And you never told him he could do it if he wanted

22  to; correct?

23  A    Correct.

24  Q    Because that's just not part of the process at Georgia

25  Tech; correct?

Case 1:15-cv-04070-SCJ   Document 102   Filed 04/26/17   Page 137 of 217
Case 1:15-cv-04070-SCJ   Document 94   Filed 12/28/15   Page 137 of 216

137

1   A    Correct.

2   Q    And, in fact, when he asked you to go back and reinterview

3   Informant 1, ███████████████████, about something,

4   you told him you weren't going to do that; correct?

5   A    Correct.

6   Q    In fact, he didn't even know the names of the witnesses

7   against him until the day that you expelled him; correct?

8   A    Correct.  He knew it when we were talking about the

9   witness -- the last witness you were talking about, ████

10  █████████████.  At that point he knew all their names

11  because that was when we met in person.

12  Q    Right.  But he didn't know the names -- you did not

13  provide him with the names of any of the witnesses against

14  him, not the victims, any of the witnesses against him until

15  the day you expelled him; correct?

16  A    Correct.

17          MR. DILLON:  No further questions.  Thank you.

18          THE COURT:  Redirect?

19          MS. ORLAND:  Yes, your Honor.  Thank you.  May I

20  approach the witness, your Honor?

21          THE COURT:  Yes, ma'am.

22                      REDIRECT EXAMINATION

23  BY MS. ORLAND:

24  Q    I'm going to hand you what's been marked as Defendant's

25  Exhibit 3.  Do you recognize that?

1   A    I do, yes.

2   Q    What is it?

3   A    It is the final report with the outcomes.

4   Q    And what is the difference -- if you could turn to that,

5   plaintiff's counsel has pointed out that you didn't provide

6   the list of the plaintiff's witnesses, character witnesses, in

7   your report.  Since this is your final report, could you look

8   at that and see if you provided the list of the names of

9   witnesses.

10  A    Yes.  O ████████ it's included, the list of 12, 11

11  witnesses, I think.

12  Q    And was that included in your final investigation that was

13  taken up on appeal?

14  A    Yes.  All 11 of those were included.

15  Q    And were the statements included?

16  A    Yes.

17  Q    Okay.  And so the statements went up to -- with the appeal

18  as well?

19  A    Correct.

20  Q    Okay.  The plaintiff has talked about the fact that you

21  didn't interview -- that you interviewed all of Doe's

22  witnesses but not all of -- all of Roe's witnesses but not all

23  of Doe's witnesses.

24  A    Correct.

25  Q    So all of the victim's witnesses but not all of his.  Can

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 139 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 139 of 216

139

1  you explain why that's the case.

2  A    Yeah; exactly as I said from beginning, that at the point

3  I interviewed the respondent, it narrowed this case down to

4  two things I was trying to decide, and none of those people

5  would help me make the decision because they didn't have any

6  information germane to that question.

7  Q    And so once you interviewed Doe what issue remained in the

8  case?

9  A    Once I interviewed Doe --

10 Q    The respondent.

11 A    Thank you.  At that point, once I interviewed him, the

12 only thing that remained is ███████████████████████ and

13 then credibility decisions from there.

14 Q    So listen carefully to this question.

15 A    Yeah.

16 Q    At the point in the investigation where the respondent

17 came in, if he had exercised his right not to give an

18 additional statement, would you have found against him?

19 A    I don't know that the information at that point would have

20 reached our threshold of more likely than not.  I think from

21 my perspective --

22            THE COURT:  Say that again.

23            THE WITNESS:  I don't know that at that point the

24 information would have reached our threshold of more likely

25 than not, so I don't know that I could have found it.

Case 1:15-cv-04079-SCJ  Document 192  Filed 04/26/17  Page 140 of 217
Case 1:15-cv-04079-SCJ  Document 184  Filed 12/28/15  Page 140 of 216

140

1  BY MS. ORLAND:

2  Q    You could have found against him?

3  A    Correct.

4  Q    So it was his testimony and -- you tell us.  What was it

5  about his statement to you that made that threshold get

6  crossed?

7  A    I think when he -- when it became clear that he had

8  falsified information.

9        THE COURT:  Can you follow-up on that?  Falsified --

10       THE WITNESS:  Yeah, yeah.  I think before when I was

11  asked the question about ██████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ██████████████████, that by itself to me would not be enough to

15  make a credibility decision for something this large.  When he

16  added the fact that he had lied to me the first time and been

17  given a chance to clarify that in email as well, that's when I

18  think I decided that that's -- the falsified information to me

19  left no credibility with him.

20       THE COURT:  Can I interject one question here?  And I

21  apologize.

22       MS. ORLAND:  Absolutely, your Honor.

23       THE COURT:  Is there anything that could have been

24  said or done after that that would have changed your mind?

25       THE WITNESS:  I think I would need something after

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 141 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 141 of 216

141

1  that that would question -- I don't think so.  Nothing comes

2  to mind, I guess, is the answer.  I could probably come up

3  with -- given time I could come up with some ideas, but based

4  on the information I had that day, that would be my answer.

5  BY MS. ORLAND:

6  Q   So if the victim had come to you and said I made it all

7  up, would that have changed your mind?

8  A   Certainly, yes.

9  Q   If somebody else -- if the plaintiff had come in with a

10  witness who said I have somebody who said she made it up,

11  could you have interviewed that person?

12  A   Yeah.  Yeah, I would continue the investigation, I guess,

13  is the answer.

14  Q   Now, the plaintiff has brought in this incident with this

15  Informant No. 1, ████████████████████████████████████████

16  ██████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████

18  ████████████████████.  Why didn't you go back and talk to her?

19  A   I don't see think it's -- I mean, I don't see that as a

20  change in story.  I think that -- I don't remember the time

21  that that ████████████████████████████████████████

22  ████████████, but it doesn't -- to me it doesn't strike me as

23  something -- I mean, that seems like something you might tell

24  somebody when you're not sure what transpired.

25  Q   And is there anything in the victim's version of events

Case 1:15-cv-04078-SCJ  Document 192  Filed 04/26/17  Page 142 of 217
Case 1:15-cv-04078-SCJ  Document 94  Filed 12/28/15  Page 142 of 216

142

1  that leaves you to believe that ████████████████████

2  ████████████████?

3  A   Oh, yeah.  Yeah.

4  Q   Can you explain that.

5  A   Yeah.  █████████████████████████████████████

6  ███████████████████████████████████████████████████

7  ███████████████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ████████.

12 Q   And the conversation alluded to by plaintiff's counsel

13 would have taken place before that?

14 A   The conversation wit ██████████████████████?

15 Q   Uh-huh.

16 A   I don't know when that happened.

17 Q   Okay.  And would that have mattered to you?

18 A   I don't know is the answer.  I don't kno ███████████

19 ████████████████████████████████████████.  I don't know

20 the answer to that.

21 Q   Okay.  No, that's fine.

22        If I may have one more moment, your Honor --

23        THE COURT:  Yes.

24        MS. ORLAND:  -- make sure I got what I needed.

25        The plaintiff's counsel has alluded to the fact that

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 143 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 143 of 216

143

1  the plaintiff hasn't had any other involvement with anybody on

2  campus ███████████.  Has the plaintiff been on campus since

3  this incident came about?

4          THE WITNESS:  No.

5  BY MS. ORLAND:

6  Q   Where was he?

7  A   ████████████████████████████, as far as I know.

8  Q   And then during the time of the incident ███████████?

9  A   ████████████████████████████████████████ ███████████

10 ███████████████████████████

11         MS. ORLAND:  All right.  Thank you.  That's all I

12 have.  Thank you, your Honor.

13         THE COURT:  Thank you.  Recross?

14         MR. DILLON:  No, your Honor.

15         THE COURT:  Thank you, sir.  You may step down.

16         Ms. Orland, you can call your next witness.

17         MS. ORLAND:  Your Honor, I will call Dr. Cara

18 Appel-Silbaugh.

19         THE COURT:  Okay.

20         MS. ORLAND:  Judge, I gave you a binder with all the

21 exhibits, and I want to make sure you have them.

22         THE COURT:  Got them.  They're very helpful.

23         MS. ORLAND:  I want to make sure the originals get

24 where they need to go.

25         THE COURT:  Thank you, ma'am.

```
 1              COURTROOM DEPUTY:  Raise your right hand, please.
 2                   CARA APPEL-SILBAUGH, PH.D.,
 3         herein, having been first duly sworn, was examined
 4  and testified as follows:
 5         COURTROOM DEPUTY:  Okay.  If you could sit down and
 6  if you could state and spell your name for us, please.
 7         THE WITNESS:  Cara Appel-Silbaugh. C-a-r-a A-p-p-e-l-
 8  S-i-l-b-a-u-g-h.
 9         THE COURT:  Thank you.
10                   DIRECT EXAMINATION
11  BY MS. ORLAND:
12  Q   Can you tell us where you work.
13  A   Georgia Institute of Technology.
14  Q   And what's your position there?
15  A   Associate Dean of Students.
16  Q   And what do you do as Associate Dean of Students as it
17  relates to this case?
18  A   As it relates to this case, I serve as part of the appeals
19  committee, serve essentially as an administrative liaison.
20  Q   And what does that mean?
21  A   The literal file will land in my in-box as submitted by
22  the student integrity staff.  I'll organize the file, make
23  copies, and then organize our meeting to bring together myself
24  and the two faculty members.
25  Q   Okay.  So when you say yourself and the two faculty
```

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 145 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 45 of 216

145

1  members, what is that?

2  A   That's the appeals committee.

3  Q   Okay.  So do you hear appeals for what?

4  A   Sexual misconduct.

5  Q   Okay.  So can you describe for me what transpired in this

6  case.

7  A   The same administrative details in terms of receiving the

8  file, organizing the file, making the copies, getting a

9  meeting arranged, the three of us came together.  Myself and

10  the two faculty members came together.  We read through the

11  entire file page by page and then have a discussion.  This

12  case in particular took two meetings.  We had -- there's a

13  great deal of paperwork involved, and so we both ran out of

14  time or at least I ran out of time.  I can't speak for the

15  other two.  I think at least one other person had a time

16  commitment, and so we had to meet a second time.

17          MS. ORLAND:  If I may approach, your Honor?

18          THE COURT:  Yes, ma'am.

19  BY MS. ORLAND:

20  Q   I'm going to hand you Defendant's 4 and 5.  Would you look

21  at those, please.

22  A   Yes.

23  Q   Do you recognize those?

24  A   Yes.

25  Q   And what are they?

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 146 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/16   Page 146 of 216

146

1  A    Exhibit 4 is a short statement submitted by the respondent

2  stating his intention to appeal and on what grounds, and then

3  Exhibit 5 is the appeal rationale description brief submitted

4  by his attorney.

5  Q    And if you look at -- what are the grounds for which the

6  plaintiff appealed?

7           THE COURT:  No objections to 4 and 5 coming in?

8           MR. DILLON:  No objection.

9           MS. ORLAND:  I'm sorry.  Move to tender.

10          THE COURT:  Admitted.

11          THE WITNESS:  The respondent appealed on all four

12  grounds to -- do you want me to read through them?

13  BY MS. ORLAND:

14  Q    Yes.

15  A    Okay.  To determine whether the original investigation was

16  conducted fairly and in conformity with prescribed procedures;

17  number two, to determine whether there was sufficient evidence

18  to support the decision; three, to determine whether the

19  sanction and supplementary requirements imposed were

20  appropriate for the violation for which the student was found

21  responsible; and, four, to determine whether new information

22  not available at the time of the investigation is relevant to

23  the final decision.

24  Q    And if you could look through the larger document -- I'm

25  not going to ask you to read that whole thing, but if you

1  could look through it and see if there were facts and

2  statements and argument put forward in there about those

3  grounds.

4  A   The attorney who wrote this definitely documented section

5  by section responses and justification for each level of

6  appeal.

7  Q   One of the grounds stated in here relates to a statute of

8  limitations and the charges brought more than 30 days after

9  the incident.  What finding did you make as to that ground?

10 A   Well, the policy does not stipulate a statute of

11 limitations, so that wasn't part of our decision making.

12         MS. ORLAND:  Your Honor, I have just noticed that in

13 the conclusion --

14         THE COURT:  I did too.

15         MS. ORLAND:  If I could take that off?

16         THE COURT:  Yes, please.

17         MS. ORLAND:  The last page, if we can remove that

18 from the record, and I apologize.

19         THE COURT:  I also want to give you the one that you

20 put in my binder back.

21         MS. ORLAND:  Yes, sir.  That page is not necessary

22 really.

23         THE COURT:  It's not needed.  I don't need it.

24 BY MS. ORLAND:

25 Q   So I'm sorry.  You did answer the question as to why that

Case 1:15-cv-04070-SCJ Document 192   Filed 04/26/17   Page 148 of 217
Case 1:15-cv-04070-SCJ   Document 94   Filed 12/28/15   Page 148 of 216

148

1   was.  So as we're going through these allegations, I'm going

2   to also hand you Defendant's Exhibit 6, if you could look at

3   that, please.  Do you recognize that, ma'am?

4   A    Yes.

5   Q    And what is that?

6   A    This is the letter to the appeal committee from the

7   victim, Victim 1, which was submitted.  Part of the process

8   for a sexual violence matter is that the victim has the right

9   to submit a victim impact statement, and that was part of and

10  her response to the appeal.

11  Q    And without reading the entire document, can you give us a

12  summary of what the victim impact statement said.

13  A    ███████████████████████████  ████████████████████████

14  ██████████████████████████████████████████████

15  ██████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████████

18  █████████████████████████████████████

19           THE COURT:  Are you submitting 6 into evidence?

20           MS. ORLAND:  I am submitting 6 into evidence.  Thank

21  you, your Honor.

22           THE COURT:  No objections?

23           MR. DILLON:  No, your Honor.

24           THE COURT:  Admitted.

25           MS. ORLAND:  I'm going to hand you -- if I can get

1   Defendant's Exhibit 2 back?

2         THE COURT:  No problem.

3         MS. ORLAND:  If I could hand you Defendant's Exhibit

4   2, which has been previously tendered, I believe.  If not, I'd

5   move to tender it.

6         THE COURT:  I think it has, but to be on the safe

7   side, though, no objections?

8         MR. DILLON:  No, your Honor.  I mean, I can blanketly

9   not object to any of this.  I've seen what she's -- I'm fine

10  with that.

11        THE COURT:  Admitted.

12        MS. ORLAND:  Thank you, your Honor.

13        So can you look at that and see if you've seen those

14  statements before and if they were part of your record upon

15  review.

16        THE WITNESS:  These were definitely statements that

17  were part of our appeals packet, part of the original file,

18  yes.

19  BY MS. ORLAND:

20  Q   Okay.  So after your committee met, did you reach a

21  conclusion as to the allegations?

22  A   We did.

23  Q   And what was that conclusion?

24  A   We upheld the finding in the sanction for Victim 1.  We

25  overturned the finding, and the sanction was the same.  But

1   the finding for Victim 2.

2   Q   Now let's talk about the sanction.  Some might say that

3   the sanction of expulsion for conduct that -- of this nature

4   might be extreme.  Can you describe Georgia Tech's policy in

5   relation to this and why that decision was met and upheld.

6   A   Georgia Tech's policy has what is called a "first

7   considered sanction" depending on the violation.  Expulsion

8   was the first considered sanction for what transpired in this

9   incident.

10  Q   And why is that?

11  A   The accusation was intercourse and that is a -- expulsion

12  is the first considered sanction for intercourse.

13  Q   And could you define intercourse as it's defined by

14  Georgia Tech.

15  A   Penetration.  I don't know the policy, obviously, but

16  penetration.

17  Q   With anything?

18  A   Correct.

19  Q   I'm going to show you what is marked Defendant's Exhibit

20  7.  It's a two-page document.  Do you recognize that?

21  A   Yes.

22  Q   And how do you recognize it?

23  A   Well, it has my signature on it.

24  Q   And what is it?

25  A   It is the -- the first page is the cover sheet that myself

1   and the two other members of the appellate committee signed in

2   regards to our decision.  The second page is a memo that I

3   authored which, on behalf of the committee, which states our

4   finding.

5   Q   And then what happens to communicate this to the parties

6   involved?

7   A   After the cover sheet is signed and the memo is drafted, I

8   walk it back down the hall to the office of student integrity,

9   the entire file, give it to the administrative staff or

10  student integrity, and then they send out final notification

11  to all parties.

12  Q   Now, there's been some confusion about who heard the

13  appeal, and there's been an allegation that it was held

14  exclusively by Dean Stein.  Did Dean Stein have any role in

15  the appeal of this case?

16  A   No.

17          MS. ORLAND:  Your Honor, that is all I have.

18          THE COURT:  Thank you.  Mr. Dillon.

19          MR. DILLON:  Thank you, your Honor.

20                       CROSS-EXAMINATION

21  BY MR. DILLON:

22  Q   Good afternoon.  Do you still all the exhibits up there?

23  A   Yes.

24  Q   So just to be clear, ma'am, there's no -- you've testified

25  today to what happened during the appeal process.  But there's

1   actually no written record of what happened, what you all did

2   during those meetings, is there?

3   A   No.

4   Q   There's no transcript?

5   A   No.

6   Q   There's no recording?

7   A   No.

8   Q   You just reviewed the investigative report and its

9   attachments?

10  A   We review everything that's part of the case file.  That

11  includes letters that were sent to the respondent, emails,

12  text messages, investigative reports, appeals, documents

13  witness statements.

14  Q   But everything you review is provided to you by Peter

15  Paquette; correct?  That he puts together, the case file?

16  A   He does not.  His administrative stuff does.

17  Q   Is there anything that goes in the case file that he

18  doesn't provide you that he didn't get?

19  A   So would his administrative staff have access to anything

20  he didn't get?

21  Q   Right.

22  A   No.

23  Q   Okay.  So then for all intents and purposes Peter Paquette

24  and his office sort of give you everything you're supposed to

25  look at; right?

1    A    Correct.

2    Q    You're not going and doing independent investigation;

3    right?

4    A    For this, no.

5    Q    Okay.  You're just relying on what he and his office sent

6    you?

7    A    Yes.  And if we read in the documents something that we

8    feel as though is -- that we notice is missing or we feel as

9    though should be somewhere, I will walk myself down the hall

10   and ask for it.

11   Q    And you were in court and saw Mr. Paquette testify earlier

12   today; correct?

13   A    I did.

14   Q    And you heard him admit on the stand under oath that the

15   report actually didn't contain all of the information that he

16   used to make his credibility findings?

17   A    In what respect?

18   Q    Didn't he tell you that he sort of thought to himself, he

19   had some of his own thoughts about why certain witnesses were

20   credible or not credible, why he shouldn't interview Informant

21   11 and things like that?  He didn't write that out in the

22   report; right?

23   A    We do not -- I don't have the report in front of me.  I

24   believe there were statements about credibility, but in terms

25   of what was in his own head and not on paper, no, I did not

1  have access to that.

2  Q   And let me have you turn to -- so Defendant's Exhibit

3  No. 6, that's the letter that Victim 1 presented to the

4  appellate committee; correct?

5  A   Correct.

6  Q   He never saw this, did he?

7  A   I can't speak to that.

8  Q   It's not part of the Georgia Tech -- this was submitted

9  to -- not to Peter Paquette but to you because it says letter

10 to the appellate committee; correct?

11 A   Administratively it was not submitted to me.  It was

12 submitted to the office of student integrity.  Whether it was

13 submitted to Peter directly or his administrative staff, I

14 can't say.

15 Q   As far as you're aware, though, it's not part of Georgia

16 Tech's process to let each side see the other's submission;

17 correct?

18 A   Sorry.  I'm just thinking through my language.  Students

19 in sexual violence matters, not non-sexual violence matters,

20 complainants, can see respondents' appeals.  That's why her

21 letter is basically a response to the appeal and the outcome.

22 Q   But respondents can't see complainants' responses?

23 A   Correct.

24 Q   Now, let's see, turn, if you will, to Defendant's Exhibit

25 7, two-page document.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 155 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 155 of 216

155

1    A    Yes.

2    Q    Page 1 is just basically a bunch of check marks.  And

3    under 2 when you select your action, you all selected E,

4    reverse the original decision regarding charges related to ▇;

5    correct?

6    A    Correct.

7    Q    And that's the only explanation he received, Mr. Doe

8    received, about why you made the decision you did; correct?

9    A    Did he not receive the memo that was --

10   Q    It's not -- I mean, it's written to -- as far as you know,

11   I mean, it's written to office of student integrity from you.

12   But do you know if he saw this?

13   A    I can't say.

14   Q    Okay.  And the memo, which is page 2 of Defendant's

15   Exhibit 7, that doesn't explain.  It just says we found

16   insufficient evidence for V2, and we're you upholding as to

17   V1; correct?

18   A    Correct.

19   Q    But it doesn't actually say why you upheld the decision as

20   to V1, does it?

21   A    Technically, no.

22   Q    So he doesn't know why you upheld the decision to V1 based

23   on what he saw; correct?

24   A    Correct.

25   Q    And as far as you know, no one on the appellate committee

Case 1:15-cv-04079-SCJ Document 192 Filed 04/26/17 Page 156 of 217
Case 1:15-cv-04079-SCJ Document 194 Filed 12/28/17 Page 56 of 216

156

1   reached out to him, met with him and said this is why we're

2   upholding the decision; correct?

3   A    No.

4   Q    So, I mean, as far as you're aware, based on what you know

5   you all told him, he doesn't know why you affirmed the

6   decision; correct?

7   A    Nobody explained to him explicitly.

8   Q    And that was never put in writing anywhere; correct?

9   A    No.

10  Q    Sorry.  I think we've double negatived each other.  It is

11  correct -- the reasons for the appellate committee's upholding

12  the decision on V1 was never explained to him in writing;

13  correct?

14  A    Correct.

15  Q    And then have you actually, just in preparation for your

16  testimony today, seen the appeal letters that happened after

17  your level, like the two letters from President Peterson and

18  from the Board of Regents?

19  A    No.

20  Q    You've never seen those?

21  A    No.

22  Q    Okay.  So and just to be clear, ma'am, when you all did

23  your appellate review, the three people that you talked about,

24  there was no new hearing, was there?

25  A    No.

Case 1:15-cv-04073-SCJ  Document 182  Filed 04/26/17  Page 157 of 217
Case 1:15-cv-04073-SCJ  Document 194  Filed 12/28/15  Page 157 of 218

157

1   Q    There were no witnesses that were called, were there?

2   A    No.

3   Q    And there was no opportunity for Mr. Doe to pose questions

4   that he didn't have a chance to pose before, was there?

5   A    No.

6            MR. DILLON:  Thank you very much.

7            THE COURT:  Redirect?

8            MS. ORLAND:  Briefly, your Honor.

9                         REDIRECT EXAMINATION

10  BY MS. ORLAND:

11  Q    If in Mr. Doe's appeal he had asked questions that you

12  needed the answers to or believed you needed the answers to,

13  would you have a mechanism to get additional information?

14  A    If we felt as though those questions were relevant,

15  important to the decision, we do have the right to remand the

16  case back to the original hearing officer.  We would have done

17  that.

18  Q    If, for example, Mr. Paquette had found against one victim

19  and for another, that victim would have the right to appeal as

20  well; right?

21  A    Correct.

22  Q    And if that victim had the right to appeal, would the

23  plaintiff have had the opportunity to respond to that appeal?

24  A    Yes.

25           MS. ORLAND:  Okay.  That's all I have.  Thank you.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 158 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 158 of 216

158

1          THE COURT:  Recross?

2                    RECROSS-EXAMINATION

3   BY MR. DILLON:

4   Q    One question.  How many sexual misconduct cases have you

5   ever seen in which a female is the respondent?

6   A    The female is the respondent.  In my entire career?

7   Q    Since you've been at Tech?

8   A    Since I've been at Tech, none.

9   Q    How long have you been at Tech?

10  A    I'm in my fifth academic year.

11  Q    And how long have you been involved in a disciplinary

12  process?

13  A    I've been working in higher education 20 years.

14  Q    Sorry.  How long have you been in the disciplinary --

15  involved in the disciplinary process at Tech?

16  A    At Tech basically all of my five years.

17  Q    So in all the five years you've been at Tech, you've never

18  seen a case where a woman was a respondent in a sexual

19  misconduct case?

20  A    Woman was a respondent, not me personally.

21          MR. DILLON:  Thank you.

22          THE COURT:  Ms. Orland, I think one of your

23  associates is trying to get your attention.

24          MS. ORLAND:  Thank you, your Honor.

25                    FURTHER DIRECT EXAMINATION

Case 1:15-cv-04078-SCJ Document 192 Filed 04/26/17 Page 159 of 217
Case 1:15-cv-04078-SCJ Document 194 Filed 12/28/17 Page 159 of 216

159

1 BY MS. ORLAND:

2 Q   Just to clarify, there were two victims here.  Your

3 committee did what with the two decisions?

4 A   So for Victim 1 the finding and the sanction were upheld.

5 For Victim 2 the finding was overturned.

6 Q   And what does that mean?

7 A   It means we reversed the decision.  We felt as though --

8 in this case the memo states we did not find there was

9 sufficient evidence to justify the finding.

10         MS. ORLAND:  Thank you.

11         THE COURT:  You say you've been doing this for 20

12 years.  Is it normal to have one person doing the initial

13 investigation?

14         THE WITNESS:  Well, every institution is different,

15 as counsel pointed out.

16         THE COURT:  Let me change it not to say normal.  Have

17 you found that at other institutions?

18         THE WITNESS:  Yes.

19         THE COURT:  Okay.  Anything else?

20         MS. ORLAND:  (Shakes head.)

21         MR. DILLON:  Can I follow-up on that?

22         THE COURT:  Yes.

23                 FURTHER CROSS-EXAMINATION

24 BY MR. DILLON:

25 Q   What other institutions?

1    A    What other institutions what?

2    Q    Uses a single investigator model where one person does all

3    the investigating and all the adjudicating.

4    A    I mean, to be candid with you, I can't cite every other

5    institution's code.  The institution I most readily came from,

6    UC San Diego, uses a very similar model.

7    Q    And, actually, a federal judge out there just struck that

8    down, didn't he?  Are you aware of that?

9    A    Well, they didn't strike it down.

10   Q    Said there were due process problems with that?

11   A    Right.  But that was not about the individual investigator

12   hearing officer model.  There were other issues involved in

13   that case.

14   Q    But it was decided against the school on due process

15   grounds, fair to say?

16   A    But not what you're alluding to.

17             MR. DILLON:  Okay.  Thank you.

18             THE COURT:  Thank you, Doctor.

19             THE WITNESS:  Thank you.

20             THE COURT:  Call your next witness.

21             MS. ORLAND:  Thank you.  I would like to call

22   Kimberly Ballard-Washington, please, your Honor.

23             COURTROOM DEPUTY:  Would you raise your right hand,

24   please.

25                    KIMBERLY BALLARD-WASHINGTON,

1       having been first duly sworn, was examined and

2  testified as follows:

3       COURTROOM DEPUTY:  Thank you.  You can have a seat.

4  If you'd please state your name for the record.

5       THE WITNESS:  My name is Kimberly Ballard-Washington,

6  Kimberly, K-i-m-b-e-r-l-y, Ballard, B-a-l-l-a-r-d –

7  Washington.

8                       DIRECT EXAMINATION

9  BY MS. ORLAND:

10  Q   And where do you work?

11  A   Board of Regents of the University System of Georgia.

12  Q   And what is your background?

13  A   I serve as the Assistant Vice Chancellor for Legal Affairs

14  and Title IX Coordinator for the System.

15  Q   And what is your role in the appeal process as it relates

16  to allegations of sexual misconduct at the universities?

17  A   For the appeals I serve as an administrator of the

18  process, not just for the Title IX type cases but generally as

19  the administrator of the process.  I am not on the committee,

20  but I am in the office and am the one that kind of makes sure

21  that all the cases get processed properly, get to the hearing

22  committee and so forth.

23  Q   I'm going to show you what's marked as Defendant's Exhibit

24  8.

25       THE COURT:  Yes, ma'am.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 162 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/16 Page 162 of 216

162

1  BY MS. ORLAND:

2  Q   Do you recognize that?

3  A   I do.  This is our discretionary review policy.

4  Q   And can you describe what that is because in and of itself

5  it's not exactly clear.

6  A   Okay.  It basically indicates that any person aggrieved of

7  a university decision can ask for a discretionary review of

8  that decision, about that institution's decision, and the

9  board or a committee of the system will review it.

10         MS. ORLAND:  Move to tender Defendant's 8.

11         THE COURT:  No objections?

12         MR. DILLON:  No.

13         THE COURT:  8 is in as well as 7.

14  BY MS. ORLAND:

15  Q   In this case what role did the Board of Regents serve in

16  the appellate process?

17  A   The board or the --

18  Q   The committee.

19  A   Okay.  In this case the -- Mr. Doe submitted an appeal

20  █████████████████  of the president's decision and that

21  appeal -- at that point he was informed that he could submit

22  additional information.  Also, simultaneously Georgia Tech was

23  given notice that an appeal had come in and asked for a

24  response.  They were both given dates certain to submit

25  information, and after that, after receiving all of that

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 163 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 163 of 216

163

1  information, the documents were provided to the committee

2  members.

3  Q    Okay.  So what I'm going to show you is Defendant's 9 and

4  10.  Do you recognize those?

5  A    Yes.  To my knowledge, I believe 9 is the first document

6  that we received on behalf of the appellant, and the

7  supplemental information came in about a month later, ████.

8  Q    And were those submitted as grounds for the plaintiff's

9  appeal?

10  A    Yes, they were.

11  Q    And did the committee consider these grounds?

12  A    Yes.

13  Q    And can you describe that committee process.

14  A    The committee has all the documents that are provided by

15  the student appellant and also by the university in response

16  to that, and they go through the documents in advance of the

17  meeting.  The committee consists of the vice chancellor for

18  legal affairs, vice chancellor for student affairs, vice

19  chancellor for human resources, and the vice chancellor for

20  academic affairs or a designee from one of those offices.

21  Q    In this case --

22  A    In this case all four of those individuals were present.

23  Q    And can you describe the process that they underwent.

24  A    In this case, if memory serves me correctly, they actually

25  heard this case for the first time sometime ████.  I

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 164 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 164 of 216

164

1  believe it would have been ███████████████████████

2  ████████  they met to discuss this case, and after that

3  meeting -- well, during that meeting, they determined that

4  they needed more information.  They had further questions.

5  They wanted to make sure they had all of the record.  They

6  weren't certain that they had everything, and so they asked

7  that I request additional information from Georgia Tech.

8  Q   And what were you asked to request?

9  A   One thing that they thought they didn't have is the

10 complete file, and I found out when I contacted Georgia Tech,

11 that I did have the complete file.  And the second question

12 was they were really looking at the issue of credibility.

13         In Title IX cases one of the key things is the

14 investigator.  The investigator is the person that has seen

15 and talked to every person involved in the case, and so they

16 were wondering what was the item that turned the case, what

17 was the credibility issue.  And so I asked that question of

18 Georgia Tech and got a written response back and prior to the

19 committee's next meeting, gave that to the committee.

20 Q   And what was that response?

21 A   It was something to the effect tha ██████████████████

22 ███████████████████████████████████████████████████

23 ███████████████████████████████████████████████████

24 ██████████████████████████.

25 Q   All right.  And then I'm going to show you what has been

1    marked and tendered as Defendant's 2.  You've obviously heard

2    testimony about his statements.  Do you know whether these

3    statements were included in the Board of Regents' file upon

4    review?

5    A    Yes.  They were included in the file.  Now, I will say I

6    don't recall seeing the cover sheet.  I am -- I do recall the

7    statements being there and knowing that the committee went

8    through, and various committee members talked about various

9    things that were in this --

10   Q    The statements were considered?

11   A    Absolutely.

12   Q    And what was the ultimate decision of the committee?

13   A    The committee upheld the decision of the president.

14        MS. ORLAND:  Thank you.  I have no further questions.

15        THE COURT:  Mr. Dillon.

16        MR. DILLON:  Thank you, your Honor.

17                    CROSS-EXAMINATION

18   BY MR. DILLON:

19   Q    Good afternoon, ma'am.

20   A    Good afternoon.

21   Q    What Ms. Orland just showed you, the list of eight

22   statements.  You know that the committee considered those?

23   A    I do.

24   Q    And how do you know that?

25   A    I was present for most of their review, and I remember

1  them going through and looking at statements.

2  Q   And you have a specific memory, as you sit here today, of

3  them looking at those particular statements?

4  A   Yes.  I have no reason -- I don't recall anything else

5  that's remotely similar.  Do you know of anything else?

6  Q   I'm just asking you what you remember, ma'am.

7          So you sat in on how much of the committee's

8  deliberations?  Should I say board?  What do you call it?

9  Board?  Committee?  Panel?

10 A   We'll go with committee.

11 Q   Committee.  Okay.  Great.  So, first of all, how long did

12 they -- how many hours did they spend looking at this, if you

13 can remember?

14 A   It was on two different dates.  On Day 1 the committee met

15 for -- I was present for at least two hours of the committee's

16 meeting.

17 Q   And did you have to leave at some point?

18 A   I did.

19 Q   And do you know how much longer the meeting went on after

20 you left?

21 A   I do not know how much longer it went on after I left.  I

22 spoke with them by phone.  When I got to another destination,

23 and they were still meeting.

24 Q   And then the second day of deliberations, were you there

25 the entire time for that?

Case 1:15-cv-04079-SCJ   Document 192   Filed 04/26/17   Page 167 of 217
Case 1:15-cv-04079-SCJ   Document 184   Filed 12/28/15   Page 167 of 216

167

1   A    I believe so.

2   Q    Do you participate in the deliberations or are you just

3   sort of a silent observer?

4   A    I'm very rarely silent, but I wouldn't say I participate.

5   Q    So they're the people who sort of discuss --

6   A    They're the decision makers.

7   Q    Okay.  And they might ask you your advice since you're the

8   Title IX coordinator?

9   A    If there's a question specifically about process, then,

10  yes, they may ask questions.

11  Q    Now, you said the committee, after the first date, had

12  questions about the basis for the credibility finding;

13  correct?

14  A    Correct.

15  Q    And that you asked Georgia Tech the basis, and you got a

16  written response back; correct?

17  A    Correct.

18  Q    Who did you get the written response from?

19  A    From Georgia Tech Legal.  I believe it was Kate Wasch, but

20  it could have been someone else in the office.

21  Q    So you asked someone in the legal department at Georgia

22  Tech what the basis was for Mr. Paquette's finding, and that

23  person did something you don't know and then reported back

24  this was the basis; is that correct?

25  A    Correct.  Georgia Tech's Legal is the department that

1 responds to the appeals on behalf of the institution.

2 Q   And the response you got back, as far as you remember, was

3 it's because he lied about Victim 2 that I thought that he was

4 guilty on Victim 1; correct?

5 A   Something to that effect, yes.  And I will say that the

6 committee reviewed it in its entirety, and they probably would

7 be able to answer exactly what they thought about it.  That's

8 my basic recollection.

9 Q   Right.  And maybe there will be someone called from the

10 committee, but I'll ask you what you remember to the best of

11 your memory.

12 A   Okay.

13 Q   And so -- and you know that he was actually -- he was

14 initially found responsible for the Victim 2 case; right?

15 A   Correct.

16 Q   And then that was reversed at the first level of appeal;

17 correct?

18 A   Yes.

19 Q   So by the time it got to the Board of Regents, he was

20 innocent of the Victim 2 accusation as far as the board knew;

21 correct?

22 A   If that one was no longer at issue.

23 Q   Right.  Because he had been found not responsible for

24 that?

25 A   Not responsible, correct.

Case 1:15-cv-04079-SCJ   Document 102   Filed 04/26/17   Page 169 of 217
Case 1:15-cv-04079-SCJ   Document 94   Filed 12/28/15   Page 169 of 217

169

1    Q    And you're saying that the Board of Regents said that

2    because he lied about something that he was innocent of, that

3    they believed that undermined his credibility about Victim 1;

4    right?

5    A    The Board of Regents didn't say that.  I'm saying that the

6    committee was interested in knowing what was the basis of the

7    credibility determination.

8    Q    Right.  And they were told he lied about Victim 2, as far

9    as you remember; correct?

10   A    Yes.

11   Q    And the Board of Regents then acting, as far as you know

12   as someone who participated in deliberations -- to be clear,

13   let me back up.  As far as you remember, that's the only thing

14   that you got back from Tech's legal counsel; right?  He lied

15   about Victim 2?

16   A    There's a long document.  I would trust that you may have

17   it, and if you want me to read it, I will do that, but I don't

18   recall.

19   Q    As far as you -- I mean, you testified --

20   A    That's the piece that I recall.

21   Q    That you recall.  Okay.

22   A    But there is a -- there's a full email that came back.

23   Q    I may or may not get that in discovery -- do we have it?

24        MS. ORLAND:  I don't have it with me.

25   BY MR. DILLON:

Case 1:15-cv-04079-SCJ   Document 192   Filed 12/26/17   Page 170 of 217
Case 1:15-cv-04079-SCJ   Document 192   Filed 04/26/17   Page 170 of 217

170

1    Q    Okay.  I don't know if that's going to -- we might have a
2    privilege fight.  I don't know.  So let me just -- as you sit
3    here today, your recollection is what you heard back from Tech
4    legal affairs was he lied about Victim 2, and that was the
5    basis; correct?
6    A    Yes.
7    Q    And as you sit here today, to the best of your
8    recollection, that's what was reported back to the Board of
9    Regents; correct?  By you; right?  I mean, you got that
10   information from Tech legal counsel, and you then reported
11   back --
12   A    I didn't report.  I handed them a document.
13   Q    Okay.  And the document said, as far as you remember, he
14   lied about Victim 2; that was the basis of the credibility
15   determination?
16   A    As far as I remember, yes, but the document says more than
17   that.  And they read the document.
18   Q    And on the -- as far as you recall today on the basis of
19   that, he lied about Victim 2 and maybe some other things that
20   you don't remember, they upheld the Victim 1 finding; correct?
21   A    Yes.  They upheld the president's decision.  They didn't
22   see a reason to overturn.  They couldn't make a determination
23   that there was insufficiency of evidence.
24   Q    Because he lied about something he had been found innocent
25   of?

Case 1:15-cv-04079-SCJ Document 182 Filed 04/26/17 Page 171 of 217
Case 1:15-cv-04079-SCJ Document 194 Filed 12/28/15 Page 171 of 216

171

1    A    Credibility is a key component in any of these

2    investigations.

3           THE COURT:  They read the whole file, but they still

4    read that --

5           THE WITNESS:  Exactly.  But they have that question.

6    After reading through the file, they wanted to know about

7    that, and so they asked that question and got the response

8    back.

9    BY MR. DILLON:

10    Q    And, ma'am, there was no -- there's no written transcript,

11    written record of what the committee did as it considered the

12    appeal, is there?

13    A    No.  I don't believe so.

14    Q    It wasn't -- the deliberations were not recorded, were

15    they?

16    A    No.

17    Q    There were no live witnesses presented, were there?

18    A    No.

19    Q    You just reviewed the investigative report and its

20    attachments and then talked to Tech legal counsel to ask the

21    question we've already talked about, and that was it; right?

22    A    The committee reviews all the documents that are

23    submitted, any and every document that would have been

24    submitted by your client, any document that was submitted by

25    Georgia Tech, and that could be more than the investigative

Case 1:15-cv-04079-SCJ  Document 102  Filed 04/26/17  Page 172 of 217
Case 1:15-cv-04079-SCJ  Document 94  Filed 12/28/17  Page 172 of 216

172

1  file.  But it's all the documents that are submitted by either

2  party, both -- the committee reviews those in their entirety.

3  Q   And he -- there was no -- during that process with the

4  Board of Regents, there was no opportunity for Mr. Doe to pose

5  questions that he wasn't able to pose before; correct?

6  A   Absolutely he could have.

7  Q   He could have posed questions to witnesses?

8  A   Well, we didn't have witnesses but if he had -- you have

9  an opportunity to write to the committee and submit anything

10 that you want.  If there are questions that are unanswered,

11 there's opportunity to do that.

12 Q   Right.  But as part of the process, it doesn't involve

13 live witness testimony, does it?

14 A   It does not.

15 Q   And if he had said I would, you know, I would like to ask

16 Informant 11 the following or Informant 9 the following, your

17 process just does not provide for new live witness testimony,

18 does it?

19 A   It doesn't provide for new live witness, but it does

20 provide for remanding.  If there were enough questions that

21 were raised and it was in the committee's mind that there were

22 so many unanswered questions, then it could have been remanded

23 back to the institution to find that information back --

24         THE COURT:  Let me ask you this question as well.

25 Could Mr. Dillon have submitted an affidavit from Informant

1   No. 11 to you all?

2          THE WITNESS:  Absolutely.

3   BY MR. DILLON:

4   Q   Was he ever told that?

5   A   I don't know what he was told.  He was given a -- given an

6   information sheet outlining the process.  Was he told that he

7   could submit an affidavit from Applicant No. 11 -- I'm

8   sorry -- Informant 11 specifically?  Probably not.  What he

9   should have been told -- and I believe he probably was -- was

10  that he can submit any information that is relevant to his

11  testimony or to his case.

12         MR. DILLON:  May I approach, your Honor?

13         THE COURT:  Yes.

14         MR. DILLON:  I don't know what number we're on for

15  me, maybe 3, I think.

16         COURTROOM DEPUTY:  Plaintiff's 2 is the only one that

17  has come in.

18         MR. DILLON:  Okay.  I move to admit Plaintiff's 1 and

19  Plaintiff's 2.

20         THE COURT:  Admitted.  No objection?

21         MS. ORLAND:  I don't know what they are.

22         MR. DILLON:  I can go back and look.

23         MS. ORLAND:  I mean, are they part of your motion?

24         MR. DILLON:  Yeah, they are --

25         MS. ORLAND:  Okay.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 174 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 174 of 216

174

```
 1              MR. DILLON:  We showed them to witnesses.
 2              MS. ORLAND:  Okay.  Yeah.
 3   BY MR. DILLON:
 4   Q   Ma'am, I'm showing you what's been marked for
 5   identification as Plaintiff's Exhibit 3.  Do you recognize
 6   that?
 7   A   Yes, I do.
 8   Q   What is it?
 9   A   It is a letter date ███████████, indicating that
10   the applicant's complaint is being continued for further
11   consideration.
12   Q   And then I'm showing you what's been marked as Plaintiff's
13   Exhibit 4.  Do you recognize that?
14   A   I do.
15   Q   And what is that?
16   A   It is a letter date ██████████ providing the outcome of
17   the deliberations of the committee.
18   Q   Is that, as far as you're aware, the only explanation that
19   Mr. Doe ever got about why the committee reached the decision
20   it did?
21   A   I would assume that it is.
22   Q   Could you read it into the record, please.
23   A   Sure.  The name of the complainant, care of Mr. W. Scott
24   Smith, Peachstate Lawyer, 2060 Equitable Building, 100
25   Peachtree Street, Atlanta, Georgia  30303-1911, Re Application
```

1  for Review, Georgia Institute of Technology.  Dear Mr. Doe,

2  pursuant to Board of Regents Policy 8.6, Application for

3  Discretionary Review, your application was considered by a

4  committee convened by this office.  The committee was composed

5  of me, the Associate Vice Chancellor for Academic Affairs,

6  Vice Chancellor for Human Resources, and Vice Chancellor for

7  Student Affairs.

8         Please be advised that after review and careful

9  consideration, the committee has decided to affirm the

10  university's decision.  This is the final action to be taken

11  in this matter.  Sincerely, Nels Peterson, Vice Chancellor for

12  Legal Affairs.

13  Q   And nowhere in there does it say why they made their

14  decision; correct?

15  A   It does not.

16         THE COURT:  I want to back up a second here.  When

17  the appeal reaches the Board of Regents, your committee, walk

18  me through how you all let Mr. Doe or any respondent know that

19  you all had -- tell me exactly what you all do and what you

20  all say.

21         THE WITNESS:  First of all, Mr. Doe would typically

22  be the one to appeal.

23         THE COURT:  Exactly.

24         THE WITNESS:  And so once he makes contact with our

25  office -- and it can be done in a myriad of ways.  Sometimes

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 76 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 76 of 216

176

1    we get an email from a student simply saying president made a
2    decision, and I'm suspended for a semester, I want to appeal
3    this.  Then our -- we have an administrator who handles
4    appeals, and he sends out guidance and information as to what
5    the person needs to submit.
6              THE COURT:  All right.  Can you be more specific?
7    What does he say in this letter or letters he sends out saying
8    to -- we have received your appeal?
9              THE WITNESS:  We have received your appeal.  Please
10   submit by a date certain information showing the record from
11   the institution, everything that's happened in the case.
12             THE COURT:  So the person, in this case Mr. Doe,
13   would know what you all have received from Georgia Tech?
14             THE WITNESS:  Yes.
15             THE COURT:  The complete record you all have
16   received?
17             THE WITNESS:  Right.  We send something to Georgia
18   Tech also, however.  Georgia Tech doesn't initiate the appeal.
19   The person initiates.  Georgia -- we send information to the
20   student or employee, or whomever it is, and ask them to submit
21   information, whatever it is they want to appeal, and showing
22   why the institution's decision --
23             THE COURT:  Are they limited in any way what they can
24   send you all?
25             THE WITNESS:  I can't think of any limitations.  You

Case 1:15-cv-04078-SCJ Document 192 Filed 04/26/17 Page 177 of 217
Case 1:15-cv-04078-SCJ Document 194 Filed 12/28/17 Page 177 of 218

177

1  know, not everything is subject to appeal.  The board has the

2  right to accept more things, but typically for students it's

3  dealing with expulsions and suspensions, not just anything

4  that goes wrong on a university campus.  But they can submit

5  documents that show why they think they've been wronged and

6  how they've been wronged.

7         THE COURT:  Okay.  Thank you.

8         THE WITNESS:  And the process was changed in February

9  of this year.

10         THE COURT:  In what way?

11         THE WITNESS:  Well, previously these cases would go

12  to a committee of the Board of Regents, and now it's a system

13  level appeals process.  We after -- now the board members

14  themselves have a right to review.

15         THE COURT:  The Regents?

16         THE WITNESS:  The Regents have a right to review, but

17  it doesn't go to them directly.  They used to get it directly,

18  but given their time constraints being in the office, it was

19  thought better that a committee would have more time to

20  dedicate towards this.

21         THE COURT:  Why did it change?  For that reason?

22         THE WITNESS:  For that reason and, again, the

23  dedication.  You're wanting to make sure that everyone got a

24  proper review and had time and energy to invest in it and

25  heard the whole case.  The employees, vice chancellors, are

1  able to look at every piece of paper and make sure they

2  understand the case, and they're subject matter experts.  The

3  reason that these four individuals are the ones to serve is

4  because they're subject matter experts in these various issues

5  that go on at university campuses, whereas our Regents may not

6  be subject matter experts.

7          THE COURT:  Thank you.  Mr. Dillon.

8          MR. DILLON:  Thank you, your Honor.  Actually just

9  following up on that.  I'm showing you what's been

10  previously -- I'm sorry.  May I approach?

11          THE COURT:  Yes.

12          MR. DILLON:  It's getting late in the afternoon --

13  what's been previously admitted as Defendant's Exhibit 1.

14  I'll show you the top of the first page.  What does that say?

15          THE WITNESS:  Student Sexual --

16          THE COURT:  I think we should probably start doing

17  that.  I can see Ms. Orland -- once you give it to them, you

18  can always move back from them and ask them --

19          MR. DILLON:  Sure.  I just want to show it to her and

20  have her authenticate it.

21          THE WITNESS:  Student Sexual Misconduct Policy.

22  BY MR. DILLON:

23  Q   Have you looked at that before?

24  A   I've seen it.

25  Q   Can you turn to page -- Section E1, Reasons for Appeal.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 179 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 79 of 216

179

1  If you look at the top of the page, it might say --

2  A   Can you tell me what page that is.

3  Q   Yes, ma'am.  Page 10 of 15, if you're using the labels

4  from the top of the page.  Does it say there's a Section E

5  Appeals and Number 1 Reasons for Appeal?

6  A   Yes.

7  Q   Okay.  So am I reading this correctly about -- I want to

8  get -- basically what I want to do is get to sort of what is

9  typically looked at on appeal by the first committee or the

10  board in your experience.  So reasons for appeal, does that --

11  Number One, and I'm just going to read here, quote, the appeal

12  process is not intended to grant a new investigation at a

13  higher level.  An appeal shall be limited to a review of the

14  record of the initial hearing, supporting documents, and the

15  respondent's or victim's written appeal.  Did I read that

16  correctly?

17  A   You did.

18  Q   And it goes on to say, quote, appeals will only be

19  considered for the following reasons:  A, to determine whether

20  the original investigation was conducted fairly and in

21  conformity with prescribed procedures:  B, to determine

22  whether there was sufficient evidence to support the decision;

23  C, to determine whether the sanctions and supplementary

24  requirements imposed were appropriate for the violation for

25  which the student was found responsible; and/or D, to

1  determine whether new information not available at the time of

2  the investigation is relevant to the final decision.

3        Did I recall read all that correctly?

4  A   You did.

5  Q   Does any of that talk about putting new -- putting

6  affidavits at the board about witnesses who were, you know,

7  identified at the time of the investigation?  Does it say you

8  can bring out new evidence, you know, on appeal even if --

9  A   Actually, it does.

10 Q   Let's look at D.  It says, to determine whether new

11 information not available at the time of the investigation is

12 relevant to the final decision.  That's what it says; right?

13 A   It does.  And, by the way, in my mind -- and I could be

14 completely wrong on this this -- this is talking about Tech's

15 process and procedure.  It is not in any way referring to the

16 board's process and procedure.

17 Q   And we're going to get there absolutely.  But here in

18 terms of what Tech does, it says that you can only have new

19 information if that information was not available at the time

20 of the investigation; correct?

21 A   Correct.

22 Q   Okay.  So let's flip over to page -- to No. 4, Board of

23 Regents on page 11.  And tell me if I'm reading this correctly

24 at No. 4.  The Board of Regents of the University System of

25 Georgia, the board, is the final appellate authority for all

1  cases of suspension or expulsion that have been reviewed by

2  the institute president.  Should the respondent and/or victim

3  be dissatisfied with the decision of the institute president,

4  he/she may apply to the board for a review of the decision.

5        The application for review shall be submitted in

6  writing to the executive secretary of the board within the

7  period specified by the Board of Regents.  Decisions of the

8  Board of Regents will be communicated simultaneously to the

9  victim and respondent in accordance with communication

10 guidelines in Section D-2.  Did I read that correctly?

11 A   You did.

12 Q   And that doesn't say anything about giving new evidence at

13 the Board of Regents; correct?

14 A   It does not.  But it also does not say that you can't.

15 Q   Absolutely.  But it doesn't say that you can; correct?

16 A   Correct.

17 Q   And as far as you're aware, the Board of Regents policy

18 doesn't say, doesn't invite people as part of its standards to

19 submit new information that was available at the time of the

20 hearing; correct?  It doesn't invite --

21 A   Then it wouldn't be new information, would it?

22 Q   Let me put it this way:  As far as you're aware, does the

23 Board of Regents policy allow a party to submit evidence to

24 the Board of Regents that they could very well put in front of

25 the initial investigator if they had just tried?

Case 1:15-cv-04079-SCJ   Document 192   Filed 04/26/17   Page 182 of 217
Case 1:15-cv-04079-SCJ   Document 194   Filed 12/28/15   Page 182 of 216

182

1    A    If that were to happen, then more than likely the way the

2    committee would handle that is that they would remand it.  If

3    it was something that was viewed as being probative and could

4    have changed the outcome of the case, I mean, the committee,

5    the board, and I think the institute, would have an interest

6    in making sure that you get these things right.

7    Q    But to be clear --

8    A    You don't want to do anything if -- come up with a wrong

9    decision.  So if there is something that's probative that

10   would have helped really clarify a situation, then remanding

11   the case would be the -- what would have occurred.

12              THE COURT:  Well, to be more specific, if Mr. Doe had

13   said Informant No. 11 was not personally interviewed in this

14   matter, would that fall under something the board would look

15   at or remand?

16              THE WITNESS:  He probably would have had to have gone

17   further to say why that was such a major problem with the

18   investigation.  Just saying that one person is not interviewed

19   is not necessarily enough to warrant sending something back to

20   the campus, saying that the person that wasn't interviewed had

21   evidence, concrete evidence that X didn't happen and if that

22   person were interviewed, then I wouldn't have been found in

23   violation.

24              THE COURT:  If they said first the information

25   contradicts what the alleged victim said, would that rise to

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 183 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 183 of 216

183

1   that level?

2           THE WITNESS:  It depends on what the contradiction

3   was.

4   BY MR. DILLON:

5   Q   Have you ever seen anybody argue that?  Have you ever seen

6   anybody in your time at the Board of Regents bring up a new

7   witness all of a sudden to you guys, and then it gets remanded

8   so you can figure that out?

9   A   We've remanded many cases.

10  Q   Sure.

11  A   I can't tell you sitting right here now as to whether it

12  was because of a witness.  I can't recall when about a

13  witness, but I would not be able to say that the answer was

14  no.

15  Q   But you can't remember?

16  A   Yeah.  That means that's not really --

17  Q   Do you have Exhibit 10 in front of you?

18          THE COURT:  Defendant's 10?

19          MR. DILLON:  Defendant's 10, yes, sir.

20          THE WITNESS:  I do.

21  BY MR. DILLON:

22  Q   Could you turn to page 2, please.  And this was, just to

23  be clear, that was -- this is kind of one of the two appeals

24  filed by Mr. Doe to the Board of Regents; correct?  It was, I

25  think, the second document he sent.

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 184 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 184 of 216

184

1  A    Correct.

2  Q    Okay.  I'm going to read from No. 9.  Dean Paquette never

3  entertained hearing from blank, blank's witnesses or their

4  written affidavits in support of blank.  This was most clear

5  in the interview of ███████████ Informant 11.  I'm not

6  going to put his name here, but I think we've established

7  that.  Dean Paquette contacted Informant 11 and asked him to

8  meet during a time ████████████████████████████████

9  When Informant 11 stated ████████████████, Dean Paquette

10 refused to reschedule.  Informant 11 was ████████████

11 ██████████  that is central to this incident and had eyewitness

12 testimony as to both, I think we can assume complainant and

13 respondent, that evening.

14            Did I read that correctly?

15 A    Yes.  I believe so.  There are blanks here, but I believe

16 so.

17 Q    So and this got to the Board of Regents; correct?

18 A    This did.  This got to the committee.

19 Q    This got to the committee, and they never asked to

20 reinterview Informant 11; correct?

21 A    And I'm assuming that Informant 11 then is --

22 Q    Is the person -- let's -- I think we can -- can we

23 stipulate we're not trying to use his name?  So can we

24 stipulate that --

25            MS. ORLAND:  I know we're redacting the victim and

Case 1:15-cv-04070-SCJ   Document 192   Filed 04/26/17   Page 185 of 217
Case 1:15-cv-04070-SCJ   Document 194   Filed 12/28/17   Page 185 of 216

185

1  the defendant.  I don't think there's any problem --

2          THE COURT:  Yeah.  We're allowed to use their names.

3  We've already stipulated to that.

4          MR. DILLON:  We are using the name or we're not?

5          THE COURT:  We're not going to use their names.

6          MR. DILLON:  That's what I thought.

7          MS. ORLAND:  But, your Honor, as far as witnesses do

8  we not want to --

9          THE COURT:  For the witnesses we can use the

10  witnesses' names.

11          MR. DILLON:  Okay.  Fine.  I was trying to be

12  careful.

13          So I think at this point --

14          THE WITNESS:  So ███████████████ is the one you're

15  referring to?

16  BY MR. DILLON:

17  Q   Yes.  Informant 11.

18  A   Is that the one you were referring to in your earlier

19  questioning?  Because I thought we were talking about the --

20  Q   Here's what I want to ask.  So I think we've established

21  by now -- you've listened to all the testimony today; right?

22  A   Generally, yes.

23  Q   Okay.  And I think we've established that the Informant 11

24  was ████████████████.  So isn't it true that Mr. Doe's

25  lawyers complained about the fact that he was never

Case 1:15-cv-04079-SCJ Document 192 Filed 04/26/17 Page 186 of 217
Case 1:15-cv-04079-SCJ Document 194 Filed 12/28/15 Page 186 of 216

186

1  interviewed and that he had eyewitness testimony about both of

2  them that night?  That's what they told the committee;

3  correct?

4  A   They did say that to the committee, but also the lawyers,

5  or at least someone, had submitted a statement from this

6  person.  And the committee members discussed this during their

7  meeting, and one of them pulled out the statement from -- that

8  this student had written.

9  Q   But they never went -- no one ever went back and said

10 let's have him interviewed again; let's have someone sit down

11 with him?

12 A   They did not.  They did not.  They pulled that statement

13 and used that.

14          MR. DILLON:  Okay.  Thank you.  No further questions.

15          THE COURT:  Redirect?

16          MS. ORLAND:  No, your Honor.

17          THE COURT:  Thank you.

18          THE WITNESS:  Thank you.

19          THE COURT:  Call your next witness.

20          MS. ORLAND:  I have no further witnesses, your Honor.

21 Only argument.

22          THE COURT:  Okay.  Any evidence, form of witnesses

23 you wish to offer?

24          MR. DILLON:  No, your Honor.

25          THE COURT:  All right.  We have argument.  You may

1    proceed.

2           MS. ORLAND:  Your Honor, I'm going to try very hard

3    not to just regurgitate my brief and instead just go through

4    what we've heard today and tie it all together.

5           THE COURT:  Let me say this, Ms. Orland:  Do what you

6    think is necessary.

7           MS. ORLAND:  I appreciate that, your Honor.  I also

8    appreciate it's late in the day, and probably everybody is

9    getting tired.

10          The plaintiff needs to prove a substantial likelihood

11   of prevailing on the merits, irreparable injury, harm to the

12   plaintiff outweighs the harm to the defendant, and that it's

13   in the public interest.

14          In this case the plaintiff has sort of brought

15   forward essentially three theories that we're going off of

16   today.  One of them is that the process itself is inherently

17   flawed.  The second is that the -- Mr. Paquette is inherently

18   biased.

19          THE COURT:  Yeah.

20          MS. ORLAND:  And the third is that, frankly, I

21   haven't heard any evidence of, is that there's gender bias

22   inherently in the process.

23          THE COURT:  I agree.

24          MS. ORLAND:  So as to the first matter, that the

25   process itself is inherently flawed simply because there's no

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 188 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 188 of 216

188

1 opportunity to cross-examine witnesses, there's absolutely no

2 support for the -- legal support for the proposition that

3 that's required. Is it the best of processes from an

4 accused's perspective? Perhaps not. Is it the best of

5 processes from a potential victim's perspective? Perhaps not.

6 But is it enough process? Is it a constitutional level

7 process? That's --

8          THE COURT: That's a good question. Go ahead.

9          MS. ORLAND: And the question there is it is. Here

10 we have an investigation that definitely did give parties,

11 both sides, an opportunity to present evidence. While they're

12 trying to make it out like the plaintiff or the alleged

13 victim, only her voice got heard, the reality is that at the

14 time he was beginning the investigation, the issues weren't

15 winnowed. There was no indication at that point as to what

16 the issues would be.

17          Was there going to be a question as to ███████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ██████████████████? What were the issues in the case?

21          At the time he began the initial investigation, there

22 was no clarity beyond that because the respondent didn't

23 respond until many days later. Once he had an opportunity to

24 get his point of view, it became clear the issues went really

25 narrow at that point. The question then became everybody was

1   in agreement ████████████████████████████

2   ████████████████████████████████████████████

3   ██████████████████████████   ██████████

4   ███████████████████████████████████████████

5   ████████████████████████████████   ███

6   ████████████████████████████████████████████

7   ███████████████████████.

8       So then the really -- the only issue then became ███

9   ██████████████.   There were two people who had an opinion

10  about that, two people, because there were only two people in

11  the room.  So at that point whether Informant 11 heard early

12  on that ███████████████████████████████████

13  █████████████████████████████████████

14  ██████████████████████████████████

15  ██████████████ -- it was almost a non-issue at that point.  The

16  question was is who do you believe.  It's a he said she said.

17  Who do you believe?

18       And Mr. Paquette said if he'd walked in there and

19  said nothing, he couldn't have demonstrated it was more likely

20  than not or he couldn't have found, based on the evidence that

21  day, that it was more likely than not that the assault had

22  occurred.  But the minute Doe came in and flat out admitted he

23  lied, that tipped the scales.  More likely than not, not the

24  highest standard, it's not beyond a reasonable doubt.  And

25  that's a standard we're legally obligated to follow under

1    Title IX, so his reasoning was not biased.  It was very clear

2    in that process when he made the decision and how he made the

3    decision.

4            Despite the allusion to the contrary, his testimony,

5    which has gone unrefuted, is in that moment if he had not said

6    a single solitary word, it would have not been more likely

7    than not that the offense occurred.  But because he admitted

8    to lying about significant details, he had no credibility.  So

9    then he said she said.  It shifted.

10           Now, whether you agree with that decision is not the

11   issue.  The question is was it a deliberative process, and the

12   answer to that question is indisputably it was.  There's no

13   question.  There's no confrontation.  Can we nitpick details

14   until the end of time?  Certainly.  But at the end of the day

15   was it a deliberative process that was fair?  And that

16   testimony in and of itself cements it.

17           Go to the second appeal.  Was that a deliberative

18   process?  Was that a fair and equitable process?  A proof

19   positive evidence of that it was --

20           THE COURT:  Yes.

21           MS. ORLAND:  -- is that --

22           THE COURT:  Reversed.

23           MS. ORLAND:  -- victim 2 was reversed.

24           Then we have yet another stage of the process where

25   the president looks back through it.  And again deliberative

1  process because it's not a biased process if we affirm the

2  decision as to Victim 2.  Victim 2 appeals.  The respondent

3  appeals.  Affirmed as to both.  And, again, Board of Regents,

4  was it a deliberative process?  They asked questions.  They

5  met.  They inquired.  It was thoughtful.  It wasn't a rubber

6  stamp.

7         THE COURT:  Let me ask you this, Ms. Orland.  This

8  was not brought up today but was brought up in the plaintiff's

9  briefs, that the president did not follow all four steps in

10  making his decision.

11         MS. ORLAND:  And he's testified through affidavit

12  that he did, and there's been no contrary -- the letter is

13  probably inartfully phrased certainly, but he has testified.

14  And obviously affidavit testimony is fine in a preliminary

15  injunction, so there's nothing to dispute that today.  So I

16  think the Court has to accept it as true.

17         So the process itself, the plaintiff has not shown

18  that he has a substantial likelihood of prevailing on the

19  merits as to the actual process.  So then the question becomes

20  was Peter Paquette biased.  The first part of that

21  demonstrates, I think, the fact that he testified here today

22  that he was still making his decision when he interviewed

23  victim -- the plaintiff in this case.

24         The other evidence of bias that the plaintiff has

25  attempted to demonstrate is this book that he asked folks to

1  read and comment on.  The interesting part about their use of

2  that book is that it wasn't used in a sexual assault case

3  ever.  It was used during hazing incidents and incidents where

4  group activities were taking place, and it was used as a form

5  of education to have people have thoughtful deliberative

6  educational reasoning, pros and cons, what you agree with,

7  what you don't --

8           THE COURT:  But never in sexual cases.

9           MS. ORLAND:  That was the testimony here today.  And

10  interestingly enough, when asked do you agree with these

11  statements, my client said no.  Mr. Paquette said, no, I don't

12  agree with them.  This is an educational institution.  Our job

13  is to help these young men and women learn how to think, to

14  use their brains, and to engage in their own deliberative

15  processes before making decisions.

16           The next thing that they've used as evidence of bias

17  is a case involving another student who was expelled because

18  of allegations of sexual assault.  He wasn't involved in the

19  investigation or the findings of that case, so that in and of

20  itself is no evidence at all.

21           The third thing that they've used is this case

22  involving allegations that a fraternity was involved in using

23  racial epithets.  Was Mr. Paquette involved in that?  Yes, but

24  only bringing the charges.  It's the student body that made

25  the findings in that case, and he wasn't involved at all with

1  the respondent because they had counsel and they brought it to

2  a student tribunal.  So while they're trying to create

3  inherent bias, his role was very different in that case.  It's

4  not the same type of scenario, and he made that quite clear.

5         So all of their key points to demonstrate that he is

6  an unfair processor of information have failed.

7         THE COURT:  What indirect point they tried to -- not

8  tried but I think they put in today and they definitely put in

9  their briefs is that Georgia Tech is trying to protect an

10 image, that there's some negative publicity about Georgia Tech

11 regarding fraternities, and that Mr. Paquette was trying to

12 protect Georgia Tech's image by being tough.

13 Q   And I've read the newspaper articles for -- from 2013, but

14 they've provided no actual evidence that that's the case.

15 They've provided newspaper articles that Georgia Tech was

16 attacked for being inappropriate in situations where there are

17 allegations of sexual assault in 2013, but they've never tied

18 the knot to demonstrate causation.

19        And I would suggest that probably every educational

20 institution would probably like to protect its image against a

21 lot of things, including being a party school where sexual

22 assault is accepted.  So if that is the motivation, I'm not

23 sure that that's a due process violation.  I think that's

24 probably something that all institutions of higher learning

25 would aspire to, and, more importantly, it's certainly

1 evidence of no gender bias because if your motivation is to

2 keep a clean public image, then you by definition don't have

3 gender bias.  You have a motivation to keep your image clean.

4 And that does not create a due process violation certainly,

5 but it certainly doesn't define who somebody is looking at a

6 process fairly or unfairly.

7          So as far as the elements of due process in a due

8 process claim, the process itself they haven't demonstrated as

9 flawed.  Perfect, no, but not constitutionally level flawed.

10 They have not, despite their best attempts, they have not

11 demonstrated that the finder of fact was, in fact, biased.

12 His testimony refutes that.  The investigation refutes that.

13 Their color of the investigation is clearly explainable, and

14 they've offered nothing to the contrary.  So they haven't

15 demonstrated a likelihood of prevailing on the merits as to

16 that part of the claim.

17          So then if I might move to the Title IX claim, in

18 order to show -- in order to show a Title IX violation, they

19 have to find that the decision makers had actual knowledge of

20 discrimination or harassment, were deliberately indifferent,

21 the conditions were so severe and pervasive and objectively

22 offensive that it bars access to the educational opportunity

23 or benefit.  What they're saying here is that Tech made the

24 wrong decision, that there was an erroneous outcome.

25          The courts have not recognized such a cause of

1  action, Title IX, and obviously these sort of reverse Title IX

2  cases are on their way through the courts.  But even those

3  that have still have said that you have to show this level of

4  deliberate indifference.  It's not neglect.  It's not poor

5  decision making.  It's deliberate indifference based on

6  gender.  Do you want to say that there were errors in judgment

7  in the investigation?  Maybe there were.  Maybe there weren't.

8  But that in and of itself does not create gender bias, and it

9  certainly doesn't create deliberate indifference.  So they

10  have proven no element of a Title IX claim.

11          So with all that being said and the elements that

12  they're required to demonstrate, they have not shown

13  substantial likelihood of prevailing on the merits.

14          Let's talk about irreparable injury for a minute.

15  The plaintiffs have said that the break in education is going

16  to be the end all be all that fries the egg and ends his life.

17  Assuming that he prevails in this case, students take breaks

18  in their educational program for a variety of reasons.  They

19  have mental health issues.  They have family issues.  Whether

20  he has to explain that, you certainly don't have to explain it

21  by saying I was charged with rape.  And later you can say I

22  had personal reasons.  I had stuff going on in my life.  And

23  that's not a lie.  It's true.  But you don't have to

24  necessarily lay it all out there for everybody to see.

25          But, more importantly, is that irreparable?  Is it

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 196 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 196 of 218

196

1  irreparable?  And at the end of the day, is the grant of an

2  injunction going to change that?  And what I would suggest to

3  the Court is if it is irreparable, then the harm has been

4  done, and it's not going to be repaired by putting him back in

5  school now.  He's been out of school for quite some time

6  already.  He's going to have to explain that.  So there's

7  nothing irreparable about the harm.  Could it be made up

8  financially?  Perhaps.  But there are gaps in education, and

9  those can be explained.

10        The initial irreparable harm that they presented to

11  the Court was that he couldn't complete the course work at any

12  other time, and obviously we've put forth evidence that that's

13  just simply not the case.  So in the event that the decision

14  is overturned and he's entitled to additional process and the

15  process is given and the decision is made to reinstate him,

16  then he'll be able to complete his program.  So there's no

17  irreparable injury.

18        And then I think we come down to the harm to the

19  plaintiff outweighs the harm to the defendant.  There's a

20  victim impact statement here from a woman who believes that

21  she's been victimized.  There's been a finding that she has

22  been victimized more likely than not, and she has said in that

23  statement that if he's allowed back on campus, it will affect

24  her education.  Like Title IX or not, whether you agree with

25  it or not, we're responsible for it and --

1          THE COURT:  Sure.

2          MS. ORLAND:  -- Congress has decreed, and there's

3  Chevron deference to the Office of Civil Rights that we can't

4  let people on our campus who are known to commit sexual

5  assault.  The Board of Regents learned that really the hard

6  way in a case that really established the law in this circuit

7  where there was some evidence of not even -- of sort of sexual

8  impropriety, not even truly sexual assault.  And I was at the

9  argument at the Eleventh Circuit where the Board of Regents

10  got accused of letting a cat into a mouse den.  So I was --

11  there is no way that the Board of Regents could allow a

12  student back on campus who's been found responsible for sexual

13  assault who God forbid would clearly deprive, at least the

14  victim in this case, of an educational opportunity but perhaps

15  be accused of somebody else and not be deliberately

16  indifferent.  There's no -- there's no out there.

17          So we we'd be jeopardizing federal funds.  We'd be

18  jeopardizing the health and safety of the student.  And as

19  President Peterson said, he believes the student -- it impacts

20  the school.  He's a safety risk at the school, and as a

21  result, he believes that this was the correct decision.

22          So then we tie that into the public interest, and

23  it's a no brainer.  You have a delay in completing your

24  program versus letting a potential sexual predator on campus.

25  I mean, it's just not even a contest.  So at the end of the

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 198 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 198 of 216

198

1   day there is -- the plaintiff has not demonstrated any of the

2   four elements of this case, and as a result the injunction

3   should be denied.  Thank you.

4           THE COURT:  Thank you, Ms. Orland.  Mr. Dillon.

5           MR. DILLON:  There was no evidence that he's a sexual

6   predator.  ██████████████████ he's alleged to have

7   at worst sort of overridden her consent when she was too

8   intoxicated or something like that.  And then ████████████,

9   ████████absolutely clean.  That is the most unfounded parade

10  of horribles I have ever heard.  He is not some, you know,

11  horrible predator walking the streets or Jesse Matthews that

12  we have up in the D.C.-Virginia area.  There was literally no

13  evidence of that, nothing, nothing.  He has done nothing in

14  the ████████████

15         ████████████████████  ████████████████

16  █████████████████████████████  ███

17  ██████████████████████████████████

18  █████████████████████████████  ███

19  ████████████  █████████████████████.

20  That's why he did it.  But there was absolutely no evidence of

21  that.

22          With respect to the balance of harms, you know,

23  respectfully Ms. Roe is not the party.  You know, the balance

24  of harms is plaintiff defendant balance of harms, and Ms. Roe

25  is not a party.  And she has said that if he's back, she'll

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 199 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 199 of 216

199

1  leave and -- you know, she wrote that in an appeal document

2  where, frankly, I think she has a motive to say, you know,

3  uphold the appeal, and if you change it, I'm going to leave.

4  Because no one wants that; right?  I mean, no one wants to do

5  that to her even if they don't really believe her.

6      I think the balance of harms, your Honor -- you know,

7  the *Jones* case in the Fourth Circuit, 30 years, says it is

8  irreparable to have a gap in your education.  It is

9  irreparable to not graduate with your class.  It is

10  irreparable to not be able to complete your course work and

11  start your career on time.  And now the earliest he'd be able

12  to do that is 2017.  I think if you had a Jesse Matthews

13  situation where you had more than one data point based on a

14  deeply flawed process, this would be a different conversation.

15  But what Ms. Orland is trying to paint him as, given the

16  record, is just -- it's inflammatory, and it's basely.  And I

17  think it's unfair.

18      Ms. Orland suggests that students take breaks for a

19  variety of reasons, and if he's asked, he can just say it was

20  personal reasons.  That would never fly, not if it was

21  applying for a job, not if he's applying for judicial

22  clerkship, not if he's applying for graduate school.  No one

23  is going to take on face value I left Georgia Tech ██████

24  ████ or something, or more, because of personal reasons.  And

25  if he applies to graduate school, he's again going to have to

Case 1:15-cv-04079-SCJ Document 102 Filed 04/26/17 Page 200 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/16 Page 200 of 217

200

1  sign a FERPA waiver and produce those records. So it's going

2  to come out.

3          Ms. Orland suggests that this is not remediable by an

4  injunction, but that's just not true. I mean, I went through

5  this before. I mean, it's factually untrue. If an injunction

6  is granted and it preserves the status quo, it says you can

7  finish your degree. If he is later exonerated, it means that

8  he will not have to explain this. If he is not later

9  exonerated, it means that he still will. But once you don't

10 grant the injunction, that ship has sailed. So even if we go

11 to a jury trial, he wins, the jury finds this process

12 offensive and says you should have given him more and he wins,

13 it's a Pyrrhic victory because all he has to do, he still will

14 have to explain for the rest of his life why there was that

15 big gap. And he still again, as per *Jones*, has the

16 irreparable harm of not graduating with his class, not

17 starting his career on time. He's just sort of in limbo.

18         We said that we would agree -- and I will of course

19 represent to the Court he will agree to the most restrictive

20 conditions you could possibly imagine and will -- I'm happy to

21 talk about it if you have ideas. But, again, living off

22 campus, only going for academic reasons, not, you know, not

23 going to parties, not doing anything. He will -- I mean, it

24 doesn't matter how restrictive it is. All he wants to do is

25 get his degree and that's --

1          You know, of course one thing the Court is supposed

2     to do is figure out is there a way to do this; right?  Is

3     there a way to fashion this when you're thinking about the

4     balance of harms and things like that, what is the way

5     through.  I think that's the way through, being credibly

6     restrictive.  Don't put him in a position where there's

7     parties, you know, anything like that, and he's just going to

8     go to and from and do his boring engineering work and then

9     he'll get his -- no offense -- and then he'll get his degree.

10    That's all that he wants.

11         With respect to Title IX, just respectfully,

12    Ms. Orland cites the wrong standard.  That's not -- it's not a

13    deliberative indifference standard.  That's for

14    student-on-student sexual harassment.  That's just the wrong

15    legal standard.  Regardless of how you come out, that's not

16    the right legal standard.  *Yusuf* is the right legal standard,

17    and that's, you know, common "sensically" so; right?  I mean,

18    if you prove that -- I mean, let's say we had an email from

19    Peter Paquette saying I am expelling him because I don't like

20    men, that may not be deliberately indifferent, but it is

21    direct evidence of discrimination.  So the standard is not

22    deliberate indifference.  That's just the wrong case for this

23    case.

24         I think I'll -- I've explained the Title IX argument.

25    I think we've amply put out there when you have -- again, it's

 1   the -- I would just emphasize to the Court it's the totality

 2   of the circumstances.  It's not any one thing.  With respect

 3   to the -- Ms. Orland raises the issue about the investigation

 4   of the fraternity for the racial slurs.  I didn't talk a lot

 5   about that on cross because we just kind of wanted to get

 6   through it.

 7           I'd really encourage the Court, if you haven't, to

 8   look closely at that.  It's Exhibit -- it's 8-16.  And what

 9   the appeal -- the appeal goes through in, I think, excellent

10   and painstaking detail to show all the ways that he was biased

11   and sort of railroaded the investigation.  Now, she says,

12   well, it doesn't matter because he wasn't the decision maker.

13   But that's not the point; right?  What we're using that for is

14   to show he treated an all male organization in an incredibly

15   unfair way.  He didn't interview witnesses that they asked to

16   be interviewed.  He didn't look at evidence that they asked to

17   be interviewed.  It was the same thing in that case that you

18   have here.  And why is that?

19           Well, in both cases it's a bunch of frat boys.  And

20   he says, well, I don't believe what's in "Guyland."  I mean,

21   your Honor, do you really believe that?  Do you really believe

22   that he assigns a book that talks about sort of the "fratty"

23   rape culture and that he -- because he doesn't agree with it?

24   I mean, I think there is -- I think the -- his assertion to

25   the contrary, I would just say fairly strange credulity.  I'll

Case 1:15-cv-04079-SCJ Document 192 Filed 04/26/17 Page 203 of 217
Case 1:15-cv-04079-SCJ Document 94 Filed 12/28/15 Page 203 of 216

203

1    put it politely.

2            With respect -- I'm going to sort of go in reverse

3    order, as I've been doing with respect to the appeal process.

4    Then I'm going to go back to him.  I think -- and I could tell

5    from the Court's questions -- the Court is thinking maybe.

6    You know, hey, even if the process wasn't fair on Time 1, he

7    got three levels of appeal, and nobody said he couldn't submit

8    new evidence and things like that.  Respectfully, your Honor,

9    I don't think that's right.  I think the appeal process is

10   maybe best described as fruit of the poisonous tree.  And what

11   you have is a -- I mean, yes, they reversed on V2, but that

12   was -- I mean, it was paper thin.  They couldn't not reverse

13   on V2.

14           It was a swearing contest, and ███████████████

15   ██████████████████████.  And, again, I don't want to get into

16   the gory details, but there was nothing.  It was just a

17   swearing contest, and it also doesn't really make sense,

18   frankly, why -- you know, the main credibility strike against

19   him was that he lied about V2, something he was innocent of.

20   That doesn't make sense that you lied about something that you

21   were innocent of, probably because you were freaked out,

22   already under investigation, ████████████ didn't have a

23   lawyer.  And then that's used.  Something you lied about and

24   you were innocent of is used to taint your -- to say your

25   credibility on V1 is shot.  It just doesn't make any sense,

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 204 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 204 of 216

204

1   your Honor.

2          So I think that the appeal process as -- you know,

3   you heard me when I read the policy.  At level one it's

4   incredibly narrow so it would not -- he would not have been

5   able to put forward, you know, anything -- any evidence from

6   Informant 11 at that point because that was new evidence.  It

7   was not evidence that was not available at the time.  By the

8   time he put it in front of, you know, the board like three

9   levels later, respectfully, your Honor, it's too late.  No one

10  interviewed him.  No one sat down with him and said what do

11  you remember.  No one went and actually tried to, you know,

12  find it out contemporaneously.  You just have this submitted

13  sort of months later.

14          I think that, you know, Ms. Orland also suggests

15  that -- tries to justify not talking to Informant 11, not

16  talking to ███████████████████████████ -- I think

17  it's Informant 4 -- and saying well -- and not talking --

18  excuse me -- not talking to Informant 11 and not talking to

19  any of Mr. Doe's six witnesses or other five witnesses.  She

20  tries to justify that by saying, well, by the time that he

21  submitted those witnesses on March 3rd, the issues had been

22  winnowed, and we were really down to just ████████████

23  ███████████████████████ .

24          But the winnowing, your Honor, was done by only

25  talking to her witnesses; right?  How can you accurately

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 205 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 205 of 216

205

1  winnow if you're not talking to all of the witnesses?

2  Moreover, you know -- and there's a thing I used to all the

3  time -- I can't remember how many times I heard judges say

4  this when I was doing criminal cases.  You know, you can

5  always cross on bias; right?  You can always cross on bias.

6  You can always cross on credibility, prior inconsistent

7  statements.  That is just -- I know we're not in a criminal

8  proceeding, but that's just sort of common sense you always

9  get to do that.

10        He didn't get to do that here.  He had no opportunity

11  to do that.  He asked.  Go talk to Informant 1 again.  There's

12  an inconsistent statement.  He didn't do that.  I asked

13  Mr. Paquette.  You have an inconsistency between ███████████

14  ████████████████████████████████████████████████    ███████████

15  ████████████████████████████████████████    ██████████

16  █████████████████.  Your Honor, I mean, I think that

17  doesn't pass the laugh test.  He's picking and choosing what

18  he wants to consider.  That does not comport with due process.

19  Credibility is always important.

20        Informant 11 could have been asked about did you see

21  ████████████████████████████████████████████████████████

22  ███████████████████████████ -- Informant 4, did you hear

23  anything.  You know, I think it's described, undisputed, ███

24  ████████████████████    ████████████████████████████████

25  ████████    ██████████████████████    ██████████████████

Case 1:15-cv-04070-SCJ Document 102 Filed 04/26/17 Page 206 of 217
Case 1:15-cv-04070-SCJ Document 94 Filed 12/28/15 Page 206 of 216

206

1   █████   Informant 11 was never asked that. Informant 4 was never

2 asked that; right? ████████████████████   ████████

3 ██████████████████████████████████████████

4 ████████████████████████████████████

5 █████████████████████████████████, that goes

6 to her credibility, your Honor.

7       So this winnowing is a red -- this winnow is a red --

8 winnowing is a red herring. It goes to credibility. You

9 could always cross on bias. You can always cross on

10 credibility. And, again, he doesn't have the chance to cross.

11 He doesn't have the chance to ask anybody questions. All he

12 gets to do is say please, please, please talk to this person.

13       THE COURT: ████████████████████

14 ████████   ██████████████████████████████

15 ██████████████████████████████████████████

16 ████████, is it your argument that makes her into a liar or

17 questions her credibility?

18       MR. DILLON: My argument is ████████████████

19 █████████████████████████████████, right,

20 would never be admissible, right, in a court. Just use that.

21 That's why it's a prior -- so, yeah, ████████████████

22 ████████████████████████████████████████████

23 ██████████████   ████████████████████

24 ████████████████████████████████

25 ████████████████████████████████

Case 1:15-cv-04078-SCJ Document 102 Filed 04/26/17 Page 207 of 217
Case 1:15-cv-04078-SCJ Document 94 Filed 12/28/15 Page 207 of 216

207

1 ██████████  ████████████████████████████

2      You had two witnesses who were in a position to be

3 asked whether that was true, and they were never asked that.

4 That's my point. Am I making it -- I mean, you may not agree

5 with it. But, I mean, so that's the point, is that she's

6 trying to bolster by saying ████████████████████

7 ████████████████████████████████████████████. And no

8 one ever asked her about that. No one ever asked the

9 witnesses about that. It just was left out because

10 Mr. Paquette decided because he for -- he decided I don't care

11 ██████████████████████.

12      I mean, your Honor, in the history of the world have

13 you ever heard of -- has any police officer, has any

14 investigator, has any FBI agent ever said, well, I saw that

15 they had said another thing to somebody but I just didn't --

16 they didn't say it to me, so I don't give it any value?

17 Again, I don't think that passes the laugh test.

18      We're not saying that, you know, it's a full

19 proceeding with Brady and all this kind of stuff. But we're

20 saying with something as crucial as that, ████████████████

21 ████████████████████████████████████████████████████████

22 ████████████  ████████████████████████  ████████████████

23 ████████████████████████████████████████████████████████

24 Again, no one has even asked that. And I think that's the

25 problem.

1          So, your Honor, I think what I want to emphasize

2    because, you know, I think the Court -- I can tell, I think,

3    the Court doesn't want to make new law.  Most judges, in my

4    experience, don't want to make new law.  There's a few that

5    do, but it's very rare.  And I get the sense from the tone of

6    the Court's very fair questioning to both parties, the Court

7    doesn't really want to make new law, isn't looking to, you

8    know, to do that.  And I just want to emphasize here, your

9    Honor, you're not doing that.  All you are is following *Nash*.

10         *Nash* says that a school gets less process than a

11   criminal proceeding, that I think I led with, not trying to

12   hide the ball there.  But it upholds a proceeding.  It upheld

13   a proceeding that did not include direct, cross-examination of

14   the witnesses only because -- and it really emphasized this --

15   there was a hearing with live witnesses.  You could pose

16   questions -- that questions could be posed to those witnesses,

17   and you could produce witnesses in your defense.  A hearing

18   with live witnesses, you could pose questions, and you could

19   produce witnesses in your defense, that's it.  Those three

20   things.  Simple.

21         Those protections were either not available here or

22   actively denied.  Of course there's no opportunity to have a

23   hearing with live witnesses.  There's no opportunity to pose

24   any questions, and the only thing he could do, the only means

25   that Georgia Tech gave him to produce his own witnesses is say

1   please, Mr. Paquette, can you talk to these people.  And he

2   said no because he had winnowed.  The *Nash* court says -- I

3   think the strong implication is that is not sufficient .

4          And forgot to add one thing.  So there was no live

5   hearing, no questioning.  He didn't -- he only interviewed one

6   of the six witnesses he asked him to interview and didn't

7   reinterview Informant 1.  So you've got seven basically.  He

8   wanted him to talk to seven people.  He talked to one.  He has

9   no recourse for this, none.  And then he didn't even know the

10  names of the witnesses against him until the day he was

11  expelled, six of them.  And the Court can look at this.  There

12  is no way on God's green earth, if you look at six of those

13  witness descriptions, you can tell who they are.

14         So this is not -- the Court could write an opinion

15  that is just saying I don't know what it is but *Nash* -- I

16  don't know what everything you have to have is, but I'm

17  looking at *Nash*.  In *Nash* they said not enough notice, no

18  cross, and we didn't get a recess.  Who really cares about a

19  recess?  That's kind of a dumb argument anyway, so it's really

20  about notice and cross.  They got six days notice, pretty good

21  amount of notice for a case like this.

22         So really the only major issue was we didn't get to

23  cross, and that's when, again, the *Nash* court says, look, it's

24  not a criminal proceeding.  You get less, but here look how

25  much they got.  And because they got this, we are satisfied

1  that you meet the lower standard of procedural due process on

2  a college campus.  I mean, so you are so safely within *Nash*.

3       And I know, you know, again, Ms. Orland wants to say

4  there's no legal authority for what we're asking.  There's not

5  for what -- I mean, there's a lot more legal authority for

6  what we're asking than what she's asking.  All the legal

7  authority on her side is statements of a very high level of

8  generality about, oh, you get less than in a criminal

9  proceeding and, you know, sometimes it's okay to have the

10  adjudicator and the investigator.  Fine.

11       But, again, your Honor, let me just stress those four

12  things.  You will search in vain for any court that has upheld

13  in a matter and when you have a situation as serious as this,

14  a proceeding in which the investigator and adjudicator are the

15  same person.  There's no hearing at all.  There are no

16  questions to be -- that can be asked.  There's no witnesses

17  that can be called, and the names of your accusers are secret

18  until the day the decision comes down.

19       You will -- I mean, again, I know you'll get a

20  transcript, but like you will search this.  You will search

21  every case, and you're going to see sometimes, like in

22  *Withrow*, it's the medical board, you know, investigated and

23  adjudicated.  There was a live hearing, and in Footnote 3

24  again the Supreme Court specifically reserved and said he's

25  not alleging that he didn't get an adversarial opinion, so our

1  opinion doesn't really speak to that. You will find no case,

2  no case that says that, that says when it's a state actor,

3  when the government wants to use the, you know, hammer you

4  with the power of the sovereign, the very, very powerful power

5  of the sovereign, that it can do that without any of these

6  things.

7          It is the, you know, to use your analogy before, your

8  Honor, it's the brake on the car. Here all they have is an

9  accelerator pedal. That's all they've got. They floor it,

10 and they kind of say, all right, well, we're going to, you

11 know, we're going to do whatever we want.

12         If you write an opinion that says all of this is

13 okay -- because what Ms. Orland wants you to do, I think, is

14 write an opinion that says it's not perfect, but I can find 20

15 cases probably in the Supreme Court alone and probably

16 hundreds that say there's a difference between imperfect and

17 constitutionally imperfect. I think that's what she wants you

18 to say, write an opinion that says I don't think this process

19 was perfect but I think -- I don't think it meets due process.

20         Then just think about what you're allowing in that

21 situation. How does it get worse than this? So this means

22 that in a public school the government can basically say one

23 person can make all the decisions, never -- interview whoever

24 they want because here, I mean, it's kind of hard to get worse

25 than talk to seven people, no, I'll talk to one. Here's three

1  exculpatory people.  I'll talk to zero of those.  It's kind of
2  hard to get worse than that.  So you want a parade of
3  horribles from due process perspective, your Honor.

4          Imagine that, if you say it wasn't perfect, but it's
5  good enough.  Schools are going to take that, and they're
6  going to say great, we're all going to the single investigator
7  model because it's more efficient.  We don't have to bother
8  with these hearings, and, you know, who knows what happens at
9  a hearing.  And testifying is stressful for witnesses and
10  stuff like that.  Well, of course it is, you know, but it
11  should be.

12          If you're going to accuse someone of a horrible thing
13  and if -- look, this is a horrible accusation.  I mean, no one
14  disputes that at all.  If you want to accuse someone of a
15  horrible thing, shouldn't you have to do it, you know -- you
16  can be separated by a screen, but shouldn't you have to like
17  look at them or at least be in the same room?  Or you don't
18  have to do that.  If you're going to be accused of a horrible
19  thing, shouldn't you get to say, hey, there's all these
20  witnesses who have testified who said I did bad things and all
21  that, can you tell me who they are?  No, we're not going to do
22  that.  Because there's no indication here, your Honor, to be
23  clear.

24          Mr. Paquette, he didn't refuse to give the names of
25  the witnesses because they were irrelevant; right?  I mean, it

1  wasn't that he said I'll give you the important ones, but for

2  the little rinky dinky ones, you'll get those on the day of.

3  So what your opinion, I think, would be implying is that even

4  if it is here are five eyewitnesses who saw you do it, no, the

5  government doesn't have to tell you who the witnesses are.

6  The government doesn't have to let you -- tell you that.  It

7  doesn't have to let you question them.  You don't get to call

8  witnesses, and you don't even get a hearing.  You can have one

9  guy sit in a room, make a few phone calls, talk to you, you

10  know, talk to you a couple times, and do it.  That is -- I

11  mean, if you want a parade of horribles, your Honor, I think

12  that is your parade of horribles.

13        My last point would be if you look at that and you

14  decide that there is a reasonable likelihood of success on the

15  merits, in terms of the balancing of harms, let me emphasize

16  one thing.  Then what you're finding is he got a bad process.

17  So then essentially, I mean, you're finding -- I'll qualify

18  that with the usual injunction things but -- so that's what

19  you're finding.

20        And I think then he stands in the same position as

21  someone who is innocent; right?  And that's how he should be

22  thought of, just as if you're -- if the government has you on

23  video doing the robbery but because of some statements made by

24  the prosecutor or whatnot, you know, something happens at

25  trial and it's reversed on procedural grounds, when the --

1   when you get that do-over, you are presumed innocent.  You are

2   an innocent man.  And I think that's the same thing here.  If

3   you find that there's a likelihood of success on the merits,

4   then I think you have to look at him as an innocent man, and

5   you can consider his disciplinary record, which is zero absent

6   this.  And I think that's how you have to look at him.

7        All this is, your Honor, it is just a *Nash* case, and

8   you will go back and you will read all these cases.  But I --

9   you will find no case, no case that says the government in a

10  case as serious as this can say no live hearing, no questions,

11  you can't know who the witnesses are, and you can't even call

12  witnesses in your defense, which again was he tried to do

13  that, and he was not allowed to do that.  So it's a very

14  narrow opinion.  It's just under *Nash*, and that's the decision

15  we'd ask you to make.  Thank you.

16       THE COURT:  Thank you.  I thank both of y'all for

17  being here today.  I thank you for your briefs.  Also, I will

18  be giving you an order on this matter as soon as possible.

19       MS. ORLAND:  Your Honor, there is one other matter.

20       THE COURT:  Yes, ma'am.

21       MS. ORLAND:  So the plaintiff in the case had

22  opposition to some of the exhibits that I put in.  I'd still

23  take the position that they were well redacted, but in an

24  effort to keep the peace, I did redact them again and

25  resubmitted them.  If we could strike Defendant's 24 and let

1  26 substitute?

2          THE COURT:  We'll seal it.

3          MS. ORLAND:  25?

4          THE COURT:  I think we had talked about this,

5  Ms. Wright, and I think we're going to seal it.

6          COURTROOM DEPUTY:  It has been sealed but with the

7  court's order that it permanently --

8          MS. ORLAND:  I think we need a court order to

9  formally seal it.

10          THE COURT:  You'll get a court order permanently

11  sealing it.

12          MS. ORLAND:  Thank you, your Honor.

13          MR. DILLON:  Thank you, your Honor.  Thank you,

14  Ms. Orland, for raising that.

15          THE COURT:  Thank you all.

16          COURTROOM SECURITY OFFICER:  All rise.  Court stands

17  in recess.

18          (Whereupon, the proceedings were adjourned at 4:16

19  p.m.)

20                        -  -  -

21

22

23

24

25

1          REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on December 10, 2015, in the

9   matter of JOHN DOE V. THE BOARD OF REGENTS OF THE UNIVERSITY

10  SYSTEM OF GEORGIA, ET AL., Case No. 1:15-CV-04079-SCJ; that

11  said proceedings in connection with the hearing were reduced

12  to typewritten form by me; and that the foregoing transcript

13  (Pages 1 through 215) is a true and accurate record of the

14  proceedings.

15         This the 28th day of December, 2015.

16

17

18

19                              _____

20                              /s/ Wynette C. Blathers, RMR, CRR
                                    Official Court Reporter

21

22

23

24

25

Doe v. The Board of Regents of the University System of Georgia et al, Docket No. 1:15-cv-04079 (N.D. Ga. Nov 20, 2015), Court

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Northern District of Georgia; United States District Court for the Northern District of Georgia |
| **Federal Nature of Suit** | Civil Rights - Other[440] |
| **Docket Number** | 1:15-cv-04079 |

Bloomberg Law®    © 2016 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service